UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LUCIA URIZAR-MOTA, et al., | |
| Plaintiffs, | |
| *v.* | Civil Action No. 21-CV-155-JJM-PAS |
| UNITED STATES OF AMERICA, et al., | |
| Defendant. | |

THE UNITED STATES OF AMERICA'S
PROPOSED FINDINGS OF FACT
<u>AND CONCLUSIONS OF LAW</u>

TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

I.     Introduction ................................................................................. 1

II.    Medical malpractice negligence claims ...................................... 2

III.   The parties' experts ..................................................................... 3

IV.    Headache overview ...................................................................... 5

       A.   Headache signs and symptoms ........................................... 6

       B.   Red flags .............................................................................. 9

       C.   Evaluation of patients reporting headache ....................... 15

V.     Documentation ............................................................................ 18

VI.    Ms. Urizar-Mota's PCHC presentations, 2007 to 2019 ............ 20

       A.   2007 and 2010 ..................................................................... 20

       B.   December 2011 to November 2012 ..................................... 23

       C.   February 1, 2013 ................................................................. 28

       D.   March 13, 2013 ................................................................... 32

       E.   June 26, 2014 ...................................................................... 36

       F.   July 10, 2014 ...................................................................... 38

       G.   Intervening PCHC OB/GYN visits ..................................... 40

       H.   July 20, 2016 ...................................................................... 41

       I.   August 23, 2018 .................................................................. 43

       J.   November 1 and 14, 2018 ................................................... 44

       K.   January 2019 ....................................................................... 47

       L.   April 5, 2019 ....................................................................... 47

       M.   May 1, 2019 ........................................................................ 48

VII.   Intermittent headaches over a period of years do not compel
       imaging. ....................................................................................... 50

VIII.  Hydrocephalus ............................................................................. 52

IX.     Ms. Urizar-Mota's day-in-the-life evidence ....................................... 54

X.      Pilocytic astrocytomas ........................................................................ 56

XI.     Causation ............................................................................................. 57

        A.     Earlier diagnosis would not have changed the treatment .................... 57

        B.     Inevitable surgery to remove Ms. Urizar-Mota's tumor
               caused all of her permanent injuries. .................................................. 59

        C.     The delay in diagnosis did not affect Ms. Urizar Mota's
               surgical risk. ....................................................................................... 63

XII.    Damages ............................................................................................... 66

        Local Civil Rule 7(c) Statement ............................................................ 72

TABLE OF AUTHORITIES

**Cases**

*Almonte v. Kurl,*
    46 A.3d 1 (R.I. 2012) .................................................................. 57

*Atl. Tubing & Rubber Co. v. Int'l Engraving Co.,*
    528 F.2d 1272 (1st Cir. 1976) ...................................................... 66

*DiCristoforo v. Fertility Sols., P.C.,*
    521 F. Supp. 3d 153 (D.R.I. 2021) ................................................. 3

*DiPetrillo v. Dow Chem. Co.,*
    729 A.2d 677 (R.I. 1999)............................................................. 57

*Flanagan v. Wesselhoeft,*
    712 A.2d 365 (R.I. 1998)............................................................. 66

*Glendale Fed. Bank, FSB v. United States,*
    39 Fed. Cl. 422 (1997) ................................................................. 1

*Hall v. City of Newport,*
    138 A.3d 814 (R.I. 2016).............................................................. 3

*Marshall v. Tomaselli,*
    372 A.2d 1280 (R.I. 1977)............................................................ 3

*Perry v. Alessi,*
    890 A.2d 463 (R.I. 2006)............................................................. 57

*Ribeiro v. R.I. Eye Inst.,|*
    138 A.3d 761 (R.I. 2016)............................................................. 57

*Schenck v. Roger Williams Gen. Hosp.,*
    382 A.2d 514 (R.I. 1977)......................................................... 3, 57

*Tomaino v. Concord Oil of Newport, Inc.,*
    709 A.2d 1016 (R.I. 1998).......................................................... 66

**Rules**

Fed. R. Civ. P. 32(a)(3)................................................................... 1

Fed. R. Evid. 106........................................................................... 1

Fed. R. Evid. 801(d)(2)(C)............................................................... 1

Fed. R. Evid. 803(18) ..................................................................... 2

## I.    Introduction

In this medical malpractice action filed under the Federal Tort Claims Act, Plaintiffs—Lucia Urizar-Mota; her husband, Sergio Reyes; and their children Delmy, Sergio, Wilmer, and Gerson Reyes—allege that primary-care providers at the Providence Community Health Center ("PCHC") were negligent.

Based on headaches and other symptoms that Ms. Urizar-Mota presented during nine primary-care office visits at PCHC between November 2012 and May 2019, Plaintiffs contend that PCHC breached the standard of care by not referring her either to brain imaging or to a neurologist after each one of those visits. It is undisputed that in this period no PCHC provider referred Ms. Urizar-Mota to imaging or to a neurologist. It is also undisputed that Ms. Urizar-Mota experienced acute hydrocephalus and was admitted to Rhode Island Hospital on June 19, 2019. Physicians there relieved her hydrocephalus with a shunt, identified a tumor following an MRI, and, after stabilizing her, surgically removed that tumor on June 24, 2019. The parties agree that the tumor, whenever detected, required surgery.

Plaintiffs contend that Ms. Urizar-Mota's delayed diagnosis caused her various permanent injuries. Based upon the trial exhibits admitted into evidence (most by stipulation), testimony presented at trial and in deposition,[1] as well as the contents

---

[1]    The deposition testimony of a party is admissible for any purpose at trial when offered by an adverse party. Fed. R. Civ. P. 32(a)(3). The Defendant has cited deposition testimony of its own witnesses as part of its proposed factual findings for the Court to assess as necessary to satisfy the rule of completeness. Fed. R. Evid. 106.

The Court should also consider experts' deposition testimony adverse to the claims or defenses of the party that called those witnesses to testify at trial. *See Glendale Fed. Bank, FSB v. United States*, 39 Fed. Cl. 422, 424-25 (1997) (applying Fed. R. Evid. 801(d)(2)(C)):

> By the time the trial begins, we may assume that those experts who have not been withdrawn are those whose testimony reflects the position of the party who retains them. At the beginning of trial we may hold the parties to a final understanding of their case and hence an authorization of their expert witnesses who have not been withdrawn. At

of learned treatises in the trial record,[2] the Defendant United States of America re-
spectfully asks the Court to make the following findings of fact and conclusions of
law.

As set forth further below, and consistent with credible expert testimony pre-
sented by both parties, no PCHC providers breached the standard of care in respond-
ing to Ms. Urizar-Mota's intermittent presentation of headache symptoms. Even if
there had been a breach, it did not cause Plaintiffs' injuries. The expert opinion pre-
sented by the only surgeon in this case confirms that, although unfortunate,
Ms. Urizar-Mota's injuries were among the expected risks of her surgery whenever
conducted. And experts for both sides agree that Ms. Urizar-Mota's permanent inju-
ries were caused by the surgery itself. As a result, the Court should enter judgment
for the Defendant.

Even if the Court were to find the Defendant liable, Plaintiffs have not proven
any damages by a delay in diagnosis. Plaintiffs offered no facts or expert opinion
identifying expenses they incurred only as a result of a delayed diagnosis. Plaintiffs'
testimony establishes various non-economic consequences of Ms. Urizar-Mota's sur-
gery, but no evidence connects those consequences to a delayed diagnosis. As a result,
judgment should enter for the Defendant.

## II.    Medical malpractice negligence claims

Under Rhode Island law, a medical malpractice claim requires a plaintiff to
prove the standard four elements of a negligence action: "a legally cognizable duty
owed by a defendant to a plaintiff, a breach of that duty, proximate causation between

---

this point when an expert is put forward for trial it is rea-
sonable and fair to presume they have been authorized.
This of necessity includes prior deposition testimony of that
expert. . . . When an expert witness is put forward as a tes-
tifying expert at the beginning of trial, the prior deposition
testimony of that expert in the same case is an admission
against the party that retained him.

[2]    Fed. R. Evid. 803(18).

the conduct and the resulting injury, and the actual loss or damage." *DiCristoforo v. Fertility Sols., P.C.*, 521 F. Supp. 3d 153, 156 (D.R.I. 2021) (citing *Hall v. City of Newport*, 138 A.3d 814, 819 (R.I. 2016)). The parties agree that each of the providers at PCHC owed Ms. Urizar-Mota a duty to provide medical care that met the standard of care for primary-care providers. Each of the remaining three elements, however, are heavily disputed.

"[A] physician's duty is not to cure, but to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice . . . ordinarily have and exercise in like cases." *Schenck v. Roger Williams Gen. Hosp.*, 382 A.2d 514, 514-17 (R.I. 1977) (citing *Marshall v. Tomaselli*, 372 A.2d 1280 (R.I. 1977)). In a case alleging a failure to diagnose, like this one, the plaintiff must prove that "other skilled physicians" would "conduct a test, consult a report, or perform an examination, i.e., utilize the scientific means of diagnosis at his disposal" in the same circumstances, and that the physician accused of breaching the standard of care failed to do so. *Id.* "It is this kind of conduct, and no other, [that is] evidence of negligence." *Id.* Therefore, to analyze whether the providers at PCHC met the standard of care for treating Ms. Urizar-Mota's headaches, the Court must determine whether other skilled physicians would have referred Ms. Urizar-Mota to imaging or a neurologist given her presentation at each PCHC visit Plaintiffs criticize.

## III.  The parties' experts

The parties presented experts to opine about the standard of care that applies to clinicians in the primary-care setting as well as about whether PCHC providers satisfied that standard in treating Ms. Urizar-Mota's headaches.

Plaintiffs' primary-care expert is Dr. Russell Phillips. He is board certified in internal medicine,[3] and has been a primary-care provider at Boston's Beth Israel

---

[3]    1/9/24 Tr. 20:11-17 (Phillips).

Deaconess Medical Center for about 45 years, where he has also supervised resident and fellowship training in general medicine.[4] Dr. Phillips is a global health and social medicine professor at Harvard Medical School, where he directs the Center for Primary Care, which is focused on primary-care financing and policy.[5] He treats patients in a primary-care setting one day a week.[6]

Defendant's primary-care expert is Dr. Amy Ship. Dr. Ship is board certified in internal medicine,[7] and has been a primary-care-physician for nearly 30 years.[8] She has taught at Harvard Medical School,[9] and directs the primary-care physician residency program at Boston's Brigham and Women's Hospital.[10] She is the Director of Medical Education at Massachusetts' largest primary-care provider, Atrius Health.[11] Dr. Ship treats patients in a primary-care setting 1.5 days a week.[12]

The parties also presented experts on the pathology of Ms. Urizar-Mota's brain tumor, her post-surgical condition, and causation.

Dr. Knarik Arkun is board certified in pathology and an associate professor of pathology and lab medicine at Tufts University School of Medicine.[13] Plaintiffs presented her to opine about the diagnosis of Ms. Urizar-Mota's tumor and that it did not metastasize.[14] Those facts are not disputed.

---

[4]     1/9/24 Tr. 5:19-6:1, 6:21-8:6 (8:1-3), 9:17-10:11 (Phillips). For the Court's convenience, the government has occasionally added parenthetical cites within full question-and-answer pairs to pinpoint where the transcript substantiates the precise factual finding in the text.

[5]     1/9/24 Tr. 10:15-12:6, 18:16-19:1 (Phillips).

[6]     1/9/24 Tr. 12:22-13:12 (12:24) (Phillips).

[7]     3/1/24 Tr. 7:4-14 (Ship).

[8]     3/1/24 Tr. 7:15-19 (Ship).

[9]     3/1/24 Tr. 11:22-12:22, 13:23-14:13 (Ship).

[10]    3/1/24 Tr. 9:23-11:21 (Ship).

[11]    3/1/24 Tr. 8:9-9:8 (Ship).

[12]    3/1/24 Tr. 9:9-22 (Ship).

[13]    *E.g.*, Arkun Rule 26 Disclosure at 2 (marked for identification as Trial Ex. 107).

[14]    *E.g.*, Arkun Dep. 25:11-26:14, 26:23-27:16, 30:12-22 (Trial Ex. 115).

Plaintiffs' expert neurologist, Dr. David Caplan, evaluated Ms. Urizar-Mota's physical abilities and neurological condition in June 2022.[15] He is the only expert who has met Ms. Urizar-Mota. He has been a neurologist at Massachusetts General Hospital for 36 years, sees neurology patients full time, and has been a professor of neurology at Harvard Medical School for 28 years.[16]

Plaintiffs' expert neuro-oncologist is Dr. David Ashley. He has 31 years of experience in that field and conducts clinical research on brain tumors.[17] Since 2018, he has directed Duke University's Brain Tumor Center, which annually treats more brain-tumor patients than any other U.S. provider.[18] He advises brain-tumor patients on treatment options as part of interdisciplinary teams that also include radiation oncologists, neuropathologists, and surgeons.[19]

The government's expert neurosurgeon is Dr. Timothy Smith. He is board certified in neurosurgery, which he has practiced for 10 years at Boston's Brigham and Women's Hospital.[20] At Harvard Medical School, he is an associate professor of neurosurgery and directs the Computational Neuroscience Outcomes Center, which evaluates trends in patient care.[21] He is the only surgeon who testified in this case.

## IV.    Headache overview

Before assessing each of Ms. Urizar-Mota's PCHC office visits relevant to Plaintiffs' claims, the Defendant asks the Court to make the following findings about the nature of headaches and how reasonable providers evaluate them relative to a potential decision to refer a patient to imaging or a neurologist.

---

[15]    *E.g.*, 1/11/24 Tr. 17:10-12, 20:17-24 (Caplan).

[16]    1/11/24 Tr. 12:12-23, 13:9-11, 13:24-14:16 (Caplan).

[17]    1/16/24 Tr. 10:4-11:6, 14:8-22 (Ashley).

[18]    1/16/24 Tr. 22:2-21 (Ashley).

[19]    1/16/24 Tr. 27:10-28:13 (Ashley).

[20]    2/29/24 Tr. 9:13-10:4 (Smith).

[21]    2/29/24 Tr. 8:17-23 (Smith).

### A.    Headache signs and symptoms

Headaches are among the most common problems patients present to primary-care providers.[22] About half of the American population experiences a headache every year.[23] The high frequency of headaches is one reason reasonable providers do not refer every headache patient to a neurologist or imaging.[24] There are other reasons reasonable providers do not or should not refer headache patients to imaging:

- The infrequency of identifying any problem;[25]

- The risks of radiation (from CT scans), of false-positives, and of unnecessary follow-up that could cause patient anxiety;[26]

---

[22]    1/9/24 Tr. 33:19-34:2 (Phillips); 3/1/24 Tr. 16:12-21 (Ship); 2/29/24 Tr. 16:12-19 (Smith); 2/14/24 Tr. 15:6-10 (Harris).

    *See also* 1/19/24 373:11-16 (Phillips); *id.* 371:14-372:13 (Phillips) (adopting following learned treatise, hereafter "***Migraine or Need Imaging***," as reliable under Fed. R. Evid. 803(18)); Michael E. Detsky, et al., *Does This Patient with Headache Have a Migraine or Need Neuroimaging?*, 296 J. Am Med. Ass'n 1274, 1275 (Sept. 13, 2006) (marked for identification as Trial Ex. 144) ("With a lifetime prevalence of 99% in women and 94% in men, headaches are ubiquitous.").

[23]    *E.g.*, 2/29/24 Tr. 24:10-25:8 (Smith).

[24]    *E.g.*, 3/1/24 Tr. 192:25-193:8 (Ship); 2/29/24 Tr. 29:16-20 (Smith).

[25]    1/9/24 Tr. 198:11-199:4 (Phillips) (adopting following cited learned treatise, hereafter "***Choosing Wisely***," as reliable under Fed. R. Evid. 803(18)); *id.* 226:6-11, 229:11-230:6, 230:12-24, 231:1-16 (Phillips); Sara Jane Reed & Steven Pearson, *Choosing Wisely® Recommendation Analysis: Prioritizing Opportunities for Reducing Inappropriate Care*, Inst. for Clinical & Econ. Rev., at 3 (2015), https://collections.nlm.nih.gov/catalog/nlm:nlmuid-101654290-pdf (marked for identification as Trial Ex. 163) ("Even though several clinical specialty society guidelines recommend against the use of imaging for uncomplicated headache, **neuroimaging remains an area of substantial overuse**.") (emphasis added); *id.* at 4.

    1/9/24 Tr. 240:19-241:10, 242:11-16 (Phillips) (adopting following points in following source); Benjamin M. Frishberg et al., *Evidence-based guidelines in the primary care setting: neuroimaging in patients with nonacute headache*, at 3 (Jan. 2000), https://www.researchgate.net/publication/237487226_Evidence-Based_Guidelines_in_the_Primary_Care_Setting_Neuroimaging_in_Patients_with_Nonacute_Headache (marked for identification as Trial Ex. 164) (hereinafter "***Evidence-based Guidelines***") ("The relative rarity of secondary headaches, compared with the large number of patients with primary headache, **raises concern about the wisdom of routine neuroimaging studies**, either computerized tomography (CT) or magnetic resonance imaging (MRI), **to exclude underlying causes of headache**.") (emphasis added); *id.* at 14 ("Testing is not recommended if the individual is not significantly more likely than anyone else in the general population to have a significant abnormality.").

[26]    1/9/24 Tr. 229:11-230:6 (229:15-20) (Phillips); 2/29/24 Tr. 28:8-29:15 (Smith);

6

- When patients and providers only seek to prove the negative that their head-aches are not brain tumors where there might not be an indication for imaging;[27] and

- When scans—even when identifying abnormalities—would not change patient management.[28]

Rather than imaging all headache patients, reasonable providers first try to distinguish between "primary" headaches, where the headache is the symptom and the diagnosis, and "secondary" headaches, where the headache is a symptom of some other cause that might merit further investigation.[29]

Patients with primary headaches comprise 98 to 99 percent of all patients who report headache symptoms.[30] Undifferentiated, uncomplicated, migraine, and chronic headaches are primary headaches, and the standard of care does not require imaging to determine their causes.[31]

---

2/14/24 Tr. 57:10-17 (Harris); *Choosing Wisely* at 2 ("Imaging studies may also cause adverse events including unnecessary exposure to radiation and increased chances for false-positive test results that lead to unnecessary follow-up testing that may be expensive and cause patient anxiety.").

[27]    1/9/24 Tr. 44:13-45:18 (45:9-13), 231:1-23 (Phillips); 1/19/24 Tr. 294:17-23 (Phillips); *Choosing Wisely* at 4.

[28]    1/9/24 Tr. 231:1-16, 241:24-242:10 (Phillips); *Choosing Wisely* at 4.

     1/9/24 Tr. 241:24-242:10 (Phillips) (adopting following point in following source); *Evidence-based Guidelines* at 13 ("In making decisions about neuroimaging and headache, the U.S. Headache Consortium identified three consensus-based (not evidence-based) general principles of management. One, testing should be avoided if it will not lead to a change in management.").

[29]    *See, e.g.*, 1/9/24 Tr. 36:19-37:11, 239:3-9, 240:8-18 (Phillips); *see also* 2/29/24 Tr. 23:14-25:8 (Smith).

[30]    2/29/24 25:9-19 (Smith); 1/9/24 Tr. 45:19-46:5, 47:18-49:14, 52:12-53:13 (Phillips) (adopting following cited learned treatise, hereafter "***Red and Orange Flags***," as reliable under Fed. R. Evid. 803(18)); 1/19/24 Tr. 354:8-19, 355:16-356:7 & 13-20 (Phillips); Thien Po Do et al., *Red and orange flags for secondary headaches in clinical practice*, 92 Neurology 134, 134 (2018) (marked for identification as Trial Ex. 145) ("A minority of headache patients have a secondary headache disorder.").

[31]    1/9/24 Tr. 36:19-37:7, 57:3-10 (Phillips); 1/19/24 Tr. 316:22-317:6, 372:14-373:10, 373:17-374:3, 375:17-377:6, 377:12-14, 379:11-16 (Phillips); 3/1/24 Tr. 54:6-24 (Ship); *Migraine or Need Imaging* at 1274 (article title); *id.* at 1275 ("Undifferentiated headache usually is of benign etiology, so neuroimaging rarely reveals significant intracranial pathology."); *id.* at 1282 ("In the patient with recurrent episodes of classical visual aura followed by headache, **the diagnosis of migraine is relatively straightforward and the patient does not require neuroimaging**.") (emphasis

Secondary headaches encompass multiple conditions, including brain tumors.[32] Patients with confirmed brain tumors sometimes report headaches, although those headaches can be unrelated to their tumors.[33] The incidence of serious intracranial pathology among the small segment of patients with secondary headaches is itself low:[34] between 0.00003% to 3%.[35] The type of tumor that Ms. Urizar-Mota had, moreover, is rare among brain tumors, and rarer still among adults.[36]

---

added).

*See also* 1/9/24 Tr. 199:5-200:7, 201:13-202:17 (201:13-15), 202:24-203:6, 226:12-16 (Phillips); 2/14/24 Tr. 22:13-23:2 (Harris); *Choosing Wisely* at 1 ("The American College of Radiology (ACR) and the American Headache Society recommend against the use of imaging for uncomplicated or stable headaches."); *id.* ("Don't do imaging for uncomplicated headache."); *id.* ("Don't perform neuroimaging studies in patients with stable headaches that meet criteria for migraine.").

*See also* 1/19/24 Tr. 402:15-403:14 (Phillips) (adopting following cited learned treatise, hereafter "***Neuroimaging for Migraine***," as reliable under Fed. R. Evid. 803(18)); *id.* 404:4-13 (Phillips); Randolph W. Evans et al., *Neuroimaging for Migraine: The American Headache Society Systematic Review and Evidence-Based Guideline*, 60 Headache 318, 333 (2019) (marked for identification as Trial Ex. 147) ("It is not necessary to do neuroimaging in patients with headaches consistent with migraine who have a normal neurologic examination.").

[32]    1/9/24 237:22-238:22 (Phillips); 2/29/24 Tr. 23:14-24:9, 27:22-28:7 (Smith).

[33]    1/16/24 Tr. 202:25-203:12, 205:3-11 (Ashley); 2/29/24 Tr. 16:12-19, 31:5-23 (Smith).

[34]    1/9/24 Tr. 227:1-229:10 (228:7-14) (Phillips).

[35]    *See, e.g.,*
- **0.00003%**. 2/29/24 Tr. 27:23-25, 28:8-29:2 (Smith).
- **0.046%**. 1/9/24 Tr. 227:14-229:10 (228:7-14) (Phillips); *Choosing Wisely* at 2.
- **0.18%**. 1/9/24 Tr. 263:5-265:2 (Phillips); *Evidence-Based Guidelines* at 15.
- **2.07%**. 1/19/24 Tr. 357:4-358:19 (358:17-19) (Phillips); *Red and Orange Flags* at 135 (among patients at specialized tertiary care centers).
- **1% to 3%**. 1/9/24 Tr. 200:8-201:12 (201:3-7) (Phillips); *Choosing Wisely* at 2.

In assessing the frequency with which imaging finds intracranial abnormalities, Dr. Phillips rejected *Choosing Wisely*'s recommendations, and instead argued for individualized decision-making for imaging based on what "the possibilities are" and what "might happen" without any regard to probabilities. 1/9/24 Tr. 231:24-232:10 (Phillips); *see also id.* 200:8-201:12 (201:3-12), 229:11-230:6 (229:15-20) (Phillips).

But Dr. Phillips identified this very dynamic—imaging to prove the negative—as a reason for its overuse, which cannot be the standard of care: "I would agree that trying to rule out abnormalities of the brain is a cause of imaging overuse in any context." 1/19/24 Tr. 294:17-23 (Phillips).

[36]    1/16/24 Tr. 210:14-16 (Ashley); 1/11/24 Tr. 30:15-31:2 (Caplan).

Distinguishing primary and secondary headaches is difficult, as headaches and their potential causes are variable.[37] To distinguish secondary headaches whose causes are evident from the small percentage whose causes might be more serious, and thus provide an indication for imaging, reasonable clinicians rely on various clinical features—commonly called "red flags."[38] These red flags inform reasonable clinicians' decision-making about when to refer a patient to imaging based on probabilities—that is, red flags correspond to clinical features significantly increasing the probability that imaging will identify intracranial pathology.[39]

### B.    Red flags

There is no single set of validated red flags predictive of intracranial pathology that compel imaging of headache patients. The most compelling evidence for this finding comprises the several learned treatises that Plaintiffs' primary-care expert, Dr. Phillips, identified as reliable sources. Each source describes different, sometimes-overlapping clinical features with varying probabilities of finding intracranial pathology through imaging.

The 15-item list below comprises the longest list of those clinical features, which appears in *Red and Orange Flags* under the mnemonic "SNNOOP-10."[40] The citations to this list identify other sources in the trial record that identify similar clinical features.

---

[37]    1/19/24 374:4-375:15 (Phillips); *Migraine or Need Imaging* at 127 ("Because the mechanisms activated in secondary headache disorders (i.e., those with an identifiable structural or metabolic cause) resemble those activated in primary headache disorders (i.e., cluster, migraine, and tension type migraine headaches) diagnosis and differentiation can be particularly difficult."); *see also* 2/14/24 Tr. 15:11-23, 19:20-20:6, 21:4-17 (Harris).

[38]    *E.g.*, 1/19/24 Tr. 379:24-380:24 (Phillips); 3/1/24 Tr. 33:10-34:21 (Ship).

[39]    1/19/24 Tr. 362:9-15, 379:24-380:24 (Phillips); *Migraine or Need Imaging* at 1282 ("The decision to proceed with neuroimaging should take into account the type of headache (i.e., the pretest probability of intracranial pathology) and the presence of any clinical features that significantly increase this probability.").

[40]    1/9/24 Tr. 47:3-49:14, 52:15-53:15 (Phillips); *Red and Orange Flags* at 136.

1.   Systemic symptoms including fever.[41]
2.   Neoplasm in history.[42]
3.   Neurologic deficit or dysfunction (including decreased consciousness).[43]
4.   Onset of headache is sudden or abrupt.[44]
5.   Older age (after 50 years).[45]
6.   Pattern change or recent onset of headache.[46]
7.   Positional headache.
8.   Precipitated by sneezing, coughing, or exercise.[47]
9.   Papilledema.
10.  Progressive headache and atypical presentations.[48]
11.  Pregnancy or puerperium.
12.  Painful eye with autonomic features.
13.  Posttraumatic onset of headache.
14.  Pathology of the immune system such as HIV.
15.  Painkiller overuse or new drug at onset of headache.

---

[41]   1/9/24 Tr. 47:18-21, 215:10-217:13 (215:17-216:19) (Phillips); *Choosing Wisely* at 1 ("Clinical guidelines state that imaging for headaches is typically not needed and most underlying causes can be adequately diagnosed through clinical examination, though special consideration is warranted in the following instances: . . . signs suggesting a systemic disorder . . . .").

[42]   *See* n.53 *and accompanying text below.*

[43]   1/9/24 Tr. 215:10-217:13 (215:17-216:19), 242:17-243:8, 243:15-244:3 (Phillips); 1/19/24 Tr. 391:14-23, 397:18-399:8 (Phillips); *see also*:

- *Migraine or Need Imaging* at 1281 ("Finally, we found that several clinical signs and symptoms do increase in a meaningful way the likelihood of the patient having serious intracranial pathology. These include abnormal findings on neurologic examination . . . .");

- *Choosing Wisely* at 1 ("neurological symptoms indicating a secondary cause");

- *Evidence-based Guidelines* at 14 ("An abnormal neurological examination increases the likelihood of finding significant intracranial pathology (e.g., brain tumor, arteriovenous malformation, hydrocephalus) on neuroimaging. The absence of any abnormalities on neurological examination reduces the odds of finding a significant abnormality on imaging."); *id.* ("Neuroimaging should be considered in patients with nonacute headache and an unexplained abnormal finding on the neurological examination.").

[44]   1/9/24 Tr. 215:10-217:13 (215:17-216:19) (Phillips); 1/19/24 382:20-383:9, 386:1-387:13 (Phillips); *Migraine or Need Imaging* at 1280 ("quick-onset headache"); *Choosing Wisely* at 1 ("headaches with sudden onset and maximum severity").

[45]   1/9/24 Tr. 215:10-217:13 (215:17-216:19) (Phillips); *Choosing Wisely* at 1 ("headaches that are new or different than a patient's typical pattern of headaches, especially for individuals aged 50 and over").

[46]   1/9/24 Tr. 215:10-217:13 (215:17-216:19); 1/19/24 Tr. 394:4-395:4, 397:3-13, 401:6-14 (Phillips); *Migraine or Need Imaging* at 1281 ("New Headache (New in Onset, Change in Character . . ."); *Choosing Wisely* at 1.

[47]   1/19/24 Tr. 391:14-392:18, 393:8-394:3 (Phillips); *Migraine or Need Imaging* at 1281 ("valsalva-like maneuver").

[48]   1/19/24 382:20-384:15, 397:18-399:8 (Phillips).

10

Ten items in the SNNOOP-10 list—numbers 1-2, 4-5, 7-9, 12, and 14-15—do not apply to Ms. Urizar-Mota. Given the parties' contentions, only the remaining five are relevant: 3 (neurologic deficit or dysfunction), 6 (pattern change or recent onset of headache), 10 (progressive headache and atypical presentations), 11 (pregnancy), and 13 (posttraumatic onset of headache).

There is only one red flag on which the learned treatises in the trial record appear to agree: neurologic deficit or dysfunction.[49] One of them—*Migraine or Need Imaging*—concludes that the underlying data for this red flag, compared to the data underlying other clinical features, is the most robust and consistent.[50] *Migraine or Need Imaging* also suggests that patients should be imaged if they have both chronic headaches *and* neurological exams that are abnormal.[51] But, as the parties' experts agree, and as this Court should find, all of Ms. Urizar-Mota's neurological exams were normal.

The only red flag that *Red and Orange Flag*'s neurologist authors[52] single out as the basis for a recommendation to image (and on which the parties' experts agree[53]) is neoplasm in history—that is, when a patient already has a cancer diagnosis, given

---

[49]    *See* n.43 *above.*

[50]    1/19/24 399:9-401:5 (Phillips); *id.* 381:1-382:19 (Phillips) (describing, in part, *Migraine or Need Imaging*'s methodology and use of likelihood ratios, "LRs"); *Migraine or Need Imaging* at 1281:

>       The most robust of these findings is the presence of any abnormal finding on neurologic examination: it is supported by more studies than the other findings, the studies were nearly uniform in finding statistical significance of the positive LR, and the highest-quality (and largest) study showed the strongest effect. If a patient presents with a chronic headache and abnormal findings on neurologic examination, then the probability of a significant abnormality is high enough to warrant a neuroimaging study.

[51]    1/19/24 393:8-397:13 (Phillips); *Migraine or Need Imaging* at 1281 (graphic).

[52]    1/19/24 Tr. 362:16-363:15 (Phillips); *Red and Orange Flags* at 134 (footer).

[53]    1/9/24 Tr. 43:9-44:12 (43:9-44:11), 48:24-49:9 (Phillips); 3/1/24 Tr. 248:18-250:4 (Ship).

the risk that such a patient's headache could signal that cancer has spread to the brain.[54] The parties also agree this red flag does not apply to Ms. Urizar-Mota.

Otherwise, the learned treatises in the trial record escalate the importance of some clinical features and demote the significance of others. For instance, aside from the category name, *Red and Orange Flags* does not define what qualifies as "Progressive headache and atypical presentations."[55] *Migraine or Need Imaging* qualifies a range of clinical features—including undefined headache type, headache with aura, and headache with vomiting—as supposedly having higher probabilities of predicting significant intracranial pathology. But *Migraine or Need Imaging* also notes that little data supports such higher probabilities, and concludes that these features are less reliable indications for imaging.[56] Perhaps because of a similar lack of data, *Red and Orange Flags* does not identify nausea or vomiting as red flags.[57]

*Red and Orange Flags* includes "pattern change" as a red flag but notes only "limited data" supports it.[58] *Migraine or Need Imaging*, by contrast, includes "new-

---

[54]    1/19/24 Tr. 363:4-365:6 (Phillips); *Red and Orange Flags* at 138 ("A high proportion of patients with cancer with new onset headache have an intracranial metastasis, especially if they have a cancer type prone to metastasis to the brain or one of the above-mentioned clinical predictors. Thus, every oncology patient with newly developed headache should undergo MRI.").

[55]    3/1/24 Tr. 246:8-247:6 (Ship).

[56]    1/19/24 Tr. 393:8-394:3 (Phillips); *Migraine or Need Imaging* at 1281 (emphases added):

> The other features with clinically significant LRs are associated with **fewer studies** (cluster-type headache), **smaller effects** (undefined headache type, headache with aura, headache aggravated by exertion or valsalva, and headache with vomiting), or **no high-quality study** (headache with aura, headache aggravated by valsalva, and headache with vomiting). **Because these features have less reliability and smaller effects, their influence on clinical decision making is less certain**.

[57]    1/19/24 Tr. 368:24-369:9 (Phillips); *see also* Thomas Dep. 46:12-19 (Trial Ex. 126).

[58]    1/19/24 Tr. 366:7-368:23 (Phillips); 3/1/24 247:7-248:17 (Ship); *Red and Orange Flags* at 139 ("While there are limited data regarding this red flag, it has been

---

onset headaches"—as well as "worsening headaches," "increased headache severity," and "migraine-type headache"—on a list of clinical features that were "**not found to be useful** in predicting significant intracranial abnormalities."[59]

Despite the lack of clinical consistency and supporting data that the learned treatises note, Dr. Phillips opined that the presence of *any* red flag compels a reasonable provider to refer a patient to imaging, and that the decision not to image a patient with red flags breaches the standard of care.[60] But the learned treatises in the record, Dr. Phillips's own admissions, and the concurrence of other experts support the conclusion that the standard of care does not mandate referrals to imaging or a neurologist based on the presence of red flags alone.[61] Instead, the standard of care requires that red flags do not dictate but merely inform (with other facts) a reasonable provider's judgment whether to refer a patient to imaging or not. There are at least four grounds for this conclusion.

First, Dr. Phillips agreed that the learned treatises' weighting of various clinical features as red flags means a reasonable provider may rely on those sources in deciding whether to refer a patient to imaging—or not.[62] He also testified that:

- Evidence of red flags might increase the likelihood of imaging, but not compel it: "There's things that **potentially** should provoke imaging."[63]

- Red flags should "prompt **consideration** of imaging."[64]

---

[59]  suggested that recent change of pattern or a newly developed headache (less than three months) can be the only signs of a serious underlying etiology. These are accordingly red flags.").

[59]  1/19/24 Tr. 381:1-384:15, 386:1-387:21 (Phillips); *Migraine or Need Imaging* at 1280 (emphasis added). Dr. Phillips implausibly attempted to marginalize these findings, which undermine his opinions, by asserting that *Migraine or Need Imaging* and his co-authors "misinterpret[ed] their own data." 1/19/24 Tr. 399:9-401:5 (Phillips).

[60]  *E.g.*, 1/9/24 Tr. 43:9-44:12, 45:21-46:8, 47:3-17, 57:11-58:1 (Phillips).

[61]  *See also* 3/1/24 Tr. 193:9-12 (Ship); 2/14/24 Tr. 112:14-18 (Harris).

[62]  1/19/24 Tr. 393:8-394:10 (Phillips).

[63]  1/9/24 Tr. 44:13-45:18 (45:7-8) (Phillips) (emphasis added); *id*. 53:17-54:20 (54:2-5) (Phillips) ("potentially").

[64]  1/9/24 Tr. 45:19-47:2 (Phillips) (emphasis added).

13

- Suspicion of secondary causes of headache symptoms "generally"—but not always—"requires imaging."[65]

Second, the primary source Dr. Phillips cited for his red-flag opinions was *Red and Orange Flags*. That article, however, begins and ends by noting that red flags are not a validated screening tool for imaging.[66] Dr. Phillips conceded that point, and that red flags should only inform reasonable clinicians' judgment, not dictate imaging.[67]

Third, *Red and Orange Flags* identifies headache within the context of pregnancy as a red flag.[68] Yet Dr. Phillips himself, confronted with at least two instances in which Ms. Urizar-Mota was pregnant and reported headache symptoms to PCHC providers, opined that imaging was *not* required in either instance.[69] In other words, deviating from his contention that any red flag mandates imaging, Dr. Phillips applied precisely the sort of judgment that the scholarly literature and the standard of care permits. The Defendant's primary-care expert, Dr. Ship, agrees that the mere presence of a red flag does not mandate imaging.[70]

---

[65]    1/9/24 Tr. 72:19-73:13 (73:11-13) (Phillips).

[66]    1/19/24 358:20-361:1 (Phillips); *Red and Orange Flags* at 134 ("A validated screening tool could reduce unneeded neuroimaging and costs."); *id.* at 142:

> Large scale studies are necessary given the low incidence of many secondary causes. A validated screening tool for secondary headaches using red flags would be helpful, like the assessment for mild TBI, to minimize the amount of unnecessary testing and patient anxiety. Finally, a validated screening tool will lead to increased awareness of secondary headaches.

[67]    1/19/24 Tr. 361:2-19 (Phillips).

[68]    *See* n.40 *above*.

[69]    MED01-0093-MED01-0094 (Jan. 20, 2010); 1/19/24 Tr. 415:23-417:7 (Phillips); MED01-0828-MED01-0829 (Feb. 2, 2010); 1/19/24 Tr. 418:8-13, 419:1-421:24, 422:1-423:5, 427:9-429:11 (Phillips).

(Ms. Urizar-Mota's PCHC medical records, all Bates-stamped in the footer at the left with the prefix "MED01-" appear in Trial Exhibit 1. The number in the "MED" prefix, moreover, corresponds to Trial Exhibit number.)

[70]    3/1/24 Tr. 193:9-12 (Ship).

Finally, Dr. Phillips opined about whether red flags, or other clinical features, establish that imaging is "indicated."[71] That term, in the medical context and herein, means only that a decision to refer a patient to imaging would be reasonable.[72] The term does not mean that imaging is required, nor that a provider who does not refer a patient to imaging, even where "indicated" (*i.e.*, defensible), breaches the standard of care. Reinforcing this point, none of the learned treatises in evidence sets forth when a headache patient *must* be imaged or referred to a neurologist.

### C.    Evaluation of patients reporting headache

Whether and how any of the preceding red flags apply to any patient depends on how primary-care providers evaluate patients and make clinical judgments. The parties substantially agree that reasonable primary-care providers should review patients' medical histories, elicit the reasons for the patients' visits, conduct physical exams tailored to patients' presentations, and document their observations in as much detail as practical.[73] When a patient reports headache, there are two physical examinations of particular significance—neurological exams and fundoscopic exams.

One purpose of a neurological exam is to identify whether a neurological abnormality accompanies headache symptoms, which could affect a reasonable clinician's approach in managing those symptoms[74] and is the sole red flag on which all the learned treatises agree.[75] A neurological exam can include examining the

---

[71]    *E.g.*, 1/9/24 Tr. 44:13-45:18 (Phillips); 1/19/24 Tr. 359:14-20 (Phillips).

[72]    1/19/24 Tr. 408:12-410:14 (Phillips).

[73]    *E.g.*,

- 1/9/24 Tr. 24:3-25:13, 27:18-28:23, 34:6-38:20, 40:3-42:18 (Phillips);
- 3/1/24 Tr. 18:4-17, 26:22-28:10, 28:14-29:16 (Ship);
- 2/14/24 Tr. 10:7-12:3, 15:11-23, 16:6-18:8, 20:7-21:3, 38:5-13, 70:13-71:8, 73:15-25 (Harris);
- Thomas Dep. 44:1-45:12 (Trial Ex. 126).

[74]    *E.g.*, 3/1/24 Tr. 19:23-20:23, 21:21-22:4, 37:23-38:18 (Ship); 2/29/24 Tr. 26:16-20 (Smith); 2/14/24 Tr. 44:2-6 (Harris).

[75]    *See* n.43 *above.*

patient's cranial nerves, some of which is based on simple observation: whether a patient can see, hear, smile, and move their face.[76] Reasonable clinicians can glean cognitive function from conversation.[77] They also can conduct other portions of the exam by observing patients as they enter and exit the room—*e.g.*, their ability to talk, walk, maintain balance, and get out of a chair.[78] How extensive such exams are (and whether they include a fundoscopic exam) will depend on the provider's familiarity with the patient as well as a patient's presentation.[79]

A "normal" neurological exam lowers the likelihood that a patient has any neurological abnormality.[80] Abnormal findings on a neurological exam, as noted above, are only indications for imaging, not mandates.[81] And, as nearly every provider in this case testified, the presence of abnormalities is not subtle—instead, such abnormalities are typically obvious.[82]

---

[76]   1/9/24 Tr. 49:15-51:5 (50:1-6), 181:6-11 (Phillips); 3/1/24 Tr. 37:23-38:18 (Ship); 2/14/24 Tr. 42:24-43:17 (Harris).

[77]   1/9/24 Tr. 49:15-51:5 (49:21-22), 181:6-11 (Phillips); 2/14/24 Tr. 11:14-12:3, 17:17-18:8, 38:5-13 (Harris).

[78]   *E.g.*,
- 1/9/24 Tr. 49:15-51:5 (50:6-12), 181:6-11 (Phillips);
- 3/1/24 Tr. 20:24-21:20 (Ship);
- 2/14/24 Tr. 16:19-17:10, 22:13-23:2, 43:18-44:1 (Harris);
- Thomas Dep. 47:17-49:4, 62:16-63:3, 87:21-88:12, 153:13-154:3 (Trial Ex. 126).

[79]   *E.g.*, 3/1/24 Tr. 22:5-23:7, 57:22-58:19, 25:7-26:2, 61:2-20 (Ship); 2/14/24 Tr. 17:17-18:8, 42:24-43:17 (Harris); Thomas Dep. 45:23-46:11, 177:23-178:14 (Trial Ex. 126).

[80]   *E.g.*, 2/29/24 Tr. 26:21-27:2 (Smith); 3/1/24 Tr. 60:16-61:20 (Ship); 2/14/24 Tr. 58:16-23 (Harris); *see also* n.43 *above* (*e.g.*, Phillips testimony concerning *Evidence-based Guidelines*).

[81]   *E.g.*, 2/14/24 Tr. 22:13-23:2 (Harris).

[82]   *E.g.*,
- 1/9/24 Tr. 49:15-51:5 (49:21-22, 50:1-6) (Phillips);
- 1/16/24 Tr. 54:15-22 (Ashley);
- 3/1/24 Tr. 32:7-17 (Ship);
- 2/29/14 Tr. 24:10-25:8, 29:21-30:11 (Smith);
- 2/14/24 Tr. 22:13-23:17, 41:15-44:6, 127:10-23 (Harris);

To conduct a fundoscopic exam, a provider uses a fundoscope to examine the patient's optical disc.[83] A provider is searching for swelling of the optical disc—a sign of increased intracranial pressure called papilledema—ninth on the SNNOOP-10 list.[84] Such exams are easier to conduct with younger patients.[85] A normal fundoscopic exam forecloses increased intracranial pressure[86] and lowers the risk of significant intracranial abnormality.[87]

Using the preceding data, providers then consider the patient's "diagnostic differential"—the diagnoses that comprise the most likely cause(s) of the patient's symptoms.[88] In PCHC medical records, this diagnosis typically appears under the bold subhead "Assessment."[89]

Dr. Phillips opined that the diagnostic differential should first rule out the "most worrisome" potential causes.[90] The Court should reject this opinion. Dr. Phillips was the only provider to express it. Every other provider asked about this issue—

---

- Brosofsky Dep. 36:10-12, 36:13-18, 37:2-5, 38:10-15 (Trial Ex. 119); and
- Thomas Dep. 45:23-46:11, 47:17-48:17, 55:7-17, 64:3-18 (Trial Ex. 126).

[83]   *E.g.*, 1/9/24 49:15-51:5 (50:15-20) (Phillips); 2/29/24 Tr. 27:3-27:15 (Smith); 3/1/24 Tr. 23:8-24:6 (Ship).

[84]   *See* n.40 *above*; 1/16/24 Tr. 234:9-236:8 (Ashley); 2/29/24 Tr. 27:3-27:21, 257:13-20 (Smith); 3/1/24 Tr. 24:7-23, 200:18-22 (Ship); 2/14/24 Tr. 18:9-19:7 (Harris).

[85]   2/14/24 Tr. 19:8-19 (Harris).

[86]   *E.g.*, 1/16/24 Tr. 233:20-234:15 (Ashley), 1/11/24 109:23-110:6 (Caplan); 1/19/24 Tr. 344:4-12 (Phillips); 2/14/24 Tr. 18:9-19:7, 42:13-20, 103:13-104:4 (Harris).

[87]   *E.g.*, 1/9/24 Tr. 49:15-51:5 (50:24-51:5) (Phillips); 1/19/24 Tr. 365:7-366:6 (Phillips); 3/1/24 24:14-25:6, 59:21-60:25, 72:6-23, 84:13-85:6 (Ship); 2/14/24 Tr. 58:16-23 (Harris).

[88]   *E.g.*,

- 1/9/24 Tr. 31:23-32:17 (Phillips);
- 3/1/24 Tr. 19:23-20:23, 26:3-21, 29:17-30:22 (Ship);
- 2/14/24 Tr. 15:24-17:10, 55:18-56:2, 89:8-15, 124:1-125:4 (Harris);
- Brosofsky Dep. 25:21-28:15 (Trial Ex. 119);
- Thomas Dep. 43:3-24, 60:1-6, 64:4-65:1, 90:24-92:2, 105:6-106:7, 144:16-145:18, 196:14-22 (Trial Ex. 126).

[89]   2/14/24 Tr. 35:19-36:1 (Harris).

[90]   *E.g.*, 1/9/24 Tr. 117:17-119:4 (118:14-16) (Phillips); *cf.*, *also*, n.35 *above*.

including, on occasion, Dr. Phillips himself[91]—testified that they adopt a probabilistic approach in diagnosing patients that works off the most likely causes, not the "most worrisome." Reasonable clinicians first try several interventions to exclude common headache causes and, barring success, elevate less common causes and/or refer a patient to imaging or a neurologist.[92]

Moreover, everyone agrees that the purpose of red flags is to distinguish secondary headaches potentially caused by serious intracranial pathology from the vast majority of benign headaches. Dr. Phillips's approach—identify the most worrisome possible cause, no matter how unlikely, and then test for it[93]—would abandon the red-flag framework and cause clinicians to unnecessarily image every headache patient.

## V.    Documentation

Before turning to each of Ms. Urizar-Mota's headache presentations at PCHC, the Court should make the following findings about the documentation of Ms. Urizar-Mota's care.

First, PCHC's documentation is in many cases the only evidence of Ms. Urizar-Mota's presentations to PCHC providers. Those records exceed 55 pages.[94]

---

[91]    1/9/24 Tr. 31:23-32:17 (Phillips).

[92]    *See, e.g.*,

• 1/16/24 Tr. 221:12-222:20 (Ashley);

• 2/14/24 Tr. 55:12-17, 56:3-16 (Harris);

• Brosofsky Dep. 30:19-31:10, 32:3-11, 33:24-34:12, 140:4-11 (Trial Ex. 119);

• Thomas Dep. 46:20-47:9, 52:20-53:1, 56:17-57:2, 95:22-96:10 (Trial Ex. 126).

[93]    1/9/24 Tr. 200:8-201:12 (201:3-12), 229:11-230:6 (229:15-20), 231:24-232:17 (Phillips).

[94]    *E.g.*, MED01-0077-MED01-0078 (Aug. 2, 2007); MED01-0093-MED01-0094 (Jan. 20, 2010); MED01-0828-MED01-0829 (Feb. 2, 2010); MED01-0108-MED01-0109 (Dec. 19, 2011); MED01-0111-MED01-0112 (Mar. 21, 2012); MED01-0132-MED01-0133 (Aug. 20, 2012); MED01-0141-MED01-0142 (Sept. 24, 2012); MED01-0146-MED01-0148 (Nov. 14, 2012); MED01-0154-MED01-0155 (Feb. 1, 2013); MED01-0157-MED01-0159 (Mar. 13, 2013); MED01-0169-MED01-0171 (June 23, 2014); MED01-0172-MED01-0174 (June 26, 2014);

Ms. Urizar-Mota's trial testimony comprises fewer than 24 transcript pages.[95] Two of the three providers whose conduct is at issue—Nurse Practitioner Ellen Brosofsky Hoffer[96] and Dr. Jeffrey Harris[97]—do not remember Ms. Urizar-Mota. Ms. Urizar-Mota, in turn, does not remember Dr. Harris.[98] (The third PCHC primary-care provider, Dr. Vinod Thomas, remembers her and treated her after her 2019 surgeries.[99])

Second, in some (Dr. Ship) or most (Dr. Phillips) instances, the parties' primary-care experts opined that PCHC records did not satisfy the standard of care for documentation.[100] But the standard of care for documentation is distinct from the standard of care for treatment, including deciding whether to refer a headache patient to imaging.[101] Medical records are not full transcripts of physician-patient dialogue.[102] And most of Plaintiffs' documentation criticisms focused on whether the recorded clinical data supported Ms. Urizar-Mota's diagnoses. But there is no evidence or opinion that forecloses Ms. Urizar-Mota's documented diagnoses. The Plaintiffs

---

MED01-0176-MED01-0179 (July 10, 2014); MED01-0295-MED01-0297 (July 20, 2016); MED01-0306-MED01-0308 (Aug. 23, 2018); MED01-0311-MED01-0313 (Nov. 1, 2018); MED01-0320-MED01-0323 (Nov. 14, 2018); MED01-0329-MED01-0331 (Jan. 16, 2019); MED01-0333-MED01-0335 (Jan. 22, 2019); MED01-0338-MED01-0341 (Apr. 5, 2019); MED01-0347-MED01-0349 (May 1, 2019); MED01-0353 (June 19, 2019).

[95]    1/8/24 Tr. 145-168 (Urizar-Mota).

[96]    Brosofsky Dep. 67:4-8 & 22-24 (Trial Ex. 119). These proposed findings refer to her as "Nurse Practitioner Brosofsky," which was her name when treating Ms. Urizar-Mota.

[97]    2/14/24 Tr. 37:16-20 (Harris).

[98]    1/8/24 Tr. 154:3-9 (Urizar-Mota).

[99]    *E.g.*, Thomas Dep. 203:13-204:4, 206 (Trial Ex. 126).

[100]    Virtually no record satisfied Dr. Phillips. *See generally* 1/9/24 & 1/19/24 Trs. (Phillips). Dr. Ship testified that the documentation for only three of Ms. Urizar-Mota's PCHC visits violated the standard of care for documentation: June 26, 2014; July 20, 2016, and November 1, 2018. 3/1/24 Tr. 150:25-151:15, 159:8-13, 162:2-25, 163:16-22, 168:4-9, 177:15-18 (Ship). She also testified that the documentation was "not optimal" for others. *E.g.*, 3/1/24 Tr. 105:15-22, 106:14-20 (Ship).

[101]    3/1/24 Tr. 250:5-252:14 (Ship)

[102]    3/1/24 Tr. 26:22-28:10, 28:14-29:16 (Ship); 2/14/24 Tr. 70:23-71:8, 73:15-20 (Harris).

offered no evidence of symptoms that the PCHC documents did not record. And, re-gardless, the parties agree that the presence or absence of red flags is the evidence most probative of whether the standard of care for treating Ms. Urizar-Mota was met. There is no evidence that Ms. Urizar-Mota presented to PCHC with any red flag that was not documented. Therefore, to the extent that PCHC providers were deficient in documenting Ms. Urizar-Mota's visits, such deficiency cannot have caused any delay in diagnosis or any of Ms. Urizar-Mota's injuries.

## VI. Ms. Urizar-Mota's PCHC presentations, 2007 to 2019

### A. 2007 and 2010

Ms. Urizar-Mota testified that she suffered headaches before November 14, 2012. Those pre-2012 headaches are not part of Plaintiffs' negligence claims. Yet, be-tween 2007 and 2010, Ms. Urizar-Mota visited PCHC three times complaining of headache.

The first pre-2012 headache visit was on August 2, 2007, and Ms. Urizar-Mota's chief complaint was "headaches and dizziness since missed her Depo shot last month." Ms. Urizar-Mota reported nausea but no vomiting. The August 2007 note does not say precisely when, other than "last month," that Ms. Urizar-Mota missed her "Depo shot."[103]

Depo Provera is a contraceptive, and headache is both a side effect of the med-icine and a withdrawal symptom.[104] PCHC medical records show that, in 2006 and 2007, Ms. Urizar-Mota received these shots every 74 to 83 days.[105] Her last apparent shot before her August 2, 2007, visit was April 26, 2007.[106] As a result, her next Depo

---

[103]    MED01-0077-MED01-0078; 1/19/24 Tr. 413:10-415:5 (Phillips).

[104]    3/1/24 Tr. 75:4-76:2 (Ship); 2/14/24 Tr. 39:17-40:18, 46:3-20 (Harris).

[105]    MED01-0053 (noting Depo-Provera shots on Apr. 5, June 21, Sept. 6, and Nov. 22, 2006); MED01-0066 (noting Depo-Provera shots on Feb. 12 and Apr. 26, 2007).

[106]    MED01-0066; MED01-0074.

shot, if it followed the rough schedule of her previous administrations, would have been as early as July 10 or as late as July 18, 2007—respectively, 24 days and 16 days before her August 2, 2007, PCHC visit. Thus, her August 2007 report of having "headaches and dizziness since missed her Depo shot last month" was likely comparable to or even exceeded her 15-day November 2012 headache.

Ms. Urizar-Mota's second pre-2012 headache visit was on January 20, 2010, and her chief complaint was "vomiting last night ×2 and this morning and headache ā [*i.e.*, with] blurry vision."[107] The third pre-2012 visit was only two weeks later, on February 2, 2010, when she complained of headache, nausea, and vomiting.[108]

Dr. Phillips's Rule 26 disclosure (whose first draft Plaintiffs' counsel wrote[109]) omits these three, pre-2012 PCHC office visits.[110] Plaintiffs did not raise these visits during their direct examination of Dr. Phillips.[111] At his deposition, Dr. Phillips testified that November 2012 was Ms. Urizar-Mota's first headache because "I didn't see anything that she had headaches before."[112]

Asked about these pre-2012 headaches at trial—first on cross, then re-direct—Dr. Phillips testified that they did not change his opinions concerning Ms. Urizar-Mota's intermittent headaches between 2012 and 2019, and that no PCHC provider breached the standard of care in any of these pre-2012 visits.[113]

The omission of these earlier headache visits from his expert report and direct testimony exposes three problems with Dr. Phillips's standard-of-care opinions.

---

107     MED01-0093-MED01-0094; 1/19/24 Tr. 415:23-418:7 (Phillips).

108     MED01-0828-MED01-0829; 1/19/24 Tr. 418:8-13, 419:1-421:24 (Phillips).

109     1/19/24 Tr. 411:7-412:7 (Phillips).

110     1/19/24 Tr. 422:1-13 (Phillips); *see also generally* Phillips Rule 26 Disclosure (marked for identification as Ex. 114).

111     1/19/24 Tr. 422:15-423:5 (Phillips).

112     Phillips Dep. 35:17-22 (Trial Ex. 120).

113     1/19/24 Tr. 422:15-423:5, 428:3-14, 428:22-429:18 (Phillips).

First, as noted, Dr. Phillips's overarching opinion is that any red flag *requires* imaging. In two of these pre-2012 PCHC headache visits, Ms. Urizar-Mota was pregnant[114]—number 11 on the SNNOOP-10 list.[115] And in all three pre-2012 headache visits, Ms. Urizar-Mota presented with one or more of the very same symptoms— dizziness, vomiting, blurry vision, and nausea—that Dr. Phillips identified to support his opinion that the standard of care required imaging in later visits, as discussed in more detail below. Nonetheless, Dr. Phillips opined that these pre-2012 visits did *not* require imaging. Dr. Phillips's inconsistent opinions about the significance of red flags only reinforce the conclusion that the learned treatises in the trial record and the opinions of other experts support—that red flags only indicate imaging and do not compel imaging.

Second, these pre-2012 headaches contradict two of the central reasons that Dr. Phillips identified November 14, 2012, as the start of PCHC providers' alleged negligence: (1) that November 2012 was Ms. Urizar-Mota's "first" or a "new" headache;[116] and (2) that vomiting is itself a red flag.[117] Ms. Urizar-Mota's November 2012 headache was obviously not her first. And vomiting, even if it were a red flag (more on that below), could not require imaging, as Dr. Phillips concluded imaging was not necessary when Ms. Urizar-Mota had headaches with vomiting on two visits, only two weeks apart, in 2010.

Third, Dr. Phillips explained the omissions of these pre-2012 headaches from his opinions by citing other, apparently benign, explanations for Ms. Urizar-Mota's

---

[114]    MED01-0093 (Jan. 20, 2010); MED01-0828 (Feb. 2, 2010).

[115]    *See* n.40 *above.*

[116]    *E.g.*, 1/9/24 Tr. 83:12-84:19 (84:13-14) ("it's like a new pattern of headaches), 85:5-86:9 (85:15-16) (Phillips) ("**by all evidence** a new headache. It's a new pattern of headaches") (emphasis added); 1/19/24 Tr. 388:22-389:17 (389:11-15) (Phillips) ("Again, . . . **when we first heard of her headaches**, she had had, was it, 15 days of headaches, with nausea and vomiting, which are very worrisome in terms of a headache **pattern that is new**.") (emphasis added), 422:15-423:5 (Phillips).

[117]    *E.g.*, 1/19/24 Tr. 67:24-68 (Phillips).

headache symptoms. He asserted at trial that these pre-2012 headaches were "different in character" from Ms. Urizar-Mota's November 2012 headache.[118] He embraced the attribution of Ms. Urizar-Mota's 2007 headache "to her stopping her Depo Provera."[119] And he distinguished her 2010 headaches from her November 2012 headache because she was pregnant in 2010 and not in 2012.[120]

This exposes a fatal inconsistency in Dr. Phillips's opinions that renders him unreliable: he accepts supposedly benign, alternative causes for Ms. Urizar-Mota's pre-2012 headaches but rejects evidence of benign alternatives (including, in the instance of her visits with Dr. Harris, the very same benign alternative, Depo Provera) in assessing every single one of Ms. Urizar-Mota's other headache presentations to PCHC providers.

### B.    December 2011 to November 2012

Ms. Urizar-Mota reported abdominal pain, nausea, and/or vomiting during six PCHC office visits in the 11 months preceding her November 2012 PCHC office visit—all with Nurse Practitioner Brosofsky.[121] When she visited PCHC on November 14, 2012, Ms. Urizar-Mota's chief complaint was "headaches, nausea, and vomiting for 15 days."[122] Nurse Practitioner Brosofsky described Ms. Urizar-Mota's presentation as follows:

> Nausea with vomiting[.] She vomits every am. She also
> has N/V [*i.e.*, nausea and vomiting] which waxes and
> wanes but lasts for 2 days. She is back with her husband.

---

[118]    1/19/24 Tr. 422:15-423:5 (Phillips).

[119]    1/19/24 Tr. 413:10-17 (Phillips).

[120]    1/19/24 Tr. 425:1-428:2 (Phillips); *cf.* 1/19/24 Tr. 292:1-13 (Phillips).

[121]    *See, e.g.*, MED01-0108 (Dec. 19, 2011), MED01-0111 (Mar. 21, 2012), MED01-0114 (Mar. 28, 2012), MED01-0119 (May 8, 2012), MED01-0124 (July 30, 2012), MED01-0132 (Aug. 20, 2012); 1/9/24 Tr. 268:5-24, 270:9-14 (Phillips); 3/1/24 Tr. 44:12-47:21 (Ship).

[122]    MED01-0146.

And is concerned that she may be pregnant. She feels safe
● Nonbilious vomiting and food.[123]

She responded to Ms. Urizar-Mota's suspicion that her headaches could be tied to a new pregnancy by administering a pregnancy test, which was negative.[124] Nurse Practitioner Brosofsky also conducted a neurological exam, which was normal.[125] She did not document a fundoscopic exam, although she testified that it was her practice to conduct them as part of her neurological exams.[126] There is no evidence that Ms. Urizar-Mota presented with any neurologic abnormality.

Ms. Urizar-Mota's first report of domestic abuse to PCHC—that her husband "has hit her near the children"—was on September 24, 2012, to a licensed social worker.[127] The record for her November 14, 2012, visit with Nurse Practitioner Brosofsky notes that she had experienced abuse, but was "back with her husband" and "feels safe."[128] Such stress can cause or exacerbate headaches.[129] Nurse Practitioner Brosofsky hypothesized about whether Ms. Urizar-Mota's ongoing gastrointestinal issues, for which Ms. Urizar-Mota sought treatment from Nurse Practitioner Brosofsky six times in the year before this visit, might be "stress related."[130] She then prescribed an antidepressant typically used as a prophylactic against pain from migraine and tension headaches: amitriptyline.[131]

Finally, responding to Ms. Urizar-Mota's nausea and vomiting—a likely cause of her headaches[132]—Nurse Practitioner Brosofsky diagnosed gastroenteritis,

---

[123]    MED01-0146.
[124]    ME01D-0148; 3/1/24 Tr. 39:17-40:7 (Ship).
[125]    MED01-0148; 1/9/24 Tr. 219:12-220:13 (220:3-4) (Phillips); 3/1/24 Tr. 37:23-38:18, 48:15-19 (Ship).
[126]    Brosofsky Dep. 84:1-22 (Trial Ex. 119).
[127]    MED01-0141.
[128]    MED01-0146.
[129]    3/1/24 Tr. 40:8-42:2 (Ship).
[130]    MED01-0148.
[131]    MED01-0148; 1/19/24 Tr. 292:14-23 (Phillips); 3/1/24 Tr. 38:19-39:16 (Ship).
[132]    3/1/24 Tr. 50:20-25 (Ship).

referred Ms. Urizar-Mota for the second time[133] to a gastroenterologist, associated this diagnosis with an earlier diagnosis of H. pylori and continuing right upper quadrant ("RUQ") abdominal pain, and prescribed medication (Omeprazole).[134]

Dr. Phillips opined at trial that Ms. Urizar-Mota's longstanding gastrointestinal issues (1) were "distinctly different" from, (2) were *not* consistent with, and (3) could not explain her headache. To try to support those opinions, he noted that Ms. Urizar-Mota did not include abdominal pain in her chief complaint and Nurse Practitioner Brosofsky did not note it under "history of present illness."[135] These are irrelevant distinctions, as the documentation shows that Ms. Urizar-Mota reported abdominal pain during Nurse Practitioner Brosofsky's physical examination, and Nurse Practitioner Brosofsky cited "RUQ pain" as a basis for referring Ms. Urizar-Mota to a gastroenterologist.[136] And, at his deposition, Dr. Phillips admitted that Ms. Urizar-Mota's November 2012 symptoms *were* consistent with her presentation to PCHC in office visits in the preceding 11 months,[137] an opinion shared by Plaintiffs' expert neurologist, Dr. Caplan, as well as both of Defendant's experts.[138] A cursory review of Dr. Phillips's deposition testimony does not support his attempt at trial to distinguish his own deposition testimony as the result of "entrapment."[139]

Defendant's primary-care expert, Dr. Ship, opined that Ms. Urizar-Mota did not present any red flags—in this or any other PCHC visit—and that Nurse

---

[133]    The first time was July 30, 2012. MED01-0125.

[134]    MED01-0148; 1/9/24 Tr. 272:20-273:12 (quoting Phillips Dep. 47:18-24 (Trial Ex. 120)), 273:12-274:7, 275:6-277:7 (quoting Phillips Dep. 50:3-10 (Trial Ex. 120)); 3/1/24 Tr. 42:14-44:11, 47:8-21 (Ship).

[135]    1/9/24 Tr. 74:23-79:24 (79:16-17), 80:19-82:4 (81:1-15), 271:5-272:19, 274:8-275:1 (Phillips).

[136]    MED01-0147; MED01-0148.

[137]    1/9/24 Tr. 272:20-273:12 (quoting Phillips Dep. 47:18-24 (Trial Ex. 120)), 275:6-277:7 (quoting Phillips Dep. 50:3-10 (Trial Ex. 120)) (Phillips).

[138]    1/11/24 Tr. 144:20-145:6 (Caplan); 3/1/24 Tr. 47:8-21 (Ship); 2/29/24 Tr. 30:17-23 (Smith).

[139]    1/9/24 Tr. 277:8-278:9 (Phillips).

Practitioner Brosofsky satisfied the standard of care in responding holistically to all of the symptoms that Ms. Urizar-Mota presented.[140]

Dr. Phillips opined that Nurse Practitioner Brosofsky breached the standard of care by not referring Ms. Urizar-Mota to imaging or to a neurologist. He cited three supposed red flags:[141] (1) the persistence of her "worrisome" symptoms;[142] (2) that her headaches presented a "new pattern" for which there was no "clear history";[143] and (3) the "risk" of head trauma associated with partner abuse.[144] None supports a finding that Nurse Practitioner Brosofsky breached the standard of care.

First, aside from Dr. Phillips's testimony, nothing in the trial record recognizes "persistent" headache as a red flag. Instead, Dr. Phillips conceded that persistent headaches and headache with nausea and vomiting are *not* among the SNNOOP-10 indications.[145] Another source Dr. Phillips relied on (*Migraine or Need Imaging*) notes that no "high-quality study" supports vomiting as increasing the likelihood of intracranial pathology[146] and suggests that this symptom matters only when the headaches are "chronic,"[147] rather than intermittent, as with Ms. Urizar-Mota in 2012.

Second, the pre-2012 headaches raise other difficulties with Dr. Phillips's opinion that the November 2012 headache compelled imaging. It makes no sense for Dr. Phillips to characterize the November 2012 symptoms as a "new" headache or a

---

[140]    3/1/24 Tr.36:21-37:11, 42:3-44:11, 42:14-44:11, 47:22-48:14, 48:20-49:6, 49:21-50:19, 51:2-52:8, 204:22-205:2 (Ship).

[141]    1/9/24 Tr. 102:21-103:22 (Phillips).

[142]    1/9/24 Tr. 67:24-68:23 (68:4-6), 72:7-18, 99:24-103:22 (Phillips).

[143]    1/9/24 Tr. 83:12-84:19 (84:13-14) (Phillips); *id*. 82:5-83:11 (82:5-15), 85:5-86:9 (Phillips).

[144]    1/9/24 Tr. 69:12-71:18 (70:6-13, 71:8-18), 99:24-102:20 (100:14-15, 102:19-20), 279:6-17 (Phillips).

[145]    1/9/24 Tr. 221:23-223:3 (Phillips); 1/19/24 Tr. 368:24-369:9 (Phillips); *see also* n.40 *above* (omitting these features from the SNNOOP-15 list).

[146]    *See* n.56 *above*.

[147]    1/19/24 Tr. 393:8-397:13, 401:6-14 (Phillips); *Migraine or Need Imaging* at 1281.

"pattern change" when he overlooked her pre-2012 headaches. And, even accounting for Ms. Urizar-Mota's pre-2012 and November 2012 headaches, Ms. Urizar-Mota's headaches were insufficient to establish any pattern. Her four reported headaches between August 2007 and November 2012 were only intermittent. More than two years and three months separated her August 2007 and January 2010 presentations, and more than two years and nine months separated her February 2010 and November 2012 presentations. Ms. Urizar-Mota herself testified that she did not seek help from PCHC when she did not need it.[148] And Dr. Phillips credited another, years-long gap separating Ms. Urizar-Mota's PCHC visits to conclude that the standard of care was actually satisfied concerning a different PCHC visit.[149]

Third, even if the November 2012 headache had been Ms. Urizar-Mota's first, a first headache is not a red flag that compels imaging since, as Dr. Phillips conceded, everyone has a first headache.[150] A new headache might raise concern for a patient aged 50 or older, as *Choosing Wisely* notes,[151] but not for a patient in her 20s like Ms. Urizar-Mota.[152]

Finally, Dr. Phillips opined that Ms. Urizar-Mota's reported partner abuse compelled imaging. But Dr. Phillips conceded that he was only speculating about a head injury, for which there is no record evidence. Ms. Urizar-Mota testified that she was hit only twice, and only in 2012 and 2013.[153] Mr. Reyes testified that he had only

---

[148]    Urizar-Mota Dep. 58:14-20 (Trial Ex. 127); 1/8/24 Tr. 150:20-24, 161:2-7 (Urizar-Mota).

[149]    *See* Section VI.I. *below* (Aug. 23, 2018, PCHC visit).

[150]    1/9/24 Tr. 249:21-250:11 (Phillips); 1/19/24 Tr. 387:14-21 (Phillips).

[151]    *See* n.45 *above*.

[152]    3/1/24 Tr. 49:7-20 (Ship).

[153]    1/8/24 Tr. 159:18-21 (Urizar-Mota); Urizar-Mota Dep. 29:6-31:20, 33:18-34:4 (Trial Ex. 127); MED01-0170 (June 23, 2014) ("DV screen negative today- has had Issues in the past but not for several years/ feels safe today[.]").

pushed Ms. Urizar-Mota.[154] Moreover, the medical records reflect that Nurse Practitioner Brosofsky was attentive to the risk that Ms. Urizar-Mota could be suffering ongoing abuse, inquiring to ensure that Ms. Urizar-Mota felt safe being back with her husband.

### C.    February 1, 2013

Ms. Urizar-Mota met again with Nurse Practitioner Brosofsky on February 1, 2013—80 days after her November 2012 PCHC office visit. Her chief complaint was: "Follow up on migraines; not taking migraine meds daily; feels stabbing, pulling sensation."[155] As Ms. Urizar-Mota admitted at trial, Nurse Practitioner Brosofsky had diagnosed her with migraine headaches.[156]

Nurse Practitioner Brosofsky noted that medication (the amitriptyline prescribed in November 2012) caused side effects but eliminated Ms. Urizar-Mota's headaches.[157] She described Ms. Urizar-Mota's symptoms as:

> ● Frontal headache and over right side of head with pulling sensation upon awakening from sleep. ● Which is throbbing or pounding ● Lasting for a few hours ● Accompanied by nausea ● By vomiting
>
> When she takes medications she has no headache but when she doesn't take it she has very bad headache with nausea, vomiting and fatigue. Wants to know why the headaches came back. She had taken medication ×1 week and she was feeling tired and drunk.[158]

There is no documentation of neurological or fundoscopic exams. Ms. Urizar-Mota's blood pressure ("BP") was taken twice, and it was elevated.[159]

---

[154]    Reyes Dep. 29:12-14, 29:17-30:24, 31:12-33:2, 33:5-34:8, 34:23-35:10, 35:17-36:10, 47:18-23 (Trial Ex. 122); *see also* 1/9/24 Tr. 281:18-24 (Phillips).

[155]    MED01-0154.

[156]    1/8/24 Tr. 152:9-16 (Urizar-Mota).

[157]    MED01-0154; 1/19/24 Tr. 295:7-24 (Phillips).

[158]    MED01-0154.

[159]    MED01-0155.

Nurse Practitioner Brosofsky diagnosed "migraine headache with elevated BP."[160] Ms. Urizar-Mota's elevated blood pressure at this visit could have exacerbated her headaches and could be the result of stress induced by the partner abuse she had reported.[161] Nurse Practitioner Brosofsky did not suspect a brain tumor and, thus, did not refer Ms. Urizar-Mota to imaging.[162] She provided Ms. Urizar-Mota information about migraines and counseled her to "avoid triggers."[163] She did not change Ms. Urizar-Mota's medication, which successfully treated her headaches.

Dr. Ship concluded that Nurse Practitioner Brosofsky satisfied the standard of care in not referring Ms. Urizar-Mota to imaging or a neurologist.[164] Ms. Urizar-Mota's symptoms were consistent with a migraine headache,[165] and so did not demand a neurological exam. Dr. Ship also noted that Ms. Urizar-Mota headaches responded to amitriptyline, reinforcing the conclusion that the headaches were migraines, and that Nurse Practitioner Brosofsky should have tried a different medication.[166]

Plaintiff's expert neuro-oncologist, Dr. Ashley, agreed that it would be reasonable both to try a different medication and not to send a patient in these circumstances for imaging.[167] Dr. Ashley does not see patients in the primary-care setting. And for the last 20 years, all of the headache patients he has treated for headaches

---

[160]    MED01-0155.

[161]    3/1/24 Tr. 54:25-55:21 (Ship).

[162]    Brosofsky Dep. 102:6-104:14 (Trial Ex. 119).

[163]    MED01-0155.

[164]    3/1/24 Tr. 55:22-57:17 (Ship).

[165]    3/1/24 Tr. 52:9-25 (Ship).

[166]    3/1/24 Tr. 53:2-54:5, 55:22-57:17, 111:12-112:20 (Ship); *cf.* 1/19/24 Tr. 296:1-11 (Phillips) (noting response to medication "would not necessarily increase the likelihood" of a brain tumor or other secondary cause); *see also* Brosofsky Dep. 106:10-22, 138:4-11 (Trial Ex. 119).

[167]    1/16/24 Tr. 226:9-227:10 (Ashley).

have already been imaged and diagnosed with brain tumors.[168] Nevertheless, even in that context, when his patients suffer headaches, Dr. Ashley tries two or three medication treatments, and "escalate[s] the therapeutic paradigm" if the headaches do not respond to treatment.[169]

Dr. Phillips, by contrast, opined that Nurse Practitioner Brosofsky should have referred Ms. Urizar-Mota to imaging.[170] He testified at trial that the documentation did not support the diagnosis of migraine,[171] which (if accurate) would not indicate imaging.[172] He opined that Ms. Urizar-Mota's symptoms presented "a new pattern [of] headache" and "a matter of concern" that was "very worrisome."[173] Dr. Phillips again noted the persistence of Ms. Urizar-Mota's headaches, the absence of imaging following her November 2012 visit, and his opinion that a possible secondary cause should have been ruled out.[174] He added that his concern about partner abuse "continues to be, you know, an issue."[175] Dr. Phillips's opinions about this visit cannot establish a breach of the standard of care for at least five reasons.

First, even Plaintiffs' expert neuro-oncologist, Dr. Ashley, agreed with Defendant's expert, Dr. Ship—and all three PCHC providers—that it is reasonable to see how a patient responds to different interventions before sending a patient to imaging.[176]

---

[168]    1/16/24 Tr. 189:10-190:2, 203:25-204:12 (Ashley).

[169]    1/16/24 Tr. 204:13-205:2 (Ashley).

[170]    1/9/24 Tr. 1/9/24 Tr. 88:16-89:20 (Phillips).

[171]    1/9/24 Tr. 88:16-89:20 (89:5-7), 89:21-90:8 (89:24-90:2), 92:8-16, 96:13-97:4 (96:16-18) (Phillips).

[172]    *See* n.31 *above*; *see also, e.g.*, 1/9/24 Tr. 36:19-37:7. 57:3-10, 215:3-9 (Phillips).

[173]    1/9/24 Tr. 88:16-89:20 (88:20-21, 89:1-4, 17) (Phillips).

[174]    1/9/24 Tr. 89:21-90:8, 95:15-96:6 (Phillips).

[175]    1/9/24 Tr. 90:9-91:12 (90:9-16) (Phillips); *id.* 106:19-107:22 (107:7-8) (Phillips) ("[I]t could be that she's just, you know, continually being hit in the head . . . .").

[176]    *See* n.92 *above*.

Second, it is more likely than not that Ms. Urizar-Mota's headache was a classic migraine, which by definition did not require imaging.[177] Contrary to his trial testimony, Dr. Phillips agreed with Nurse Practitioner Brosofsky's assessment at his deposition: "Now there's no question I agree that it's a clinical migraine . . . ."[178] And the evidence in the medical record supports the conclusion that Ms. Urizar-Mota's headaches were, in fact, migraines: the migraine medication Nurse Practitioner Brosofsky prescribed completely eliminated her headaches.[179]

Given that migraine diagnosis, Dr. Phillips conceded at his deposition that Ms. Urizar-Mota's February 2013 presentation, standing alone, did not merit imaging. He testified that he believed she should have been imaged after the February 2013 only because of her November 2012 presentation.[180] But, for the reasons stated above, the absence of imaging after the November 2012 visit does not breach the standard of care. Dr. Phillips's explanation for his changed testimony at trial, moreover, is not credible. When he testified in his deposition "there's no question I agree that it's a clinical migraine," Dr. Phillips was not (as he claimed at trial[181]) merely observing the diagnosis that Nurse Practitioner Brosofsky had chosen.

Third, Dr. Phillips also contradicted himself about whether Ms. Urizar-Mota's February 2013 presentation corresponded to the red flag of "pattern change or recent

---

[177]    3/1/24 Tr. 52:9-25, 55:22-57:17 (Ship); *see also* n.31 *above*.

[178]    1/19/24 Tr. 301:21-302:10 (Phillips) (quoting Phillips Dep. 61:12-20 (Trial Ex. 120)); 1/9/24 Tr. 210:18-211:7, 212:22-213:6 (Phillips); 1/19/24 Tr. 297:20-299:16 (Phillips) (quoting Phillips Dep. 38:10-39:18 (Trial Ex. 120)); *see also* Phillips Dep. 38:10-39:18 (Trial Ex. 120) ("[T]his sounds, you know, more like a migraine than the other episode did."); *see also* 1/9/24 Tr. 91:13-92:7 (91:19-20) (Phillips).

[179]    MED01-0154.

[180]    1/19/24 Tr. 301:21-302:10 (Phillips) (quoting, in part, Phillips Dep. 61:12-20 (Trial Ex. 120)).

[181]    1/9/24 Tr. 211:17-212:1 (211:22-212:1) (Phillips).

onset of headache." He opined that this was a "new pattern" headache,[182] but then contradicted himself:

> But again, it's sort of also **so similar** to what she's been having previously, that it seems to be a **continuation of that pattern** of that headache that I was so concerned about at her most recent visit, and there seems to be a **continuation** of that.[183]

Ms. Urizar-Mota's headaches in November 2012 and February 2013 cannot evidence both a "new" pattern (a red flag) and a "continued" pattern. The Court should not fault Nurse Practitioner Brosofsky for failing to recognize a supposed red flag that Dr. Phillips tentatively applied only after unconvincingly recanting his deposition diagnosis of migraine headache.

Fourth, the persistence of Ms. Urizar-Mota's headaches, for the reasons stated above, is not a red flag. It is also unlikely that Ms. Urizar-Mota's headaches through February 2013 were actually "persistent." The drug side effects that Ms. Urizar-Mota reported followed only one week of taking amitriptyline. Ms. Urizar-Mota could not have asked Nurse Practitioner Brosofsky "why the headaches came back" if she were not headache-free in some of the 11 weeks separating Ms. Urizar-Mota's November 2012 and February 2013 visits.

Finally, as already noted, Dr. Phillips's speculation about partner abuse is just that—speculation.

### D.    March 13, 2013

Ms. Urizar-Mota returned to PCHC on March 13, 2013, complaining of "daily, constant migraines, worse."[184] Nurse Practitioner Brosofsky described her presentation as follows:

---

[182]    1/9/24 Tr. 88:16-89:20 (88:20-21) (Phillips).
[183]    1/9/24 Tr. 91:13-92:7 (Phillips) (emphases added).
[184]    MED01-0157.

    ● Temporal headache with pulling sensation on the sides
● Which is steady ● Preceded by seeing dark spot with a
bright jagged outline. ● Accompanied by nausea ○ Head-
ache not accompanied by vomiting ○ Not by diarrhea
No new medications prescribed.

    Pt comes in f/u [*i.e.*, "follow up"]. Cont with headaches.
She did not take any medications since last visit. Her BP
is in much better control. She has had a severe HA [*i.e.*,
"headache"] for the last 3 days. After much interviewing,
Pt revealed that she is being emotionally and physically
abused. Pt is planning to move in April and has a plan in
place but she feels unsafe.

    Fruity odor to breath.[185]

Responding to the headache symptoms, Nurse Practitioner Brosofsky conducted both

neurological and fundoscopic exams, whose results were normal,[186] reducing the like-

lihood of any increased intracranial pressure.[187] Ms. Urizar-Mota did not present any

neurological abnormalities,[188] reducing the possibility that her husband's physical

abuse was so severe as to raise a red flag for post-traumatic onset of headache.[189]

Unlike her previous PCHC visit, her blood pressure was "in much better control."[190]

    Concerning Ms. Urizar-Mota's report of partner abuse, Nurse Practitioner

Brosofsky spent more than half of her 45-minute visit with Ms. Urizar-Mota provid-

ing counseling and coordinating care. She referred Ms. Urizar-Mota to domestic vio-

lence shelters. She recommended that Ms. Urizar-Mota go to a hospital emergency

room "if condition gets worse"—indicating that neither the domestic violence nor the

headache symptoms Ms. Urizar-Mota reported merited emergency care (or a referral

---

[185]    MED01-0157.

[186]    MED01-0158; 1/19/24 Tr. 305:7-306:7, 306:19-22 (Phillips); 3/1/24 Tr. 59:21-60:15 (Ship).

[187]    *E.g.*, 1/19/24 Tr. 344:4-12 (Phillips); 3/1/24 Tr. 60:16-61:20 (Ship).

[188]    1/19/24 Tr. 306:19-22 (Phillips).

[189]    3/1/24 Tr. 63:10-13, 122:5-124:22, 127:20-128:7 (Ship).

[190]    MED01-0157.

to imaging). And she prescribed fluoxetine, a different class of anti-depressant from the amitriptyline previously prescribed.[191]

Finally, having noted that Ms. Urizar-Mota's breath had a "fruity odor"[192]—a sign of diabetes—Nurse Practitioner Brosofsky administered a finger-stick glucose test, which was negative.[193] Nurse Practitioner Brosofsky responded to Ms. Urizar-Mota's various symptoms consistent with the standard of care.[194]

Ms. Urizar-Mota's March 2013 headache symptoms are consistent with migraine, as substantiated by multiple witnesses' testimony: Dr. Phillips at his deposition;[195] Plaintiff's expert neuro-oncologist, Dr. Ashley, at trial;[196] Dr. Ship at trial;[197] and Nurse Practitioner Brosofsky at her deposition.[198] Dr. Phillips flip-flopped at trial, testifying that he did not believe Ms. Urizar-Mota "ever had a history of migraines"[199] and that each of the six times PCHC providers identified Ms. Urizar-Mota's symptoms as "migraine" (this being the third[200]) was a mischaracterization.[201] Dr. Phillips's about-face seems designed only to evade the simple conclusion—which

---

[191]    MED01-0159; 3/1/24 Tr. 61:21-62:2 (Ship); Brosofsky Dep. 117:3-18 (Trial Ex. 119).

[192]    MED01-0157.

[193]    MED01-0158-MED01-0159; 3/1/24 Tr. 66:22-68:8 (Ship).

[194]    3/1/24 Tr. 63:14-66:21 (Ship).

[195]    1/19/24 Tr. 303:2-305:6 (Phillips) (quoting Phillips Dep. 39:22-40:9 (Trial Ex. 120)).

[196]    1/16/24 Tr. 232:19-233:19 (Ashley).

[197]    3/1/24 Tr. 58:20-59:20 (Ship).

[198]    Brosofsky Dep. 116:3-9 (Trial Ex. 119).

[199]    1/9/24 Tr. 208:10-23 (Phillips).

[200]    *E.g.*, [*1*] MED01-0154 (Feb. 1, 2013) ("Follow up on migraine" from Nov. 2012 visit); [*2*] MED01-0155 (Feb. 1, 2013); [*3*] MED01-0157 (Mar. 13, 2013); [*4*] MED01-0178 (July 10, 2014); [*5*] MED01-0338 (Apr. 5, 2019; [*6*] MED01-0347 (May 1, 2019).

[201]    1/9/24 Tr. 213:14-214:10 (Phillips).

he and the learned treatises both embraced—that migraines are not an indication for imaging.[202]

Dr. Phillips opined that imaging was required for three reasons, all of which, as discussed above, the Court should reject:

- Ms. Urizar-Mota's symptoms persisted.[203] But persistent headaches are not red flags, and the record describes these headaches as "daily" and "chronic" only in the Active Problem list.[204]

- Ms. Urizar-Mota was "continually at risk, you know, for abuse."[205] But this is, again, only Dr. Phillips's speculation.[206]

- Ms. Urizar-Mota's symptoms were "continuing to evolve or change."[207] But Dr. Phillips's own deposition testimony—that this presentation, as with the one preceding it, was a migraine—forecloses that conclusion.[208]

Confronted by the inconsistency in his deposition and trial testimony about whether Ms. Urizar-Mota's symptoms supported a migraine headache diagnosis, Dr. Phillips was non-responsive and tacked to yet another, purported red flag—"[S]o whatever we are calling these headaches, it represents a worsening, in terms of the pattern of her headaches."[209] But the clinical data on "worsening" headache was "not found to be useful" in predicting intracranial pathology.[210] Even if Ms. Urizar-Mota's headaches were "worsening," they more likely than not stopped or abated. Following this presentation, Ms. Urizar-Mota did not report headache symptoms to any PCHC primary-care provider for more than 15.5 months.[211]

---

202    *See* n.31 *above.*

203    1/9/24 Tr. 99:24-101:9 (101:5-7) (Phillips); *id.* 101:10-102:17 (101:21-22 & 102:15-16), 102:19-103:22 (103:18-19) (Phillips).

204    MED01-00157.

205    1/9/24 99:24-101:9 (100:14-15) (Phillips).

206    *See also* 3/1/24 Tr. 117:19-25 (Ship).

207    1/9/24 Tr. 99:24-101:9 (100:21-22) (Phillips).

208    *See* nn.178, 195 *above.*

209    1/19/24 Tr. 303:7-304:12 (304:10-12) (Phillips).

210    *See* n.59 *above.*

211    1/19/24 Tr. 307:23-308:24 (Phillips); MED01-0157-MED01-0172.

E.     **June 26, 2014**

Ms. Urizar-Mota's next primary-care visit was June 26, 2014, with Dr. Jeffrey Harris for "Follow up."[212] Dr. Harris was a "covering" physician who rotated among PCHC's locations, and he saw Ms. Urizar-Mota because Nurse Practitioner Brosofsky had left PCHC.[213] Dr. Harris documented:

> ● Neurological symptoms[.] In the mor[n]ings, reports headache, facial sweating, and a sensation of chest tightness that resolves during the day. Accompanied by tiredness. No wheezing, sneezing, tearing. No fever or chills. No chest pain or palpitations. No weight loss.[214]

He conducted fundoscopic and neurological exams, whose results were normal.[215] He identified no significant neurological abnormalities,[216] and detected no physical injuries.[217] Among Ms. Urizar-Mota's current medications was Depo Provera.[218] Dr. Harris noted Ms. Urizar-Mota planned to stop taking it after discussions with Dr. Hosmer.[219] Dr. Harris documented a provisional diagnosis of "[h]eadache syndromes" contingent on further testing (a complete blood count and a comprehensive metabolic panel) and a follow-up visit in two weeks.[220]

---

212     MED01-0172.

213     2/24/12 Tr. 8:4-22, 46:21-47:6 (Harris).

214     MED01-0172; 2/14/24 Tr. 39:5-16 (Harris).

215     MED01-0174; MED01-0175; 2/14/24 Tr. 41:15-44:6, 58:16-23 (Harris); 1/19/24 Tr. 312:22-314:6 (Phillips); 3/1/24 Tr. 72:6-73:9 (Ship).

216     1/19/24 Tr. 314:3-6 (Phillips); 3/1/24 Tr. 73:11-21 (Ship); 2/14/24 Tr. 49:3-9 (Harris).

217     2/14/24 Tr. 44:7-45:8, 101:7-102:2, 102:13-23, 108:1-8 (Harris).

218     MED01-0172.

219     MED01-0175; 2/14/24 Tr. 39:17-40:18, 46:3-20 (Harris); 1/19/24 Tr. 315:8-316:11 (315:22-24) (Phillips); 3/1/24 Tr. 75:4-76:2 (Ship).

220     MED01-0175; 2/14/24 Tr. 39:17-25, 45:9-21, 47:19-49:21 (Harris).

While Nurse Practitioner Brosofsky initially said that she would "absolutely" refer Ms. Urizar-Mota to imaging if she had been the provider upon Ms. Urizar-Mota's June 2014 return to PCHC complaining of headaches, she qualified that position by stating that she would want to first investigate Ms. Urizar-Mota's presentation before deciding what to do, Brosofsky Dep. 128:17-21, 129:12-18, 140:4-11 (Trial Ex. 119).

Dr. Ship pointed to the absence of any neurological deficit or other red flag as supporting her opinion that Dr. Harris met the standard of care in treating Ms. Urizar-Mota's headache and other symptoms at this visit.[221]

Dr. Phillips opined, however, that imaging was necessary because of: (1) persisting headaches; (2) the lack of imaging dating to November 2012; (3) his view that her symptoms "didn't really fit into any benign category," and (4) a "change in the pattern."[222]

As explained above, neither the first nor second grounds that Dr. Phillips cited are red flags. Dr. Phillips's testimony also failed to account for all of the relevant evidence. Dr. Phillips contended that "now we're going into two years" of headache symptoms,[223] exaggerating the duration of Ms. Urizar-Mota's symptoms. He refused to draw any inferences based on this latest, long gap during which Ms. Urizar-Mota did not seek care from PCHC for her headaches, although (as already noted) he credited a later gap in concluding that the standard of care was met.[224] And he ignored direct evidence from Ms. Urizar-Mota herself. She testified that she sought care from PCHC when her headaches became worse.[225] This is consistent with Dr. Ship's opinion that, to the extent Ms. Urizar-Mota had headaches between PCHC visits, they could not have been severe enough to merit primary-care attention.[226] Plaintiffs' expert Dr. Ashley also contradicted Dr. Phillips by offering the commonsense opinion that a reasonable clinician would not image someone who does not seek care.[227] And, without clear evidence of intervening headaches, there is no empirical basis to

---

[221]    3/1/24 Tr. 69:6-70:2, 74:7-75:3, 170:12-172:10 (Ship).

[222]    1/9/24 Tr. 129:12-131:8 (Phillips).

[223]    1/9/24 Tr. 113:12-114:14 (114:13-14) (Phillips).

[224]    1/19/24 Tr. 309:1-9, 321:16-322:3, 322:5-16 (Phillips); *see* Section VI.I. *below*.

[225]    *See* n.148 *above*.

[226]    3/1/24 Tr. 70:3-24 (Ship).

[227]    1/16/24 Tr. 229:10-16, 230:12-21 (Ashley).

support any contention that Ms. Urizar-Mota's headaches followed any pattern at all, much less that such a pattern changed in any clinically significant way.[228]

### F.    July 10, 2014

Dr. Harris saw Ms. Urizar-Mota two weeks later, on July 10, 2014. He documented:

> ● Cardiovascular symptoms[.] Reports palpitations and "weakness" with her headaches, but no SOB [*i.e.*, shortness of breath] or dizziness.
> . . . .
> ● Neurological symptoms[.] [P]atient continues to report daily headaches, especially arising in the a.m. She relates these to her depo injection. She has declined a repeat dep injunction which was due in [J]une. She is currently using no contraceptives. No new medications prescribed.[229]

He included the cardiovascular findings given stress' potential to exacerbate migraine headaches.[230] His fundoscopic and neurological exams were both normal,[231] and he eliminated brain tumor from his differential diagnosis.[232] As with Ms. Urizar-Mota's previous visit, he observed no neurological abnormalities, and therefore did not refer her to imaging.[233]

Dr. Harris diagnosed Ms. Urizar-Mota with migraine headaches and prescribed atenolol, a beta blocker that was then the standard of care for treating migraine headaches.[234] Dr. Harris also diagnosed Ms. Urizar-Mota with

---

[228]    3/1/24 Tr. 197:11-198:16, 198:17-25, 222:10-224:20 (Ship).

[229]    MED01-0176; *see also* 2/14/24 Tr. 51:8-24 (Harris).

[230]    2/14/24 Tr. 49:25-50:13 (Harris); *see also id*. 21:4-17 (Harris).

[231]    MED01-0177; MED01-0178; 2/14/24 Tr. 51:25-52:11, 58:16-23 (Harris); 3/1/24 Tr. 76:3-9 (Ship).

[232]    2/14/24 Tr. 55:18-56:2 (Harris).

[233]    MED01-0176-MED01-0178; 2/14/24 Tr. 56:3-16 (Harris); 1/19/24 Tr. 319:13-16 (Phillips).

[234]    MED01-0178; 2/14/24 Tr. 53:7-54:2, 54:20-55:6 (Harris); *see also id*. 39:17-40:18 (Harris); 1/19/24 Tr. 319:5-12 (Phillips).

gastroesophageal reflux and prescribed Omeprazole.[235] He left PCHC in 2015, did not see Ms. Urizar-Mota again.[236]

To try to support his opinion that Dr. Harris breached the standard of care by not referring Ms. Urizar-Mota to imaging, Dr. Phillips relied on these discredited grounds: (1) the persistence of Ms. Urizar-Mota's headaches, (2) Dr. Harris's alleged failure to document all characteristics of migraine headache,[237] and (3) a changed pattern in Ms. Urizar-Mota's presentation.[238]

In addition to the above-stated reasons why the Court should reject these grounds as the basis for any standard-of-care breach, there are two more: First, if the notation "In the mor[n]ings, reports headache" (June 26) and "continues to report daily headache" (July 10) were enough to comprise a "pattern change," then a reasonable clinician would spot this red flag every time a patient reported a headache, robbing this category of any predictive value. Second, Dr. Ship—who opined that Dr. Harris satisfied the standard of care—testified that there is no medical authority that characterizes five primary-care office visits for headaches over 17 months as raising the risk of an underlying, sinister, secondary cause.[239] Plaintiffs conceded the point by failing to bring any such authority to Dr. Ship's attention, only further undermining Dr. Phillips's reliance on "persistence" as a red flag.

The preceding points render moot whether Depo Provera caused the 2014 headaches. But Dr. Phillips's opinions about this matter further expose his unreliability. At trial, Dr. Phillips interjected that Ms. Urizar-Mota's decision to stop taking Depo Provera did not:

---

[235]    MED01-0178; 2/14/24 Tr. 39:17-40:18 (Harris).

[236]    2/14/24 Tr. 131:12-24 (Harris).

[237]    Dr. Phillips described Dr. Harris's documentation as complete in his deposition. 1/19/24 Tr. 310:20-312:21 (Phillips) (quoting Phillips Dep. 108:8-21 (Trial Ex. 120)).

[238]    1/9/24 Tr. 133:1-134:7, 134:11-136:23 (Phillips).

[239]    3/1/24 Tr. 77:7-78:15 (Ship).

> seem[ ] to be very desirable necessarily—she wasn't, I
> don't think, expressing a lot of interest in wanting [to get
> pregnant] at that period of time, and so it's not neces-
> sarily something that I would have done in this context,
> but—and I don't think it reflects a standard of care, ei-
> ther.[240]

A patient, however, cannot breach a standard of clinical care. And Dr. Phillips con-
ceded on cross-examination that Ms. Urizar-Mota made the decision herself, as the
PCHC record states: "Patient has decided to stop Depo . . . ."[241]

So the only point of Dr. Phillips's testimony must have been to attack Dr. Har-
ris—an attack that the record evidence refutes. Three days before her first visit with
Dr. Harris, Ms. Urizar-Mota received "preconception counseling"[242]—suggesting the
very interest in conceiving a child that Dr. Phillips claimed was lacking. On July 10,
2014, Dr. Harris referred Ms. Urizar-Mota to family planning,[243] and she followed up
on July 11, 2014, to get condoms.[244] This evidence might reflect Ms. Urizar-Mota's
family-planning ambivalence, but not a deviation from the standard of care.

## G.    Intervening PCHC OB/GYN visits

After her last visit with Dr. Harris and before her first appointment with her
next PCHC primary-care provider, Dr. Thomas, Ms. Urizar-Mota visited PCHC
OB/GYN providers approximately 20 times for pregnancy care.[245] Plaintiffs allege no
violation of the standard of care during any of these visits. Ms. Urizar-Mota's "active
problem" list carried over the diagnosis of "chronic headaches" until May 22, 2015,
when it was removed from the list.[246] "Chronic Daily Headache" was, therefore, not

---

[240]    1/9/24 Tr. 117:17-119:4 (118:21-119:4) (Phillips).

[241]    MED01-0175; 1/19/24 Tr. 314:7-315:3 (Phillips).

[242]    MED01-0171.

[243]    MED01-0178; 2/14/24 Tr. 55:7-11 (Harris).

[244]    MED01-0180.

[245]    *See generally* MED01-0180-MED01-0290.

[246]    MED01-0283; 1/19/24 Tr. 319:20-320:1 (Phillips).

    *See also* 2/14/24 Tr. 27:13-28:1, 69:5-11 (describing content of PCHC electronic
health records as "inherited," *i.e.*, pre-populated from previous visits, including, spe-
cifically, "chronic daily headache"); Thomas Dep. 72:21-73:3 (Trial Ex. 126) (same).

in her "Active Problem" list for any of Ms. Urizar-Mota's visits with Dr. Thomas.[247] And, when Dr. Thomas did meet her for the first time, on December 18, 2015, Ms. Urizar-Mota did not report a headache.[248]

### H.    July 20, 2016

Ms. Urizar-Mota returned to PCHC to see Dr. Thomas on July 20, 2016—seven months after her first visit with him and more than two years after she last reported headache symptoms to a primary-care provider.[249] The two-year gap, as already noted, shows that any intervening headaches were not severe enough to merit primary-care attention.[250]

Her chief complaint on July 20, 2016, was "dizziness, feeling lightheaded since this morning," and did not include headache.[251] Dr. Thomas does not recall whether Ms. Urizar-Mota reported headache symptoms during this visit.[252] Regardless, the record shows the following headache symptoms: "dizziness, lightheadedness since this AM, no fever, no chills, does have some nausea."[253]

A neurological exam was normal, and Dr. Thomas observed no neurological abnormalities.[254] He diagnosed Ms. Urizar-Mota with benign paroxysmal positional vertigo,[255] ordered various labs to inform his diagnostic assessment, and prescribed (1) 500 mg tabs of acetaminophen to prevent potential headaches and (2) Meclizine

---

[247]    MED01-0291;  MED01-0295;  MED01-0306;  MED01-0311;  MED01-0329; MED01-0333; MED01-0338; MED01-0347.

[248]    MED01-0291.

[249]    MED01-0295.

[250]    3/1/24 Tr. 78:16-79:5 (Ship); *id.* 70:3-24 (Ship); *see also* n.148 *above*.

[251]    MED01-0295; 1/19/24 Tr. 320:2-7, 321:13-15 (Phillips).

[252]    Thomas Dep. 85:10-20, 86:11-20 (Trial Ex. 126).

[253]    MED01-0295.

[254]    MED01-0296; 1/19/24 Tr. 322:18-21 (Phillips); Thomas Dep. 87:21-88:12 (Trial Ex. 126).

[255]    MED01-0296.

for her dizziness.[256] Dr. Thomas did not refer Ms. Urizar-Mota to imaging as he wanted to observe her reaction to other interventions first.[257] For Ms. Urizar-Mota's report of itchy ears, he prescribed Debrox.[258] Given Ms. Urizar-Mota's reports of nausea and abdominal pain, he also diagnosed her with acute gastritis and prescribed Promethazine.[259]

Dr. Ship opined that none of these symptoms presented a red flag, and that Dr. Thomas responded appropriately to Ms. Urizar-Mota's multifaceted presentation.[260] Consistent with that conclusion, Dr. Phillips did not identify this PCHC visit as a breach of the standard of care at his deposition.[261]

At trial, however, Dr. Phillips opined that Dr. Thomas *had* violated the standard of care by not referring Ms. Urizar-Mota to imaging given: (1) her persistent symptoms, which again is not a red flag; and (2) her dizziness.[262] Plaintiffs' main criticisms pertain to the lack of explanatory documentation about the nature of this "dizziness."[263] But no medical literature identifies "dizziness" as a red flag,[264] likely because it is a common symptom with many causes.[265] Moreover, Dr. Phillips's inclusion of dizziness[266] stretches the SNNOOP-10 red flag of "Neurologic deficit or dysfunction (including decreased consciousness)" beyond its plain meaning. The flag's name—including "deficit," "dysfunction," "decreased consciousness"—highlights the need for much more serious signs and symptoms than mere "dizziness."

---

[256]    MED01-0297; Thomas Dep. 97:14-100:23 (Trial Ex. 126).

[257]    Thomas Dep. 105:6-106:7 (Trial Ex. 126); *see also* 92 *above*.

[258]    MED01-0295; MED01-0297.

[259]    MED01-0295-MED01-0297.

[260]    3/1/24 Tr. 79:6-80:15, 80:21-81:5, 95:20-96:6, 241:9-242:13 (Ship).

[261]    1/19/24 Tr. 325:5-22 (325:10) (Phillips).

[262]    1/9/24 Tr. 142:5-145:3 (Phillips); 1/19/24 Tr. 323:18-324:8 (Phillips).

[263]    3/1/24 Tr. 150:4-155:15 (Ship).

[264]    3/1/24 Tr. 95:20-96:6 (Ship).

[265]    2/29/24 Tr. 30:12-16 (Smith); Thomas Dep. 93:6-15 (Trial Ex. 126).

[266]    1/19/24 Tr. 324:9-325:4 (324:14-18) (Phillips).

## I.    August 23, 2018

More than two years and three months passed before Ms. Urizar-Mota returned to PCHC on November 1, 2018, with a complaint of a headache. In the interim, she visited PCHC three times: (1) for an annual visit,[267] (2) an OB/GYN follow-up,[268] and (3) an appointment with Dr. Thomas on August 23, 2018.[269] Ms. Urizar-Mota did not report headaches at any of these visits, the last of which was about 10 months before her acute presentation on June 19, 2019. When Ms. Urizar-Mota consulted Dr. Thomas on August 23, 2018, her chief complaint was right upper quadrant and stomach pain.[270] She reported no dizziness.

On direct, Plaintiffs did not elicit testimony about this visit. Defendant introduced this visit in cross-examining Dr. Phillips, establishing three critical facts. (1) Ms. Urizar-Mota did not experience headaches on a daily basis and, apparently, did not experience headaches for long stretches of time. (2) Dr. Phillips agreed that the persistence of her intermittent headaches over a period of years made imaging unnecessary, rather than comprising a red flag as he had claimed in assessing other PCHC visits. And (3) Dr. Thomas acted consistent with the standard of care by not referring Ms. Urizar-Mota to imaging as of August 23, 2018. In Dr. Phillips's own words:

> The fact that she's not having headaches now obviously makes that, you know, probably less critical at this point because I think now in the absence of headaches, I wouldn't necessarily hold Dr. Thomas responsible at this point for not getting imaging because now we're like four years—you know, multiple years out from admission, you know, from her initial headaches, and it doesn't sound like she's having them at present and complaining of them.[271]

---

[267]    MED01-0298.

[268]    MED01-0304.

[269]    MED01-0306.

[270]    MED01-0306.

[271]    1/19/24 Tr. 329:6-332:14 (331:12-21) (Phillips) (quoting Phillips Dep. 121:21-123:7 (Trial Ex. 120)).

This deposition testimony from Dr. Phillips effectively absolved PCHC of liability through August 2018. Dr. Phillips reached this commonsense conclusion, in light of the fact that (1) multiple years passed between Ms. Urizar-Mota's primary care visits where she complained of headaches, (2) that Ms. Urizar-Mota sought care from PCHC providers and did not have headaches or any other neurological symptoms of any kind, and (3) that Ms. Urizar-Mota's earlier headaches had resolved and were unconnected to her later presentations. Dr. Phillips tried to marginalize his own deposition testimony by characterizing that testimony as pertaining to "an isolated visit for a hypothetical patient" for whom there would be "no reason . . . for imaging."[272] Further contradicting his deposition testimony, he added at trial that Ms. Urizar-Mota "should have had imaging at this visit" given "the context of [her] medical history and ongoing symptoms."[273]

But there was nothing "ongoing" about Ms. Urizar-Mota's symptoms. Since July 2016—a period exceeding two years—she visited PCHC multiple times but did not complain to any PCHC provider about headache or dizziness. And Dr. Phillips admitted at his deposition that he *had* considered that her context and history.[274]

**J.    November 1 and 14, 2018**

More than two years and four months elapsed from Ms. Urizar-Mota's last office visit (July 2016) in which she complained of headaches and her next headache complaint on November 1, 2018.[275] This gap, as with the prior ones, establishes that,

---

272    1/19/24 Tr. 329:6-330:17 (329:22-24) (Phillips).

273    1/19/24 Tr. 329:6-330:17 (330:2-4 & 13-14) (Phillips).

274    1/19/24 Tr. 332:15-334:11 (332:15-333:21) (Phillips) (quoting Phillips Dep. 123:8-22 (Trial Ex. 120)).

275    MED01-0311.

to the extent Ms. Urizar-Mota had any intervening headaches, those headaches did not merit primary-care attention.[276]

Ms. Urizar-Mota reported "head pain with blurred vision intermittently for one year,"[277] a common symptom that is not a red flag.[278] Dr. Thomas conducted a neurological exam, which was normal, and a visual assessment, finding 20/50 vision in both eyes.[279] He noted that her headache might be due to migraine or vision problems, and diagnosed Ms. Urizar-Mota with headache syndrome related to those two possible causes.[280] Dr. Thomas prescribed propranolol for the headache, and referred her to optometry to rule out his alternative diagnosis of refraction errors,[281] which can cause headaches.[282] He did not refer Ms. Urizar-Mota to imaging because he wanted to first observe her reaction to these interventions.[283] He also conducted a depression screening. Ms. Urizar-Mota reported feelings of hopelessness or depression one to three days each week, and feeling "nervous" and "not calm" every day.[284]

Ms. Urizar-Mota returned to PCHC on November 14, 2018, to see optometrist Dr. David Mills. She did not report having a headache.[285] Dr. Mills conducted a full fundoscopic exam, which was normal and, thus, indicated that she lacked increased intracranial pressure caused by swelling of the brain or a tumor—a conclusion that even Plaintiffs' expert neuro-oncologist Dr. Ashely shared.[286] Dr. Mills did not

---

[276]    3/1/24 Tr. 80:21-81:22 (Ship); *id.* 70:3-24, 78:16-79:5 (Ship); *see also* n.148 *above.*

[277]    MED01-0311.

[278]    3/1/24 Tr. 81:23-83:2, 84:4-12 (Ship).

[279]    MED01-0312.

[280]    MED01-0312.

[281]    MED01-0312; Thomas Dep. 138:17-140:18 (Trial Ex. 126).

[282]    3/1/24 Tr. 83:3-6 (Ship).

[283]    Thomas Dep. 144:16-145:18 (Trial Ex. 126); *see also* n.92 *above.*

[284]    MED01-0313.

[285]    MED01-0320; 1/19/24 Tr. 341:4-7 (Phillips).

[286]    MED01-0322; 1/16/24 Tr. 186:20-187:13 (Ashley); 3/1/24 Tr. 84:13-85:6 (Ship).

observe any neurological abnormality.[287] Notably, this was only seven months before Ms. Urizar-Mota suffered from acute hydrocephalus on June 19, 2019.

Although Ms. Urizar-Mota had told Dr. Thomas that her vision issues had been going on for a year, she told Dr. Mills that those issues had persisted for only five months.[288] Dr. Mills determined that Ms. Urizar-Mota had a refractive vision error, leading to a diagnosis of bilateral myopia, for which he prescribed eyeglasses.[289] Ms. Urizar-Mota filled that prescription on November 28, 2018.[290] According to Ms. Urizar-Mota, her daughter, and two of Plaintiffs' experts, the glasses improved her vision.[291]

Dr. Phillips testified in his deposition that Dr. Thomas *met* the standard of care when he did not refer Ms. Urizar-Mota to imaging in November 2018.[292] Two additional reasons support that conclusion.

First, Plaintiffs' expert neuro-oncologist, Dr. Ashley, conceded that Ms. Urizar-Mota's blurred vision was not caused by increased intracranial pressure.[293] This concession is particularly significant because, before trial, November 2018 was the only time Plaintiffs contended that Ms. Urizar-Mota exhibited any neurological abnormality before June 19, 2019.[294] Dr. Ashley's concession renders that contention false. It

---

[287]    1/19/24 Tr. 343:9-15 (Phillips).

[288]    MED01-0316; *see also* MED01-0320 (amended record).

[289]    MED01-0322; 1/8/24 Tr. 160:11-15 (Urizar-Mota).

[290]    MED01-0328.

[291]    1/8/24 Tr. 160:16-21 (Urizar-Mota); Urizar-Mota Dep. 60:21-23 (Trial Ex. 127); D. Reyes Dep. 19:2-7 (Trial Ex. 121); 1/8/24 Tr. 137:4-5 (Reyes, D.); 1/19/24 Tr. 344:17-22 (Phillips); 1/16/24 Tr. 131:21-132:4, 186:20-187:8, 186:20-187:13 (Ashley).

[292]    1/19/24 Tr. 338:2-340:15 (Phillips) (quoting Phillips Dep. 125:8-127:10 (Trial Ex. 120)).

[293]    1/16/24 Tr. 186:20-187:13 (Ashley).

[294]    1/8/24 Tr. 17:25-18:4 (Pls.' opening statement) ("[Y]ou can have a brain tumor for a long time and not have any focal neurological conditions. And we know that's true, because this case is an example of that. Mrs. Mota had no focal neurological conditions until near the end of her situation in 2018 and '19."); *id.* 25:19-20 (Pls.' opening statement) ("There were very few neurological—there weren't any neurological deficits until her vision problems in 2018.").

also mitigates the alleged breach in the standard of care for documentation arising from Dr. Thomas's migraine diagnosis. Even if Dr. Thomas had more fully described symptoms of migraine, that diagnosis proved secondary to the refraction error, and did not change the appropriate care that Ms. Urizar-Mota actually received in November 2018.

Second, Dr. Phillips's deposition admissions, Dr. Ashley's trial admission, and the preceding facts refute Dr. Phillips's later trial testimony—that Ms. Urizar-Mota's "blurred vision" comprised "a different neurologic symptom" and that she "now has—now a history of multiple years of headache" and, thus, "certainly needs imaging."[295] Ms. Urizar-Mota had blurred vision because she needed glasses, not because she had a brain tumor.

### K.    January 2019

Dr. Thomas saw Ms. Urizar-Mota two months later, on January 16, 2019, when she reported umbilical pain but no headache.[296] Ms. Urizar-Mota met with Dr. Thomas again a week later, on January 22, 2019, due to a painful rash on her back. She again did not have a headache.[297]

### L.    April 5, 2019

On April 5, 2019, six months after her last complaint of a headache, Ms. Urizar-Mota met with Dr. Thomas and complained of "increased headaches" and abdominal pain.[298] Dr. Thomas diagnosed her with gastroesophageal reflux disease ("GERD"), for which he prescribed pantoprazole and simethicone.[299]

---

[295]    1/9/24 Tr. 166:16-167:8 (Phillips); *id*. 169:22-170:18 (Phillips).
[296]    MED01-0329.
[297]    MED01-0333.
[298]    MED01-0338.
[299]    MED01-0339.

Dr. Thomas conducted a neurological exam, which was normal,[300] and observed no neurological abnormalities.[301] She did not have a headache that day.[302] Dr. Thomas again diagnosed migraine headache and prescribed topiramate, a daily medication to prevent migraines, and sumatriptan, to take for acute breakthrough headaches—classic migraine treatments.[303] He conducted a screening for depression, a known cause of headaches, and the screening identified "clinically significant symptoms."[304] Dr. Thomas discussed PCHC's integrated behavioral health service with Ms. Urizar-Mota, and he recommended that she call for an appointment.[305] He personally introduced Ms. Urizar-Mota to a licensed social worker to refer her to additional resources.[306]

## M.    May 1, 2019

On May 1, 2019, Ms. Urizar-Mota returned to PCHC, met Dr. Thomas, and complained of "continued migraine headaches."[307] She reported that the topiramate he had prescribed a month before was making her feel "shaky" and she "want[ed] to try something different."[308] Dr. Thomas conducted a neurological exam, which was normal.[309] Dr. Thomas did not conduct a fundoscopic exam.[310] He did not observe any neurological abnormalities.[311] He diagnosed migraine headache.[312]

---

[300]    MED01-0339.

[301]    1/19/24 Tr. 347:9-348:6 (Phillips); 3/1/24 Tr. 90:23-91:2 (Ship).

[302]    MED01-0338.

[303]    MED01-0339; 1/19/24 Tr. 346:12-18 (Phillips); 3/1/24 Tr. 88:11-90:22 (Ship); Thomas Dep. 174:19-176:19 (Trial Ex. 126).

[304]    MED01-0339; 1/19 Tr. 346:19-347:8 (Phillips); 3/1/24 Tr. 85:16-87:7 (Ship).

[305]    MED01-0341; 3/1/24 Tr. 85:16-88:10 (Ship).

[306]    MED01-0341; 3/1/24 Tr. 87:8-21 (Ship).

[307]    MED01-0347.

[308]    MED01-0347.

[309]    MED01-0348.

[310]    1/19/24 Tr. 351:15-352:1 (Phillips).

[311]    1/19/24 Tr. 351:15-352:1 (351:15-18) (Phillips).

[312]    MED01-0348.

Dr. Thomas discontinued the topiramate and re-started propranolol.[313] Dr. Thomas diagnosed GERD and prescribed a proton pump inhibitor ("PPI").[314] Ms. Urizar-Mota's depression screening again resulted in clinically significant symptoms and a slightly higher score than her previous screening.[315] Dr. Thomas again recommended that she follow up with integrated behavioral health to rule out what he perceived as the most likely cause of her headaches: depression.[316] He did not refer Ms. Urizar-Mota to imaging because she exhibited no red flags.[317]

As with Ms. Urizar-Mota's past PCHC presentations, Dr. Ship opined that Dr. Thomas accounted holistically for Ms. Urizar-Mota's presentations and satisfied the standard of care on both April 5 and May 1, 2019.[318]

Dr. Phillips opined at trial that Dr. Thomas breached the standard of care on both April 5 and May 1, 2019, for substantially similar, already-discredited reasons:

- Documentation insufficient to support Dr. Thomas's migraine diagnoses;[319]

- A changed pattern in her presentation on April 5[320] and the persistence of those symptoms on May 1;[321] and

- The absence of imaging since November 2012[322]—the only reason Dr. Phillips offered during his deposition to support his contention that Dr. Thomas breached the standard of care on May 1.[323]

---

[313]    MED01-0348; 1/19/24 Tr. 352:2-20 (352:2-7) (Phillips).

[314]    MED01-0348.

[315]    MED01-0349.

[316]    MED01-0348; Thomas Dep. 196:14-22 (Trial Ex. 126).

[317]    Thomas Dep. 197:6-198:4, 205:16-206:22 (Trial Ex. 126).

[318]    3/1/24 Tr. 90:8-91:11, 93:5-94:6 (Ship).

[319]    1/9/24 Tr. 176:21-177:12, 183:9-184:6 (Phillips).

[320]    1/9/24 Tr. 178:23-179:5 (Phillips).

[321]    1/9/24 Tr. 184:7-18 (Phillips).

[322]    1/9/24 Tr. 180:9-181:5 (181:3-5) (Phillips).

[323]    1/19/24 Tr. 353:23-354:7 (Phillips). (Defense counsel misspoke, or the transcript is inaccurate, at 354:3, where it states "November of 2019," which should read "November 2012.")

Dr. Phillips disagreed that a reasonable provider might defer imaging until seeing how this new, May 1 drug regimen worked, citing "seven years of headaches"[324] and ignoring years-long gaps in Ms. Urizar-Mota's PCHC visits.[325]

## VII.  Intermittent headaches over a period of years do not compel imaging.

The intermittent presentation of headache symptoms during nine primary-care visits over seven years is not sufficient to prove a breach of the standard of care for at least four reasons.

First, no medical authority characterizes so few visits over such a long time (or 12 visits over 12 years) as raising the risk of an underlying, sinister, secondary cause.[326] One of the scholarly treatises on which Dr. Phillips relied applies the red flag "pattern change" to headache symptoms over a shorter period—"less than three months"—than at issue here.[327]

Second, one of Plaintiffs' own experts rejected Dr. Phillips's opinion that the allegedly years-long duration of Ms. Urizar-Mota's reported headaches constitutes a red flag. As noted, Dr. Ashley, Plaintiffs' neuro-oncology expert, is not a primary-care physician. He testified, however, that primary-care providers do refer headache patients to him, typically after having presented five to ten times with symptoms that those providers could not control—which he opined was "a reasonable standard of care."[328] Plaintiffs' 2012-2019 negligence contentions focus on nine visits over seven years, within Dr. Ashley's range even accounting for the extended period.

---

[324]   1/19/24 Tr. 348:7-349:7 (Phillips).

[325]   Dr. Phillips speculated that the gaps might have occurred because "you just lose faith in the ability of [anyone] assisting to help you, and you might figure they're part of your lor in life . . . ." 1/9/24 Tr. 114:15-115:16 (Phillips). This is pure speculation *and* is belied by the record evidence, which includes Ms. Urizar-Mota's continued reliance on PCHC providers for the care of her headaches when, as Ms. Urizar-Mota herself testified, when those headaches became worse. *See* n.148 *above*.

[326]   3/1/24 Tr. 78:2-15, 94:7-18, 221:8-223:14, 233:4-234:5, 246:8-247:6 (Ship).

[327]   3/1/24 Tr. 247:7-248:17 (Ship).

[328]   1/16/24 Tr. 221:12-222:20 (Ashley).

Third, Plaintiffs' theory of negligence—in effect, "seven years of headaches"—does not account for the many, and in some case, years-long gaps when Ms. Urizar-Mota did not seek PCHC care for headaches. The sum of the gaps among Ms. Urizar-Mota's PCHC visits for headache exceeds ten years and ten months between 2007 and 2019.[329] Ms. Urizar-Mota's long periods when she did not seek care for headaches from PCHC, even as she visited PCHC for other medical conditions, support the reasonable inferences of PCHC providers that her headaches were not worsening, were not progressive, and could not represent a change in pattern. Instead, the gaps more reasonably related to the resolution and restarting of separate, intermittent headaches rather than a seven-year headache caused by an undetected brain tumor.

Ms. Urizar-Mota testified that she did not consistently seek primary care from PCHC "because I knew they were always prescribing the same thing, which was Tylenol."[330] But the record evidence shows that PCHC providers neglected neither her nor her headache pain. Ms. Urizar-Mota admitted that Tylenol (which Dr. Thomas had prescribed in July 2016) "helped a little bit" with her headaches.[331] And Nurse Practitioner Brosofsky,[332] Dr. Harris,[333] and Dr. Thomas[334] each attempted to manage Ms. Urizar-Mota's headache symptoms with drugs other than Tylenol following six of the nine PCHC visits that Plaintiffs contest. Those other, non-Tylenol treatments had varying degrees of success, based on the medical records indicating that

---

[329]    More than two years, five months separate August 2, 2007, from January 20, 2010; more than two years, nine months separate February 10, 2010, from November 14, 2012; more than one year, three months separate March 13, 2013, from June 26, 2014; just over two years separate July 10, 2014, from July 20, 2016; and more than two years, three months separate July 20, 2016, from November 1, 2018.

[330]    1/8/24 Tr. 154:23-155:4, 156:9-18 (Urizar-Mota).

[331]    1/8/24 Tr. 157:7-24 (Urizar-Mota).

[332]    MED01-0154 (Feb. 1, 2013); MED01-0159 (Mar. 13, 2013).

[333]    MED01-0178 (July 10, 2014).

[334]    MED01-0312 (Nov. 1, 2018); MED01-0339 (Apr. 5, 2019); MED01-0348 (May 1, 2019).

some of the drugs completely alleviated her headaches, and Ms. Urizar-Mota's own admissions that she returned to PCHC for treatment only "when [the pain] got worse."[335]

Finally, "duration" cannot be a red flag, at least in Ms. Urizar-Mota's case, for the simple reason that her documented headaches occurred over an even longer period than the Plaintiffs contend. That period started in 2007 (and the three overlooked pre-2012 headaches) and continued even after her tumor had been removed, in June 2020, when Ms. Urizar-Mota reported she still had headaches every afternoon,[336] and through late 2022.[337] "Duration" of headache symptoms cannot be a clinically meaningful characteristic when this 15-year period includes *years* during which Ms. Urizar-Mota visited PCHC and reported no headache symptoms at all and after June 2019, when it is undisputed Ms. Urizar-Mota lacked any brain tumor.

## VIII. Hydrocephalus

Plaintiffs' experts opined at length about hydrocephalus—a diagnosis whose primary symptom is increased intracranial pressure.[338] There are two, widely recognized types of hydrocephalus: (1) communicating, in which the flow of cerebral spinal fluid ("CSF") is partially obstructed, and (2) acute, in which CSF flow is completely obstructed.[339] Acute, obstructive hydrocephalus can cause a patient to lose consciousness and, if untreated, die.[340] In milder presentations, hydrocephalus is "sometimes" associated with headaches.[341] The parties agree that Ms. Urizar-Mota never

---

[335]     1/8/24 Tr. 155:20-24, 161:2-7 (Urizar-Mota); Urizar-Mota Dep. 52:19-21, 58:14-20 (Trial Ex. 127).

[336]     MED20-0009 (June 11, 2020).

[337]     1/8/24 Tr. 166:7-15 (Urizar-Mota); 1/8/24 Tr. 144:14-22 (D. Reyes).

[338]     1/16/24 Tr. 54:9-14 (Ashley).

[339]     1/16/24 Tr. 50:3-54:8 (Ashley); 1/11/24 Tr. 28:7-29:8 (Caplan).

[340]     *E.g.*, 2/29/24 Tr. 31:24-33:6 (Smith)

[341]     1/9/24 Tr. 42:19-43:8, 252:8-10 (Phillips).

experienced communicating hydrocephalus.[342] The parties also agree that Ms. Urizar-Mota experienced only acute obstructive hydrocephalus on June 19, 2019.[343]

Plaintiffs' experts offered opinions about other aspects of hydrocephalus. Certain signs and symptoms—for instance, (1) the vomiting that Ms. Urizar-Mota reported during her November 2012[344] and February 2013[345] PCHC visits; or (2) the morning dizziness that Ms. Urizar-Mota reported to Dr. Thomas during her July 2016, visit[346]—could "suggest" hydrocephalus. According to only Dr. Ashley, a third type of hydrocephalus might exist, characterized by increased intracranial pressure that "can wax and wane" through a "ball valve effect" caused, in turn, by a brain tumor.[347] Also according to Dr. Ashley, this novel, third type of hydrocephalus caused Ms. Urizar-Mota's "constellation of symptoms" between 2012 and 2019.[348] For the purposes of assessing whether PCHC providers breached the standard of care, however, these opinions are irrelevant, unpersuasive, or both for at least three reasons.

First, Plaintiffs' experts disagree about whether Dr. Ashley's third type of hydrocephalus even exists. Plaintiffs' expert neurologist, Dr. Caplan, disavowed it. He characterized Dr. Ashley's conception of "intermittent increased intracranial pressure" as a type of hydrocephalus as "an outlier."[349] Dr. Smith also opined that pilocytic astrocytomas cannot cause intermittent increased intracranial pressure.[350]

---

[342]    1/16/24 Tr. 230:22-25 (Ashley); 1/11/24 Tr. 100:9-11, 128:4-13 (Caplan).

[343]    *Cf.* 1/16/24 Tr. 85:2-20 (Ashley); 1/11/24 Tr. 25:14-18, 100:9-11, 128:14-17 (Caplan) (same); 2/29/24 Tr. 20:14-17, 31:24-32:4 (Smith).

[344]    MED01-0146; 1/16/24 Tr. 54:15-22 (Ashley).

[345]    MED01-0154.

[346]    MED01-0295; 1/9/24 Tr. 253:4-23 (Phillips).

[347]    1/16/24 Tr. 54:25-55:25 (Ashley).

[348]    1/16/24 Tr. 63:9-7, 64:18-67:25,70:19-71:24,76:4-78:25, 80:21-82:14 (Ashley).

[349]    1/11/24 Tr. 128:19-129:8 (Caplan).

[350]    2/29/24 Tr. 33:7-35:21, 40:15-41:8 (Smith).

There is, moreover, no medical literature in evidence attesting to its existence,[351] much less the mechanism that Dr. Ashley described.

Second, Plaintiffs' experts disagree about whether this third type of hydrocephalus—if it existed—was something that Ms. Urizar-Mota experienced. Drs. Caplan and Phillips opined that PCHC's medical records lacked any evidence that Ms. Urizar-Mota experienced *any* type of hydrocephalus before her acute event on June 19, 2019.[352] Dr. Ashley opined that she experienced this novel form of hydrocephalus, repeatedly—with the significant exception of November 2018.[353]

Third, and most importantly, no primary-care provider could have detected this novel form of hydrocephalus even if it were to exist and even if it had occurred. Both Drs. Ashley and Phillips admitted that a fundoscopic exam could not identify a patient with intermittent increased intracranial pressure.[354] PCHC primary-care providers, thus, cannot be faulted for not referring Ms. Urizar-Mota to imaging based on a dubious phenomenon that they could not have detected.

## IX.    Ms. Urizar-Mota's day-in-the-life evidence

Regardless of the Court's assessment of PCHC documentation, Plaintiffs' own testimony makes it more likely than not that PCHC primary-care providers reasonably did not observe any red flags or neurological abnormalities because Ms. Urizar-Mota never exhibited any before June 18, 2019.

Aside from the PCHC documentation, the most obvious potential source of evidence that Ms. Urizar-Mota *had* exhibited significant clinical features suggestive of brain tumor before June 2019 would have been the Plaintiffs themselves. But there is no evidence that Ms. Urizar-Mota, before June 18, 2019, experienced any difficulty

---

351    2/29/24 Tr. 41:12-22 (Smith).

352    1/11/24 Tr. 24:11-25:18, 135:2-11 (Caplan); 1/9/24 Tr. 253:4-254:12 (Phillips).

353    *See* n.293 *above*.

354    1/16/24 Tr. 233:20-234:15 (Ashley); 1/9/24 Tr. 49:15-51:5 (50:13-51:5), 51:6-52:11 (Phillips).

walking, talking, speaking, maintaining her balance, or that she lacked strength or was incontinent. With the exception of vision issues that she reported in November 2018 and that resolved with eyeglasses, she had no vision problems.[355]

Her most intimate family member, her husband, did not testify at trial. His deposition testimony only supports what Ms. Urizar-Mota herself testified to: persistent headaches.[356] Ms. Urizar-Mota's daughter, Delmy, offered similar testimony,[357] and did not testify about any neurological deficit.

Most fatal to the Plaintiffs' contentions that PCHC medical records failed to document some significant neurological deficit is the Plaintiffs' testimony that Ms. Urizar-Mota, before her surgery, "used to do everything."[358] She could drive a car.[359] She ran the family household.[360] She could swim.[361] She stood at the stove to cook family meals.[362] She enjoyed social time with her family, including on New Year's Day 2019.[363] She watched her children's soccer games and enjoyed her family in May 2019.[364] In the few warm-weather months before her acute hydrocephalus on June 18, 2019—judging from her lack of a coat—she shopped for and carried garden plantings at Lowe's.[365] She assisted her husband on the weekends with his obviously physically demanding landscaping business, hauling 33-gallon bins filled with yard

---

[355]     D. Reyes Dep. 19:2-7 (Trial Ex. 121).

[356]     S. Reyes Dep. 19:24-20:1 (Trial Ex. 122).

[357]     1/8/24 Tr. 115:17-23, 117:5-12 (D. Reyes); D. Reyes Dep. 22:13-25, 23:5-7 (Trial Ex. 121).

[358]     S. Reyes Dep. 24:21-24; 24:25-25:2 (Trial Ex. 122); *see also* D. Reyes Dep. 14:25-15:15; 16:5-9 (Trial Ex. 121).

[359]     1/8/24 Tr. 110:7-11 & 22-24 (D. Reyes).

[360]     1/8/24 Tr. 110:12-15, 117:20-24 (D. Reyes); 1/8/24 Tr. 147:19-21 (Urizar-Mota).

[361]     Trial Ex. 86, PIC-01-0018 & 0019.

[362]     1/8/24 Tr. 125:7-12 (D. Reyes); Trial Ex. 86, PIC01-0015; Trial Ex. 87.

[363]     1/8/24 Tr. 124:10-13 (D. Reyes); Trial Ex. 87.

[364]     1/8/24 Tr. 124:14-125:1, 125:16-23 (D. Reyes); Trial Ex. 86, PIC01-0008-PIC01-0010; Trial Ex. 87.

[365]     1/8/24 Tr. 125:2-6 (D. Reyes); Trial Ex. 86, PIC01-0013; Trial Ex. 87.

waste,[366] pushing a lawnmower,[367] and operating a tractor—the last of these only days before her acute hydrocephalus.[368] All of this evidence corroborates what the PCHC medical records confirm: before June 18, 2019, Ms. Urizar-Mota did not exhibit any neurologic deficit or dysfunction that would have been a red flag.

## X.    Pilocytic astrocytomas

The parties substantially agree about the type of brain tumor that Ms. Urizar-Mota had, the tumor's characteristics, its proper treatment, Ms. Urizar-Mota's prognosis ("excellent"), and the chance a brain tumor could reoccur (negligible). Record evidence for these undisputed facts comes from both parties' expert witnesses: Plaintiffs' expert clinical pathologist, Dr. Arkun; Plaintiffs' expert neuro-oncologist, Dr. Ashley; Plaintiff's expert neurologist, Dr. Caplan; and Defendant's expert neurosurgeon, Dr. Smith.

Ms. Urizar-Mota's tumor was a pilocytic astrocytoma, which could be conclusively diagnosed only after removal.[369] In adults, such tumors are extremely rare.[370] These tumors grow slowly, although scholarly analysis about growth rates for such tumors in adults is poorly documented precisely given their rarity.[371] Pilocytic astrocytomas do not metastasize.[372] Ms. Urizar-Mota's tumors on her spine and right shoulder are, therefore, unrelated to her brain tumor.[373]

---

[366]    1/8/24 Tr. 118:3-6, 125:13-15 (D. Reyes); Trial Ex. 86, PIC01-0001; Trial Ex. 87.

[367]    Trial Ex. 86, PIC01-0005.

[368]    1/8/24 Tr. 122:25-123:11 (D. Reyes) (testifying, 12:11, that the yard work depicted "was around the 16th or 17th"); 1/8/24 Tr. 147:4-15 (Urizar-Mota); Trial Ex. 87.

[369]    1/16/24 Tr. 35:8-16 (Ashley); Arkun Dep. 19:22-21:3, 25:11-26:14, 30:12-22, 63:24-64:16 (Trial Ex. 115).

[370]    1/16/24 Tr. 210:14-16 (Ashley); 1/11/24 Tr. 30:15-31:2 (Caplan).

[371]    1/16/24 Tr. 17:13-24, 210:5-16 (Ashley); 1/11/24 Tr. 29:18-30:2 (Caplan); Arkun Dep. 40:3-13 (Trial Ex. 115).

[372]    1/16/24 Tr. 16:12-25, 17:13-24 (Ashley), Arkun Dep. 26:23-27:16, 27:19-28:1, 30:12-22, 47:16-48:1 (Trial Ex. 115).

[373]    Arkun Dep. 47:16-48:17, 58:1-7, 58:21-59:12, 60:7-11, 61:10-19 (Trial Ex. 115); 1/8/24 Tr. 165:10-12 (Urizar-Mota).

## XI.    Causation

"In malpractice suits where the negligence complained of consists of an act of omission, as in the instant case, causation is frequently difficult to ascertain and prove." *Schenck v. Roger Williams Gen. Hosp.*, 382 A.2d 514, 518 (R.I. 1977). To prove that the alleged failure to diagnose Ms. Urizar-Mota's brain tumor caused her injuries, then, she "not only needed to prove that [PCHC] deviated from the standard of care . . ., but also that [its] failure to do so set in motion the 'natural, unbroken and continuous sequence' that eventually resulted in the patient's [injury]." *Ribeiro v. R.I. Eye Inst.*, 138 A.3d 761, 772 (R.I. 2016) (quoting *DiPetrillo v. Dow Chem. Co.*, 729 A.2d 677, 692 (R.I. 1999)). "The key to proving causation is establishing the link between a deviation from the standard of care and the harm that results." *Id.* To meet their burden on causation, then, Plaintiffs must present "an expert to show that it was a probability, not a mere possibility, that the negligence of" PCHC caused her injuries, and not some other cause. *Almonte v. Kurl*, 46 A.3d 1, 21 (R.I. 2012). Absolute certainty is not required, but the expert must show that the result "'most probably' came from the cause alleged." *Id.* (quoting *Perry v. Alessi*, 890 A.2d 463, 468 (R.I. 2006)).

Even if Plaintiffs had proved that PCHC providers negligently failed to refer Ms. Urizar-Mota to imaging—which they did not do, for all the reasons discussed above—Plaintiffs have not met their burden of proving that any breach of the standard of care caused Ms. Urizar-Mota's injuries. Because Plaintiffs cannot prove causation, they cannot establish liability.

### A.    Earlier diagnosis would not have changed the treatment.

Surgeons at Rhode Island Hospital removed Ms. Urizar-Mota's entire brain tumor on June 24, 2019, and—five years later—Ms. Urizar-Mota lacks any brain

tumor.[374] All of the experts in this case agree that, if Ms. Urizar-Mota's tumor had been diagnosed any time before 2019, treatment would lead inevitably to surgery.[375]

Given that testimony, the only appropriate treatment for Ms. Urizar-Mota's brain tumor, at any time before 2019, was surgery. Both in 2019 and today, surgery is the standard treatment, which Ms. Urizar-Mota needed and received.[376] Providers do not treat such tumors with radiation, which can stimulate them.[377]

Plaintiffs' expert neuro-oncologist, Dr. Ashley, testified that certain alternative, pharmacological (a/k/a "adjuvant") treatments may have been introduced on an experimental basis shortly before Ms. Urizar-Mota's June 2019 surgery. But the U.S. Food and Drug Administration approved those treatments after 2019 for children only, and they remain unapproved for adults.[378] Providers prescribe those drugs only to children whose tumors cannot be completely resected, whereas Ms. Urizar-Mota's tumor was resected completely.[379] Even if non-surgical treatments had been available and approved for adults, therefore, surgery still would have been "the first step" and the "best" treatment option, as even Dr. Ashley admitted.[380]

---

[374]    Arkun Dep. 29:13-16, 30:12-22, 63:24-64:16 (Trial Ex. 115); 1/11/24 Tr. 160:4-7 (Caplan); MED34-0210.

[375]    1/11/24 Tr. 127:6-15 (Caplan); 1/16/24 Tr. 191:6-17 (Ashley); 2/29/24 Tr. 176:6-22 (Smith).

[376]    *E.g.*, 2/29/24 Tr. 84:3-23, 176:9-13 (Smith); 1/16/24 Tr. 190:6-17, 193:22-24, 218:1-20 (Ashley); 1/9/24 Tr. 193:3-15 (Phillips).

[377]    Arkun Dep. 33:21-35:9 (Trial Ex. 115).

[378]    1/16/24 Tr. 190:20-191:5 (Ashley).

[379]    1/16/24 Tr. 31:7-32:5, 190:15-19, 190:15-19, 218:24-220:16 (Ashley); 2/29/24 Tr. 84:3-23 (Smith).

[380]    1/16/24 Tr. 174:18-175:12, 220:17-221:11 (Ashley).

**B.    Inevitable surgery to remove Ms. Urizar-Mota's tumor caused all of her permanent injuries.**

Because Ms. Urizar-Mota needed surgery no matter when the tumor was diagnosed, Plaintiffs must demonstrate that something independent from that surgery caused her ultimate injuries to prove a link between their sole theory of liability—delayed diagnosis—and those injuries. Plaintiffs cannot do so because the evidence, and the consistent opinions of experts retained by both parties, establish that all of her permanent injuries occurred during the surgery, not before.[381]

None of Ms. Urizar-Mota's permanent injuries was apparent during any of the neurological exams conducted by the neurosurgery team at Rhode Island Hospital before the surgery. On June 19, 2019, Ms. Urizar-Mota was taken to PCHC by her husband and daughter to seek treatment for a worsening headache accompanied by nausea and vomiting, when she passed out in her car.[382] The headache that prompted Ms. Urizar-Mota's family to take her to PCHC began the day before, on June 18, 2019, and was much more severe than her earlier headaches.[383] Rescue was called and Ms. Urizar-Mota was transported to Rhode Island Hospital.[384] Ms. Urizar-Mota arrived at the hospital suffering from acute obstructive hydrocephalus.[385]

Ms. Urizar-Mota was seen in the hospital's Emergency Department. A head CT was ordered and performed on June 19, 2019, and showed "enlarged bilateral lateral ventricles, enlarged 3rd ventricle with blood present and a dilated 4th ventricle possibly due to clot or mass."[386] Her medical records characterize her

---

[381]    1/11/24 Tr. 114:18-21, 142:16-143:17 (Caplan); 2/29/24 Tr. 21:7-21, 45:4-14 (Smith).

[382]    MED01-0353.

[383]    MED03-0157; 1/11/24 Tr. 107:18-24, 147:21-148:1 (Caplan).

[384]    MED01-0353.

[385]    MED03-0157.

[386]    MED03-0672.

status after this scan as a "32 y.o. female with acute symptomatic HCP in setting of hemorrhagic IVth vent mass," meaning that she had acute hydrocephalus that was causing her symptoms in the setting of a mass in her fourth ventricle that was bleeding.[387]

Ms. Urizar-Mota's mental status declined after the CT scan was performed, indicating rising intracranial pressure causing her symptoms to worsen while she was in the hospital.[388] Neurosurgery examined her and found that she was "comatose with B/l [*i.e.*, "bilateral" or both] eyes down and out but reactive pupils, and extensor posturing" so they placed an external ventricular drain ("EVD") to relieve pressure in her brain.[389] The medical records note that Ms. Urizar-Mota's neurological exam "dramatically improved with EVD" before her brain surgery, indicating that these deficiencies, which were caused by the hydrocephalus, had begun to resolve.[390] Indeed, all of the causation experts agree that the doctors at Rhode Island Hospital appropriately treated the emergency condition of acute obstructive hydrocephalus by placing the EVD.[391]

The next day, on June 20, 2019, Ms. Urizar-Mota had an MRI of her brain, which found that, in comparison with the CT brain examinations from the day before, Ms. Urizar-Mota showed "Improvement in patient's bilateral lateral and third ventriculomegaly," or the enlargement of her ventricles.[392] This finding indicated that the emergency hydrocephalus was responding to the EVD, as the swelling of her ventricles had reduced.[393]

---

[387]    MED03-0157; 1/11/24 Tr. 146:13-147:1 (Caplan).

[388]    MED03-0157; 1/11/24 Tr. 148:2-19 (Caplan).

[389]    MED03-0096.

[390]    MED03-0147.

[391]    2/29/24 Tr. 41:23-42:16 (Smith); 1/11/24 Tr. 148:2-19 (Caplan); 1/16/24 Tr. 236:22-237:7 (Ashley).

[392]    MED03-0677.

[393]    1/11/24 Tr. 152:7-20 (Caplan).

Ms. Urizar-Mota's neurological exams after the EVD, but before surgery, also found that her down and out pupils had improved to be equal, round, reactive to light, and that she had full strength in both her upper and lower extremities.[394] She showed no signs of nystagmus or facial asymmetry, but there was evidence of slight palsy in her left sixth cranial nerve.[395]

Consistent with that evidence, Drs. Smith and Caplan agree that, with the exception of a slight left sixth cranial nerve palsy, all of Ms. Urizar-Mota's injuries that were apparent before surgery resolved.[396] The June 20, 2019, MRI also showed an injury to the corpus collosum, but experts for both sides agree that this injury had no permanent effect.[397]

After Ms. Urizar-Mota's condition stabilized following the placement of the EVD, and four days after her admission to Rhode Island Hospital, Ms. Urizar-Mota had surgery for a craniotomy/tumor resection on June 24, 2019.[398] The tumor was identified and removed, analyzed by pathology, and diagnosed as a juvenile pilocytic astrocytoma.[399] Drs. Smith and Caplan both opined that this surgery occurred at a reasonable time, after Ms. Urizar-Mota was stable and the emergency situation caused by the hydrocephalus had been resolved.[400]

It was only after the surgery that Ms. Urizar-Mota exhibited injuries that became permanent.[401] On June 25, 2019, a neurological exam found that she had

---

[394]    MED03-0147.

[395]    MED03-0147.

[396]    2/29/24 Tr. 57:18-58:14 (Smith); 1/11/24 Tr. 153:3-21, 154:10-155:3 (Caplan); 1/16/24 Tr. 218:1-9 (Ashley).

[397]    MED03-0677; 2/29/24 Tr. 48:18-49:12, 65:11-17, 250:10-251:1 (Smith); 1/11/24 Tr. 142:16-143:17 (Caplan); 1/16/24 Tr. 197:9-16 (Ashley).

[398]    MED03-0056.

[399]    MED03-0056.

[400]    2/29/24 Tr. 42:17-43:11 (Smith); 1/11/24 Tr. 148:2-19 (Caplan).

[401]    MED03-0160; 2/29/24 Tr. 21:7-21; 45:4-14 (Smith); 1/11/24 Tr. 153:3-21; 154:10-155:3 (Caplan).

developed an impaired lateral gaze, showed nystagmus, and had dysmetria (the inability to control the distance, speed, and range of motion necessary to perform smoothly coordinated movements) that was not noted before the surgery.[402] Later that same day, another post-operative MRI showed, for the first time, "diffusion restriction involving the right greater than left posterior cerebellum consistent with infarcts," or strokes.[403]

All of the causation experts—Drs. Smith, Caplan, and Ashley[404]—agree that these cerebellar strokes occurred during surgery, not before.[405] They also all agree that all of Ms. Urizar-Mota's movement disorders——including ataxia, or her inability to move smoothly and to keep her balance, and weakness—were caused by the cerebellar strokes.[406] Drs. Smith and Caplan further agree that all of Ms. Urizar-Mota's permanent injuries, with the exception of a partial left sixth cranial nerve palsy, were caused by the surgery itself or the resulting strokes.[407] Plaintiff's expert Dr. Caplan further opined that Ms. Urizar-Mota did not have any permanent cranial nerve deficits at all—neither of the left sixth cranial nerve nor otherwise. Instead, he believed her permanent eye injuries all reflected deficits in extraocular movement caused by damage to her cerebellum.[408] Given the medical records and expert testimony, the Court should find that all of Ms. Urizar-Mota's permanent injuries were caused by the surgery and the strokes that resulted.

---

[402]    MED03-0160.

[403]    MED03-0688.

[404]    At his first deposition, Dr. Ashley was emphatic that the cerebellar infarcts did not happen during the surgery itself, but changed his opinion to align with Dr. Smith and Dr. Caplan during his trial testimony. *See* 1/16/24 Tr. 199:8-21 (Ashley).

[405]    2/29/24 Tr. 51:8-52:2 (Smith); 1/11/24 Tr. 137:12-20 (Caplan); 1/16/24 Tr. 199:4-7 (Ashley).

[406]    2/29/24 Tr. 51:8-52:2 (Smith); 1/11/24 Tr. 137:12-20 (Caplan); 1/16/24 Tr. 200:18-201:21, 241:18-242:3 (Ashley).

[407]    2/29/24 Tr. 45:4-14 (Smith); 1/11/24 Tr. 140:5-141:12, 142:3-20 (Caplan).

[408]    1/11/24 Tr. 125:18-126:3; 126:14-18; 142:3-15 (Caplan).

### C.    The delay in diagnosis did not affect Ms. Urizar Mota's surgical risk.

Defendant's neurosurgery expert, Dr. Smith, is the only testifying expert in this case who has performed the kinds of surgery that Ms. Urizar-Mota required. Neither Plaintiffs' expert neurologist, Dr. Caplan, nor their expert neuro-oncologist, Dr. Ashley, performs neurosurgeries, or surgery of any kind.[409] Dr. Caplan was clear that he did not know as much about surgical risk as surgeons; that he would defer to a neurosurgeon about operative risks, including whether any particular approach to surgery would lead to a greater operative risk; and that surgeons know a lot more about the pure risk side of the physical operation.[410] And Dr. Ashley agreed that, among the interdisciplinary teams on which he works, the surgeons—not the neuro-oncologists—advise patients about the risk and benefits of surgery.[411] Therefore, the Court should credit the opinions of only Dr. Smith about surgical risk and whether any delayed diagnosis increased the risk of Ms. Urizar-Mota's inevitable surgery.[412]

Any operation in this area of the brain is high-risk, and Ms. Urizar-Mota's was particularly high risk because of the location of the tumor and the fact that such tumors grow from the brain itself.[413] The specific risks of surgery in this location, for anyone, include cranial neuropathies, injury to the brainstem, and ischemic strokes—

---

[409]    1/11/24 Tr. 171:1-7; 119:17-23 (Caplan); 1/16/24 Tr. 187:25-188:10 (Ashley).

[410]    1/11/24 Tr. 172:7-174:5 (Caplan).

[411]    1/16/24 Tr. 248:21-249:5 (Ashley).

[412]    To the extent that Plaintiffs' experts disagreed with Dr. Smith about surgical risk, those disagreements do not rise to the level of establishing that a delay in diagnosis in fact caused Ms. Urizar-Mota's injuries, to the degree of medical probability necessary for Plaintiffs to meet their burden of proof. For example, Dr. Caplan testified that he believed the surgery may have been different if the surgery occurred before her tumor bled because there would not have been blood in the field. 1/11/24 Tr. 178:20-179:4 (Caplan). But he was careful to make clear that he did not want to speak for surgeons and how they would evaluate surgical risks in that circumstance. 1/11/24 Tr. 179:19-180:1 (Caplan). And Dr. Caplan could not opine with any certainty about whether blood in the ventricles caused or contributed to Ms. Urizar-Mota's ischemic strokes, which he believes caused all of her permanent injuries, versus another purely surgical cause like the surgeon exerting too much pressure on the cerebellum. 1/11/24 Tr. 182:5-19, 183:22-184:5 (Caplan).

[413]    2/29/24 Tr. 44:7-21, 69:4-24, 72:23-74:8 (Smith).

all complications that Ms. Urizar-Mota developed.[414] Surgeons had to separate Ms. Urizar-Mota's tumor from her brainstem, thereby increasing the risk of expected surgical injuries.[415] Those surgical risks would not have differed if Ms. Urizar-Mota had surgery earlier because it is the type of tumor, intrinsic to the brain itself, and the location of the tumor, rather than its size, that makes the surgery to remove it particularly high-risk.[416]

If surgeons had tried to remove her tumor earlier (assuming the tumor had been identified earlier) and the tumor had been smaller, then the risk of cutting through, and damaging, healthy brain to identify the tumor would have been higher.[417] This makes it more likely that a patient in Ms. Urizar-Mota's position, as well as her physicians, would have taken a wait-and-see approach concerning her inevitable surgical treatment.[418] And such a wait-and-see approach only reinforces the fact that none of Ms. Urizar-Mota's injuries could have resulted merely from a delayed diagnosis.

The presence of blood in the field of surgery did not increase the risk to Ms. Urizar-Mota.[419] As Dr. Smith pointed out, anytime a surgeon operates, she cuts and causes bleeding, and the surgical bleeding here was "much, much larger than whatever tumoral bleeding there [was] before surgery."[420] Indeed, Dr. Smith opined that, in some ways, the fact that the tumor hemorrhaged before surgery made it *easier* to remove, because the bleeding brought the tumor closer to the surface of the brain,

---

[414]    2/29/24 Tr. 72:23-74:15 (Smith); *see also* 1/11/24 Tr. 113:22-115:13, 116:6-117:6, 120:4-8 (Caplan).

[415]    2/29/24 Tr. 69:4-24, 82:8-12 (Smith).

[416]    2/29/24 Tr. 79:10-80:2, 81:1-82:7 (Smith).

[417]    2/29/24 Tr. 187:14-188:12 (Smith).

[418]    2/29/24 Tr. 44:7-45:3 (Smith); 1/16/24 Tr. 219:18-24; 220:17-23 (Ashley).

[419]    2/29/24 Tr. 82:13-83:15 (Smith).

[420]    2/29/24 Tr. 82:13-82:22 (Smith).

reducing the risk of injuring normal brain tissue that the surgeon would otherwise have to pass through to remove the tumor.[421]

The fact that Ms. Urizar-Mota had acute obstructive hydrocephalus (on June 19) did not increase the risk of injury from the surgery (on June 24), because experts for both sides agree the hydrocephalus was properly treated, and all of the deficits that it had caused had resolved before the operation began.[422] Indeed, Plaintiff's expert neurologist, Dr. Caplan, as well as Dr. Smith agreed unequivocally that the emergency caused by the acute obstructive hydrocephalus had been resolved, and all the symptoms caused by it reversed, other than partial left sixth cranial nerve palsy, before Ms. Urizar-Mota underwent surgery.[423] As a result, the fact that Ms. Urizar-Mota's tumor eventually caused emergency hydrocephalus did not increase her surgical risk.[424]

The partial left sixth cranial nerve palsy that Ms. Urizar-Mota experienced sometime between her June 19 acute hydrocephalus and her June 24 surgery is not a compensable injury. First, there is no evidence that this injury was caused by a delayed diagnosis. The acute hydrocephalus that Ms. Urizar-Mota experienced was a risk that would have existed even had her tumor been identified earlier because the surgical risks described above would counsel for a wait-and-see approach. Second, the partial left sixth cranial nerve palsy injury was short-lived. Indeed, Plaintiff's expert Dr. Caplan testified that Ms. Urizar-Mota did not have any permanent cranial nerve deficits.[425] Third, the broader cranial nerve injuries that Ms. Urizar-Mota's surgery

---

[421]    2/29/24 Tr. 188:1-22 (Smith).

[422]    2/29/24 Tr. 181:5-13 (Smith); 1/11/24 Tr. 143:9-17 (Caplan).

[423]    1/11/24 Tr. 143:9-17, 154:10-155:11 (Caplan); 2/29/24 Tr. 52:22-53:5, 57:8-58:14, 181:5-18 (Smith).

[424]    2/29/24 Tr. 84:3-23; 168:10-169:12 (Smith).

[425]    1/11/24 Tr. 125:18-126:3; 126:14-18; 142:3-15 (Caplan).

caused were among the surgery's known risks. And the eye injuries Ms. Urizar-Mota now has, which are permanent and bilateral, are those caused by the surgery.[426]

All of Ms. Urizar-Mota's permanent injuries occurred during surgery. Ms. Urizar-Mota would have needed that surgery no matter when she was diagnosed. And nothing about any delay in the diagnosis of her tumor increased the risk of that surgery, which was particularly high risk for reasons independent of the size or condition of the tumor at the time of her surgery. Therefore, the Court should find that Plaintiffs have not met their burden to show any delay in diagnosis caused the permanent injuries Ms. Urizar-Mota suffered, and enter judgment for the Defendant.

## XII.   Damages

Rhode Island law permits Plaintiffs to recover only for "all the injuries and damages that can be proven to have been reasonably foreseeable and proximately caused by the tortfeasor's negligence." *Flanagan v. Wesselhoeft*, 712 A.2d 365, 371 (R.I. 1998) (citing *Atl. Tubing & Rubber Co. v. Int'l Engraving Co.*, 528 F.2d 1272 (1st Cir. 1976)). A party claiming injury due to a tort also has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages. *Tomaino v. Concord Oil of Newport, Inc.*, 709 A.2d 1016, 1026–27 (R.I. 1998). Under that rule, a party is "prohibited from recovering that amount of damages he or she could have reasonably avoided." *Id.*

Plaintiffs seek economic damages only for medical bills; they do not claim lost income or earning potential. Even if Plaintiffs had proved that PCHC violated the standard of care by failing to refer her to imaging, and that a delayed diagnosis caused her injuries, they would still have to prove that some damages flowed directly from that failure to diagnose—distinct from the fact that Ms. Urizar-Mota had a rare brain tumor and inevitably needed surgery to remove it. Only

---

[426]    2/29/24 Tr. 62:11-63:17, 64:19-65:10, 215:16-216:6 (Smith).

those expenses that Ms. Urizar-Mota would *not* have incurred but for a failure to diagnose, in other words, could be compensable.

None of the expenses related to the imaging, surgery, recovery, and follow-up care that Ms. Urizar-Mota needed—no matter when the tumor was diagnosed—could be proximately caused by any missed diagnosis. Every expert agrees that, independent of when the tumor was diagnosed, she would have needed imaging and surgery.[427] There is also no dispute that Ms. Urizar-Mota would have required significant follow-up care independent of any delay in diagnosis. Plaintiffs' expert, Dr. Ashley, testified that even if the tumor were identified early, controlled, and resected, Ms. Urizar-Mota would still require follow up care for at least five years after surgery.[428]

All of Ms. Urizar-Mota's treatment and follow-up were necessary expenses no matter when her tumor was identified and no matter when she had the surgery to remove it. For example, Ms. Urizar-Mota had a second brain surgery, an endoscopic third ventriculostomy, on July 8, 2019.[429] That second brain surgery, and her treatment to recover from it, was necessary only because of scarring caused by the first surgery, which could have occurred no matter when she had surgery to resect her tumor.[430] As a result, none of the costs of her surgeries, rehabilitation, or monitoring could be damages for any delayed diagnosis.

The current severity of her injuries also reflects that she did not seek physical therapy following her surgery against unanimous medical advice that such therapy was necessary for her recovery.[431] Indeed, Plaintiffs' expert Dr. Caplan

---

[427]    2/29/24 Tr. 84:15-86:2 (Smith); 1/11/24 Tr. 126:19-128:3 (Caplan); 1/16/24 Tr. 192:17-195:20 (Ashley).

[428]    1/16/24 Tr. 192:17: -195:20 (Ashley).

[429]    *See*, *e.g.*, MED06-0006.

[430]    2/29/24 Tr. 181:19-183:15 (Smith).

[431]    *See* MED01-0418; MED01-0449; MED01-0458; MED01-0467; MED01-0499; MED01-0529; MED01-0577; MED01-0972.

testified explicitly that physical therapy in the year after the surgery would have reduced Ms. Urizar-Mota's difficulty walking.[432] Ms. Urizar-Mota also did not follow through on referrals to other specialists, such as a movement disorder specialist.[433]

Moreover, Ms. Urizar-Mota unfortunately has a number of other unrelated medical issues—incidentally diagnosed as a result of her June 2019 ER admission—including an unrelated tumor in her right shoulder and a schwannoma tumor on her spine. These unrelated tumors have caused her significant pain and weakness since the resection of her brain tumor and inhibited her recovery.[434] All of these factors reduce the amount of damages, if any, that Plaintiffs could prove were proximately caused by any alleged failure to diagnose her brain tumor.

To the extent that Plaintiffs intend to seek economic damages in the form of ongoing medical care, it is important to note that surgeons at Rhode Island Hospital removed Ms. Urizar-Mota's entire brain tumor on June 24, 2019, and—five years later—Ms. Urizar-Mota lacks any evidence of recurrence.[435] The long-term, post-surgical prognosis for patients with pilocytic astrocytomas—including, specifically, Ms. Urizar-Mota—is "excellent," "[m]eaning that the majority of patients will be alive 20 years after the diagnosis" and "don't die from the tumor."[436] Dr. Ashley confirmed that Ms. Urizar-Mota's 20-year survival rate was not affected in any way by her

---

[432]    1/11/24 Tr. 162:8-22 (Caplan).

[433]    MED20-0023.

[434]    *See, e.g.*, MED06-0074; MED06-0089; MED06-0145; MED40-0002; MED40-0009; MED40-0014; MED40-0024; MED40-0029; MED40-0034; MED46-0018; MED46-0033; MED46-0050; MED46-0063; MED46-0075; MED46-0129; MED46-0193-94.

[435]    Arkun Dep. 29:13-16, 30:12-22, 63:24-64:16 (Trial Ex. 115); 1/11/24 Tr. 160:4-7 (Caplan); MED34-0210.

[436]    1/16/24 Tr. 17:13-18:6 (Ashley); *id.* 35:17-36:19, 217:22-25 (Ashley); Arkun Dep. 42:9-24, 44:12-21 (Trial Ex. 115); 2/29/24 Tr. 177:2-5 (Smith).

tumor or the surgery to remove it.[437] Such tumors infrequently recur and, when they do, surgery remains the standard of care, and the long-term prognosis remains favorable.[438] Most importantly, a patient who is tumor-free five years after surgery—as Ms. Urizar-Mota is—requires no follow-up.[439]

Ms. Urizar-Mota's most recent medical records from her treating neurosurgeons reflect that, as of November 22, 2022, she exhibited "more cautious but steady ambulation w/o walker" and appeared to have made "considerable improvement in her overall functioning, ambulation in particular, in correlation with most recent MRI brain findings" from November 8, 2022.[440] Given those findings, her neurosurgery team told Ms. Urizar-Mota they expect "improvement clinically and radiographically to continue, though likely not to be perfect." Importantly, her treating neurosurgeons noted this continued improvement after Dr. Caplan examined Ms. Urizar-Mota for purposes of this lawsuit.[441]

Plaintiffs have also claimed that Ms. Urizar-Mota and her immediate family are entitled to damages for psychological injuries including suffering, mental anguish, and loss of enjoyment of life as well as loss of consortium. But Ms. Urizar-Mota has not sought any mental health treatment and testified at her deposition that she has not experienced any depression since the surgery to remove her brain tumor.[442] Her medical records also repeatedly reflect that she lacked any signs or symptoms of depression after her surgery.[443] The range of potential non-economic consequences of Ms. Urizar-Mota's brain tumor—

---

[437]    1/16/24 Tr. 217:17-25 (Ashley).

[438]    1/16/24 Tr. 173:10-174:3 (Ashley); Arkun Dep. 35:16-38:11, 42:9-24, 44:12-21 (Trial Ex. 115).

[439]    1/16/24 Tr. 195:14-23 (Ashley).

[440]    MED06-0149.

[441]    1/11/24 Tr. 164:3-24 (Caplan).

[442]    Urizar-Mota Dep. 89:10-16 (Trial Ex. 127).

[443]    *See, e.g.*, MED20-0016; MED40-0003; MED40-0079-80.

illustrated by Plaintiffs' day-in-the life evidence—corresponds to challenges that would have followed her surgery no matter when it had occurred. And one of the documented stressors between 2012-2019—Ms. Urizar-Mota's at-times challenging relationship with her husband—improved *after* her surgery.[444] Those facts foreclose any non-economic damages even if Plaintiffs had proven that Ms. Urizar-Mota's post-surgical circumstances were worse because of an allegedly delayed diagnosis.

Finally, Plaintiffs' attempts to connect all of Ms. Urizar-Mota's subsequent medical records for her treatment from the Lifespan Group Neuro-Ophthalmology Department, which reflect, among other things, Ms. Urizar-Mota's extensive medical treatment for her ongoing complaints of dry eyes, are unpersuasive for multiple reasons. First, Plaintiffs relied on the testimony of Dr. Ashley, who testified in a cursory manner that all of the Neuro-Ophthalmology treatment was related to her brain tumor and treatment thereof, but was repeatedly unable to interpret what the records themselves actually said.[445] Second, another expert Plaintiffs retained, the neurologist Dr. Caplan, was unequivocal that Ms. Urizar-Mota's dry eye and blurred vision symptoms were not caused by her tumor or the surgery to remove it, directly contradicting Dr. Ashley.[446] Third, records from the Neuro-Ophthalmology Department include treatment for conditions that cannot plausibly be related to her brain tumor or the treatment thereof, and Dr. Ashley's testimony did not distinguish these records from those he argued were connected. For example, the records reflect that Ms. Urizar-Mota sought treatment for a skin lesion under her left eyebrow, from a condition the records describe as "dermatochalasis."[447] Doctors performed a procedure

---

[444]    Reyes Dep. 38:12-20 (Trial Ex. 122).

[445]    *See* 1/16/24 Tr. 119:9-24, 123:24-124:16, 131:21-132:4, 142:1-6, 186:20-187:13 (Ashley).

[446]    1/11/24 Tr. 169:6-170:11 (Caplan).

[447]    MED21-0168.

to excise this lesion on Ms. Urizar-Mota's eyelid, and sent the tissue to a lab for analysis.[448] The resulting surgical pathology report indicates that the skin reflected "inflamed verrucous."[449] Dr. Ashley did not attempt to distinguish this plainly unrelated treatment from treatment by others in the Neuro-Ophthalmology Department that he opined was related to her brain tumor.

The Plaintiffs' trial presentation otherwise did not try to cure problems that the Defendant identified in moving in limine to exclude expert opinion about which alleged expenses were connected to any alleged delay in diagnosis. Aside from the preceding, unsuccessful attempt to connect some of Ms. Urizar-Mota's medical expenses for dry eyes to her brain surgery, none of Plaintiffs' experts offered any testimony about how *any* of these medical expenses could conceivably be connected to an allegedly delayed diagnosis. Plaintiffs also failed to present a percipient witness who could testify that they created Trial Exhibit 70, a summary of Ms. Urizar-Mota's medical expenses, and whether and how any of those expenses would not have been incurred but for an allegedly delayed diagnosis. Thus, for the reasons that the government outlined in its motion in limine on these issues, the Court should not credit any of this evidence or any damage calculation based on it.[450]

Given the conflicting opinions offered by Plaintiffs' own experts, and the cursory nature of testimony regarding alleged connections between the eye treatment and her brain tumor, Plaintiffs have not met their burden to prove that the cost of Ms. Urizar-Mota's treatment with the Lifespan Group Neuro-Ophthalmology Department are properly considered damages in this case.

---

[448]    MED21-0166-167.
[449]    MED21-0178-80.
[450]    ECF 33 at 1, 3-10.

**Local Civil Rule 7(c) Statement**

The Defendant respectfully asks the Court to schedule oral argument on the parties' respective proposed findings of fact and conclusions of law. Undersigned counsel could appear at the Court's convenience this month with the exception of July 25, 26, 29, and 30, 2024.

Dated: July 1, 2024                    UNITED STATES OF AMERICA,

By its attorneys,

ZACHARY A. CUNHA
United States Attorney

/s/ *Kevin Love Hubbard*
KEVIN LOVE HUBBARD
KEVIN BOLAN
Assistant U.S. Attorneys
One Financial Plaza, 17th Floor
Providence, RI 02903
kevin.hubbard@usdoj.gov
  401.709.5078
kevin.bolan@usdoj.gov
  401.709.5029

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 1, 2024, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

/s/ *Kevin Bolan*
KEVIN BOLAN
Assistant U.S. Attorney