UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LUCIA URIZAR-MOTA; SERGIO REYES, SR., Individually and p.p.a., DELMY REYES, SERGIO REYES, JR., WILMER REYES, and GERSON REYES, Minors,<br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA; JOHN and/or JANE DOE, M.D., Alias; and JOHN DOE CORPORATION, Alias,<br>    Defendants. | C.A. No. 21-cv-155-JJM-PAS |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND VERDICT

JOHN J. MCCONNELL, JR., United States District Chief Judge.

## I.    INTRODUCTION

Lucia Urizar-Mota was a patient at the Providence Community Health Center ("PCHC").  She reported severe headaches several times over many years, but PCHC never ordered brain imaging or referred her to a neurologist.  Years later, Ms. Urizar-Mota collapsed and was rushed to the hospital where brain imaging revealed a brain tumor, which had been growing for years.  She later suffered a cerebral stroke and now has severe and permanent neurological injuries.

Ms. Urizar-Mota, her husband, and four children sued the United States under the Federal Tort Claims Act ("FTCA").  28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and

2671-2680.[1]  ECF No. 1.  The Court conducted a bench trial, admitted additional evidence, received briefing and proposed findings of fact, and heard closing arguments.[2]  The key questions to be answered in this dispute are:  (1) what is the standard of care for a general practitioner in this situation and was it breached; (2) if there was a breach, did the breach cause Ms. Urizar-Mota's injuries; and (3) if there was a breach and it proximately caused her injuries, what are Ms. Urizar-Mota's and her family's damages?

Based on all the evidence, reasonable inferences drawn from it, and evaluating witness credibility, the Court makes the following determination of the facts, followed by its conclusions of law, and verdict.

## II.    FINDINGS OF FACT

### A. PCHC Treatment

1.    Beginning in 2006, Ms. Urizar-Mota began receiving her medical care from physicians and nurse practitioners at the PCHC, a federally funded health care center in Providence, Rhode Island,

2.    Ellen Brosofsky, N.P., Jeffrey Harris, M.D., and Vinod Thomas, M.D. ("PCHC Medical Providers") were PCHC health care providers licensed and authorized to practice medicine as nurse practitioner and primary care physicians

---

[1] Plaintiffs have met all necessary conditions precedent for the filing of this FTCA action.

[2] The Court sat as the factfinder during live testimony in this case.  The parties agreed to submit their expert witnesses' testimony via transcript and video.  The Court read each of the transcripts and watched all the videos submitted.

and were acting on PCHC's behalf within the scope of their employment with the United States.

3.     On November 14, 2012, February 1, 2013, and March 13, 2013, Ms. Urizar-Mota consulted with NP Brosofsky at the PCHC office in Providence, Rhode Island.

4.     On November 14, 2012, Ms. Urizar-Mota went to PCHC with the chief complaint of headaches, nausea, and vomiting for fifteen days.

> "*Chief Complaint:*" "Ha,'s [headaches] n/v [nausea and vomiting] x15 days"

> "*History of her Present Illness:*" "Nausea with vomiting.  She vomits every am.  She also has [nausea and vomiting that] waxes and wanes but lasts for two days.  She is back with her husband.  And is concerned that she may be pregnant.  She feels safe.  Nonbilious vomiting and food."

5.     Ms. Urizar-Mota told the medical providers at PCHC that she began experiencing headaches, nausea, and vomiting in the weeks before the November 14, 2012 visit, and that she had never had headaches like that before, nor had she ever had headaches with nausea and vomiting.  Ms. Urizar-Mota's records show that she had reported headaches to PCHC personnel on three prior occasions from 2007-2012.

6.     NP Brosofsky ordered and performed a pregnancy test, which was negative.  She made the following assessment: "Gastroenteritis? stress related, Urinary tract infection, and Benign headache syndromes."  NP Brosofsky's plan included a referral to gastroenterology and a prescription of Omeprazole for gastroenteritis, a prescription of Cipro for a urinary tract infection, and a prescription

of Amitriptyline (an anti-depressant) for benign headache syndrome.  NP Brosofsky gave Ms. Urizar-Mota information on intimate partner violence.

7.     Despite unexplained nausea and vomiting along with fifteen days of unexplained headaches, NP Brosofsky did not order any brain scans and did not refer Ms. Urizar-Mota to a neurologist for a consult.

8.     NP Brosofsky did not take appropriate actions to rule out intercranial abnormalities.

9.     Ms. Urizar-Mota next visited the PCHC two and one-half months later, on February 1, 2013.   She again saw NP Brosofsky.

*"Chief Complaint:"* "Follow up on migraines; not taking migraine meds daily; feels stabbing, pulling sensation."

*"History of Present Illness:"* "Frontal headache and over right side of head with pulling sensation upon awakening from sleep.  Which is throbbing or pounding.   Lasting for a few hours.   Accompanied by Nausea.   By vomiting.   When she takes medications, she has no headache but when she doesn't take it, she has very bad headache with nausea, vomiting and fatigue.  Wants to know why the headaches came back.  She had taken medication x 1 week and she was feeling tired and drunk."

*"Assessment:"* "Migraine headache with elevated BP."

*"Plan:"* "Given information re: Migraines from AFP will try to avoid triggers and monitor BP."

10.     NP Brosofsky still did not order a neurological consult or brain imaging.

11.     A month and a half later, on March 13, 2013, Ms. Urizar-Mota saw NP Brosofsky for the third time with the chief complaint of: "C/o daily, constant migraines, worse," and NP Brosofsky noted the following:

4

"*History of Present Illness:*" "Temporal headache with pulling sensation on the sides. Which is steady. Proceeded by seeing dark spot with a bright jagged outline. Accompanied by nausea. Headache not accompanied by vomiting. Not by diarrhea. No new medications prescribed. Pt comes in for f/u. Cont with headaches. She did not take any medications since last visit. Her BP is in much better control. She has had a severe HA [headaches] for the last 3 days. After much interviewing, Pt revealed that she is being emotionally and physically abused. Pt is planning to move in April and has a plan in place but she feels unsafe."

"*Active Problem List:*" Chronic Daily Headache.

"*Assessment:*" "Chronic Daily Headache, Adult physical abuse by spouse/partner."

"*Plan:*" prescription of Fluoxetine for headache and notes that Ms. Urizar-Mota was given information about domestic violence shelters. Ms. Urizar-Mota was instructed to return to the clinic if her condition worsened or if new symptoms arose.

12.    Despite continued headaches of an unknown etiology accompanied by nausea, NP Brosofsky again did not order any brain imaging or refer her for a neurological consult. She did not take appropriate steps to rule out intercranial abnormalities.

13.    Ms. Urizar-Mota continued to have headaches throughout 2013 and 2014.

14.    At her next PCHC visit on June 26, 2014, Ms. Urizar-Mota saw primary care physician Dr. Jeffrey E. Harris. She once again complained of headaches and said she thought her birth control medication, Depo-Provera, may have been the cause of her headaches.

"*History of Present Illness:*" "Neurological symptoms in the mornings, reports headaches, facial sweating, and sensation of chest tightness that resolves during the day. Accompanied by tiredness."

"*Assessment:*" "Headache syndromes. Her exam is negative. Patient has decided to stop Depo after discussing with Dr. Hosmer the possibility that her sx [symptoms] are side effects of the injection. I note that E. Brosofsky had diagnosed depression and tried Fluoxetine."

"*Plan:*" order lab work, a CBC (complete blood count) and CMP (comprehensive metabolic panel).

15.    Two weeks later, on July 10, 2014, Ms. Urizar-Mota saw Dr. Harris again for unrelenting headaches.

"*History of Present Illness:*" "Cardiovascular symptoms Reports palpitations and 'weakness' with her headaches, but no SOB [shortness of breath] or dizziness. Gastrointestinal symptoms Low grade nausea without vomiting, but bitter taste in mouth in a.m. Neurological symptoms patient continues to report daily headaches, especially arising in the a.m., relates these to her Depo injection. She has declined a repeat Depo injection which was due in June. She is currently using no contraceptives."

"*Active Problems:*" Victim partner abuse and chronic daily headaches noted.

"*Assessment:*" "GERD. Difficult to sort out sx. Both her GI sx and headache might be attributable to the Depo injection, but she has not had this med for 6+ months. Empirically trial of Omeprazole 20 mg hs. Migraine headache. Ibuprofen insufficient. We'll try beta blocker empirically for both headache and palpitations. Patient referred to family planning."

"*Plan:*" Prescription of Atenolol [beta blocker] for headaches and heart palpitations, and Omeprazole for GERD and nausea.

16.    Dr. Harris never ordered any brain imaging or referred her for a neurological consult despite almost two years of unrelieved daily headaches.

17.    Because she became pregnant, Ms. Urizar-Mota treated with PCHC Obstetrician and Gynecologist Jennifer Hosmer, M.D. for the next 10 months, from November 3, 2014, to August 21, 2015. Dr. Hosmer's "*List of Active Problems*" during

her 22 appointments with Ms. Urizar-Mota included chronic daily headaches and partner abuse.

18.    Dr. Hosmer never ordered any brain imaging or referred her for a neurological consult.

19.    For the next few years, from the end of 2015 until mid-2019, Ms. Urizar-Mota treated with primary care physician Dr. Vinod Thomas.

> "*Chief Complaint:*" "New to PCP [primary care physician]. Pt c/o dizziness, sore throat, and body aches x 3 weeks," was diagnosed with "Aviral pharyngitis," and prescribed Acetaminophen, Ibuprofen, and Cepacol Sore Throat & Cough for her pharyngitis.

> At her next visit:

> "*Chief Complaint:*" "Pt c/o dizziness, feeling lightheaded since this morning."

> "*History of Present Illness:*" "Headache–dizziness, lightheadedness since this AM, no fever, no chills, does have some nausea."

> "*Active Problem:*" Victim Partner Abuse.

> "*Assessment:*" "Acute gastritis, Benign paroxysmal positional vertigo– basic labs ordered."

> "*Plan:*" "Other headache syndrome," for which he prescribed Acetaminophen; "Impacted cerumen, unspecified ear," for which Debrox was prescribed; "Nausea," for which Promethazine and "RaNITidine" was prescribed; "Dizziness and giddiness," for which Meclizine was prescribed; and "Chronic fatigue, unspecified," for which labs were ordered to test TSH, CBC, Vitamin D., Lipid 1 profile, and [CMP].

20.    Despite the now long history of constant headaches, dizziness, lightheadedness, all without definitive cause, Dr. Thomas never ordered any brain imaging or referred her for a neurological consult.

21.    Ms. Urizar-Mota's headaches continued in 2016, 2017, and 2018, but she did not go to the PCHC during most of this time because "they wouldn't give [her] anything else but Tylenol, [she] just continued to take Tylenol."

22.    In June 2019, seven years after first telling NP Brosofsky that she had experienced 15-days of intense headaches with nausea and vomiting, the headaches had gotten so bad, Ms. Urizar-Mota made an appointment at the PCHC's express clinic for June 19, 2019, because it was the only available prompt appointment. When she arrived with her husband in the parking lot of the PCHC clinic, Ms. Urizar-Mota lost consciousness. Her husband went inside to get help; an ambulance took her to Rhode Island Hospital ("RIH"). Ms. Urizar-Mota was 32 years old.

### B. Hospitalizations & Diagnosis

23.    RIH performed a brain CT that showed obstructive hydrocephalus ("HCP") (abnormal buildup of cerebral fluid) and a mass in the fourth ventricle of her brain.

24.    Neurosurgeon Dr. Tohaid Ali examined Ms. Urizar-Mota. He placed an external ventricular drain due to the "life threatening nature of patient's neurological examination and imaging," and the "life threatening HCP secondary to 3rd vent mass/bleed." Ms. Urizar-Mota was then admitted to the Neurocritical Care Unit at RIH for further management.

25.    Five days after being admitted to RIH, Ms. Urizar-Mota underwent tumor resection surgery to cut out the tumor.

26.     The brain tumor was a pilocytic astrocytoma, Grade 1, non-metastatic, slow growing tumor.

27.     Neurosurgeon Dr. Steven A. Toms performed an endoscopic removal of a "fibrinous debris/blood clot" that was blocking the aqueduct of Sylvius, created a by-pass for cerebral spinal fluid in the brain, and replaced the right frontal external ventricular drain. The doctors removed the external ventricular drain the next day.

28.     During the tumor resection surgery, Ms. Urizar-Mota suffered a cerebellar stroke, which resulted in permanent neurological injuries, including permanent injuries to her cerebellum (the back of the head, which controls balance, coordination, and other motor functions) that manifests in tremors and movement disorders in her left hand, arm, and leg.

29.     A month after she was admitted to the hospital, RIH's Neurosurgery Unit discharged Ms. Urizar-Mota to RIH's Inpatient Rehabilitation Unit and then eventually to the Elmwood Nursing and Rehabilitation Center.

30.     At Elmwood, Ms. Urizar-Mota received speech, occupational, and physical therapy.

31.     Ms. Urizar-Mota was readmitted to RIH for an episode of left shoulder twitching and changes in her eye.

32.     Six months after being admitted to RIH and diagnosed with the brain tumor, Ms. Urizar-Mota was discharged home from the Elmwood Nursing and Rehabilitation.

33.    Ms. Urizar-Mota saw ophthalmologist Dr. Melissa Simon, who documented: "Sixth nerve palsy of both eyes–likely due to initial elevated [intracranial pressure] on presentation in 2019." Dr. Simon noted that Ms. Urizar-Mota will "need multiple strabismus [cross-eyed] surgeries" because of her visual injuries and impairments.

34.    Ms. Urizar-Mota underwent surgery of the oblique muscle of the eye.

35.    During a follow-up examination with Dr. Simon, Ms. Urizar-Mota reported burning sensation and dryness in both eyes since the eye surgery. Dr. Simon's examination revealed that the diplopia (double vision) and torsion (twisting) had resolved, but that she still had residual vertical misalignment.

36.    Four months after her first brain surgery, Ms. Urizar-Mota underwent a follow-up brain MRI that showed "persistent findings of hypertrophic olivary degeneration [enlarged part of the brain controlling motor and sensory information]."

37.    Ms. Urizar-Mota treated with a movement disorder specialist Dr. Saud Alhusaini at RIH for her left-sided tremors. Dr. Alhusaini noted that treatment options for tremors are limited, and are linked to significant side effects, including drowsiness and cognitive adverse effects. Dr. Alhusaini noted Ms. Urizar-Mota's tremor remained unchanged, and that she continued to suffer from difficulty ambulating, imbalance, diplopia, and blurry vision.

38.    Ms. Urizar-Mota has sustained severe and permanent neurological injuries, including: (a) movement abnormalities and impaired motor function on the left side, including her left arm, hand, and leg, which manifests in tremors and

shakiness; (b) abnormal and uncoordinated eye movements when she looks up, down, and laterally, causing blurry and unsteady vision; (c) tremors on the side of her mouth and lips; and (d) balance and gait issues that prevent her from walking without the use of mobility aides.

39.     Because of her neurological injuries, Ms. Urizar-Mota: has blurry and unsteady vision; cannot perform standard ballistic movements smoothly and effectively, such as buttoning a shirt, tying a shoe, putting on socks, zipping a coat, removing her eyeglasses, slicing or chopping food, and buttering toast; cannot drive a motor vehicle, and so must rely on her daughter and husband to drive her three young sons to and from school, appointments, and other events; cannot clean, cook meals for herself and her family, or perform other types of housework, and thus must rely on her daughter to perform these tasks; cannot walk without the help of a walker, or when inside the home, cannot walk without holding onto furniture to maintain her balance; cannot care for her children the way she used to; cannot drive them to and from school and appointments, and cannot go to their school functions; cannot independently perform activities of daily living and cannot be left home alone, and therefore requires daily assistance from her family members.

40.     Mr. Urizar-Mota experienced prolonged and unnecessary pain and suffering and economic damage because of her undiagnosed tumor.

**C.  Internist/NP Expert Testimony**

41.     Russell Phillips, M.D. is a licensed physician board-certified in Internal Medicine, and the Director for the Center for Primary Care, the Applebaum Professor

of Medicine, and a Professor of Global Health and Social Medicine at Harvard Medical School. He received his undergraduate degree from the Massachusetts Institute of Technology and his medical degree from Stanford University Medical School. Dr. Phillips has been a primary care physician at Beth Israel Hospital, now Beth Israel Deaconess Medical Center ("Beth Israel"), since 1985.

42.    As the Director for the Center for Primary Care at Harvard Medical School, Dr Phillips oversees the development of a primary care track at Harvard Medical School, as well as a primary care focused research program.

43.    Dr. Phillips served as the Chief of the Division of General Medicine and Primary Care at Beth Israel from 2002 to 2012, where he teaches, trains, and supervises in taking a history, reviewing physical exam findings, and creating differential diagnoses.

44.    Dr. Phillips has published approximately three hundred peer-reviewed publications as a primary care physician, and his work has been cited around 45,000 times by other researchers and publishers.

45.    Based on Dr. Phillips' education, training, research, teaching, and experience, the Court finds Dr. Phillips to be a highly qualified expert in Internal Medicine, found his testimony to be the most credible, and relies in large part on his expert testimony to support these findings.

46.    Dr. Amy Ship testified on behalf of PCHC. She is board certified in Internal Medicine and has practiced for over thirty years. She directs the primary care residency program at Brigham and Women's Hospital. While Dr. Ship's

credentials are impressive, her testimony was less credible than Dr. Phillips. Her testimony was not as consistent with much of the evidence in the case and was not as supported by the medical literature as was Dr. Phillips' testimony.

### D. Standard Of Care

47.    There are distinct types of and different causes of headaches. Headaches can be broken into two broad categories: primary headaches and secondary headaches. Primary headaches include tension headaches, cluster headaches, and migraine headaches. Secondary headaches include other non-benign causes of a headache, including, trauma or structural changes due to vascular abnormalities or tumors.

48.    To decide whether a patient has a primary headache or secondary headache, and what is causing the headache, the primary care nurse practitioner or physician must take a detailed history from the patient. This is especially important in diagnosing the cause of the patient's headaches and any accompanying signs and symptoms.

49.    In the first meeting, the standard of care requires the medical provider to be aware of, document, and follow-up on "red flags" that could lead to the need for further study.

50.    "Red flags" are the signs or symptoms associated with or accompanying a headache that trigger the need for neuroimaging. Credible peer-reviewed medical literature supports this.

51. "Red flags" were and are a valid tool for clinicians to use when deciding whether a patient with headaches requires neuroimaging. Focusing on "red flags" prevents clinicians treating patients with headaches from missing secondary causes of a patient's headache.

52. The standard of care, in 2012 through 2019, for a reasonably competent primary care nurse practitioner or physician treating a patient with headaches requires that the primary care nurse practitioner or physician order neuroimaging of the patient if the patient has any "red flags." The patient's headache needs only be accompanied by or associated with one "red flag" to call for neuroimaging.

53. The following is a list of "red flags" that require neuroimaging or referral to a neurologist of a patient with headaches:

a) Systemic symptoms, including fever.
b) Neoplasm.
c) Neurological deficit or dysfunction.
d) Onset of headache if sudden or abrupt.
e) Older age after 50.
f) Pattern change or recent onset of headache.
g) Positional change.
h) Headache precipitated by sneezing, coughing, or exercise.
i) Papilledema (swelling of the optic discs).
j) Progressive headache in atypical presentations.
k) Pregnancy.
l) Painful eye with autonomic features.
m) Posttraumatic onset of headache.
n) Pathology of immune system such as HIV.
o) Painkiller overuse or new drug at onset of headache.

54. If there is a change in the severity, frequency, or character of the chronic headaches, and the headaches are not clearly migraine or tension headaches, this is a red flag requiring neuroimaging or referral.

55.    During Ms. Urizar-Mota's many visits to the PCHC medical providers between 2012 and 2019, she had several "red flags" and therefore the standard of care required the PCHC providers, including NP Brosofsky, Dr. Harris, and Dr. Thomas, to order neuroimaging to evaluate her headaches or make a referral for a complete neurological examination.  The "red flags" present included: progressive headache in atypical presentations, pattern change or recent onset of headache, neurological deficit or dysfunction, and posttraumatic onset of headaches.

56.    The purpose of ordering neuroimaging would be to rule in or rule out secondary causes of the patient's headaches.

57.    Mr. Urizar-Mota presented with chronic headaches that were not stable and did not meet the criteria for migraines.  Her headaches were changing in pattern, severity, characteristics, and frequency.

58.    NP Brosofsky violated the standard of care on November 14, 2012, February 1, 2013, and March 13, 2013, when, despite the presence of "red flags," she did not order neuroimaging or a complete neurological examination to evaluate the cause of Ms. Urizar-Mota's headaches.

59.    On November 14, 2012, Ms. Urizar-Mota presented with a headache and "red flags." She had a new onset headache and/or change in the pattern of her headaches.   Ms. Urizar-Mota reported she had never previously experienced headaches of this nature and of this duration—a headache with nausea and vomiting for fifteen days.  The duration of Ms. Urizar-Mota's headache with nausea and vomiting removes her headache from the benign and primary headache disorder

category, and thus required imaging. Neither migraines nor tension headaches present in this fashion.

60. Despite these "red flags," NP Brosofsky did not order neuroimaging or refer Ms. Urizar-Mota to a neurologist to evaluate the cause of her headaches, and failing to do so violated the standard of care.

61. "Red flags" were also present on February 1, 2013, because there had been a change in the pattern of Ms. Urizar-Mota's headaches. Her headaches were then "awaking [her] from sleep," and were noted to coincide with a pulling sensation and throbbing or pounding.

62. The standard of care required NP Brosofsky to order neuroimaging or make a referral to a neurologist.

63. Writing-off the headaches to migraines also violated the standard of care. The medical providers at PCHC misdiagnosed Ms. Urizar-Mota's headaches as migraines. Migraine headaches are defined by a recurring pattern of the same type of headache. There is no clear documentation in Ms. Urizar-Mota's medical records of a recurring pattern of the same type of headache. Her headaches, documented as both a "chronic daily headache" and an "Active Problem," were not consistent with a migraine headache or any type of benign headache syndrome because migraines and benign headache syndromes do not generally present as daily and persistent headaches.

64. Moreover, Ms. Urizar-Mota's headache history that NP Brosofsky documented in the November 14, 2012 medical record does not contain the detail and

necessary information that it should contain as the standard of care required, including the location of the headache, the nature of the headache, what medications the patient was on, what medications the patient had tried to alleviate the headaches, whether the patient had experienced any relief, what that patient's social and home circumstances were, and what the patient's concerns were.

65.    Ms. Urizar-Mota again presented with "red flags" on March 13, 2013, in that her headaches were continuing to change in pattern and came with a new symptom: headaches "proceeded by seeing dark spot with a bright jagged outline." As of that date, she had had four months of chronic daily headaches that were not of a stable pattern but were changing in pattern—a "red flag."

66.    The standard of care for the treatment of Ms. Urizar-Mota's headaches required neuroimaging, and NP Brosofsky's failure again to order neuroimaging on March 13, 2013, despite the "red flags" violated the standard of care.

67.    Dr. Jeffrey Harris also violated the standard of care on June 26, 2014, and July 10, 2014, when, despite the presence of "red flags," he did not order neuroimaging or make a referral to a neurologist to evaluate the cause of Ms. Urizar-Mota's headaches. She presented with "red flags" in that she had a change in the pattern of her headaches and her headaches had unique features over time.

68.    Ms. Urizar-Mota's headaches were now arising "[i]n the morning, [accompanied by] facial sweating and a sensation of chest tightness that resolve[d] during the day" after she had been awake and up and about. Positional headaches

are a "red flag," yet Dr. Harris did not take any steps to rule in or rule out whether her headaches were truly positional, and therefore he violated the standard of care.

69.    Ms. Urizar-Mota's symptom pattern was consistent with raised intracranial pressure: early morning headache that resolves on standing over a period, nausea, sweatiness, or diaphoresis, also consistent. As she had not had Depo-Provera for six months it would have been out of her system; so not a probable cause of headache.

70.    Dr. Harris violated the standard of care when he diagnosed Ms. Urizar-Mota with migraine headaches despite the absence of information necessary to support the diagnosis documented in her medical records.

71.    When Ms. Urizar-Mota saw Dr. Vinod Thomas on July 20, 2016, she again presented with a red flag, in that there was a change in the pattern of her headaches because her headaches were newly associated with "dizziness," a new neurological symptom or sign. Her dizziness was a "red flag" because it is a neurological symptom.

72.    Despite the presence of this "red flag," Dr. Thomas did not order neuroimaging to evaluate the cause of Ms. Urizar-Mota's headaches, and his failure to do so violated the standard of care.

**E. Causation**

73.    As outlined below, if Ms. Urizar-Mota had been treated consistent with the standard of care, she would have had a CT scan that would have revealed the tumor. She would not have suffered the damages she now endures because, more

likely than not, she would have had surgery sooner and an earlier surgery would have been less risky and caused less damage. It is more likely than not that the neurological damage the stroke caused would not have happened, non-surgical intervention would have been available, and her eye injuries would not have occurred.

### a. *If Surgery Had Been Done Earlier–Less Risk*

74.    Earlier diagnosis and surgical resection would have resulted in better outcomes for Ms. Urizar-Mota and prevented her from sustaining permanent neurological injuries.

75.    Ms. Urizar-Mota's most likely course of care and treatment would have involved a multidisciplinary board review and evaluation of her and her tumor to decide the safest treatment plan and would not have ended with her suffering a medical emergency on June 19, 2019.

76.    If medical providers diagnosed Ms. Urizar-Mota's tumor in November 2012, surgical resection would have had a high likelihood of success and a minimal risk of injury.

77.    A smaller tumor would take less time to resect, therefore minimizing the time the surgeon is operating on the patient's brain once the tumor is found, and there would not have been any blood or byproducts of blood in the surgical field because the tumor would have been diagnosed and resected before it hemorrhaged and bled.

78.    In addition, if it had been detected earlier, the tumor would have been smaller and further away from the floor of the fourth ventricle and thus less likely to

result in brainstem injury, there would be no hemorrhage and excessive blood in the brain, and the brain would not have been swollen from the prolonged and severe obstructive hydrocephalus.

79.    Ninety percent of patients with pilocytic astrocytoma do not have permanent injuries after surgery to resect the tumor. Most patients who have tumors in the same region of the brain as Ms. Urizar-Mota's tumor do not sustain injury during surgical resection, and that the less-than-ideal conditions under which Ms. Urizar-Mota's surgery was performed made it a difficult neurosurgical case and substantially contributed to her injuries.

80.    Ms. Urizar-Mota's tumor resection surgery had a higher risk of complication due to the conditions under which RIH personnel performed it. These less-than-ideal conditions—the blood in the brain and ventricular system because of the pre-operative hemorrhage—made her surgery much more difficult than it would have been without them.

81.    The following conditions, which made the surgery riskier and more complicated would not have existed if Ms. Urizar-Mota's tumor had been diagnosed and surgically resected at any time between November 2012 through 2018:

    a.    An external ventricular drain in her brain that was caused by obstructive hydrocephalus.

    b.    Blood in her ventricular system, including blood on the floor of the fourth ventricle, because of a hemorrhage.

    c.    The larger tumor in the roof of her fourth ventricle.

    d.    Down-and-out pupils and extensor posturing, both signs of brainstem injury.

    e.    Injury to the sixth cranial nerve/sixth nerve palsy, because of the severe increased intracranial pressure and downward herniation/uncal

herniation, after the external ventricular drain was placed and before the surgical resection.

82.     Because of the blood in Ms. Urizar-Mota's fourth ventricle, she was at risk for vasospasm (narrowing of the artery) and stroke.

### b.     If Surgery Had Been Done Before Hydrocephalus–Less Damage

83.     If Ms. Urizar-Mota's tumor resection surgery had been performed at any time prior to 2019, before she developed complete obstructive hydrocephalus, experienced hemorrhages, and/or blood in the ventricular system, and had an external ventricular drain placed, she would not have sustained permanent injury prior to, during, or because of the tumor resection surgery.

84.     Beginning in November 2012, and continuing until June 19, 2019, Ms. Urizar-Mota most likely experienced a partial obstruction of her cerebrospinal fluid caused by her tumor gradually growing in the fourth ventricle and partially obstructing the aqueduct of Sylvius, thereby preventing the complete flow of cerebrospinal fluid from the third ventricle, through the aqueduct of Sylvius, and into the fourth ventricle.

85.     Ms. Urizar-Mota more likely than not had increased intracranial pressure at times producing her headaches caused by this tumor affecting the flow of cerebrospinal fluid through the aqueduct and the egress of cerebrospinal fluid from the fourth ventricle into the subarachnoid space.

86.     Ms. Urizar-Mota's headaches and associated symptoms in 2012 and 2013 were most probably caused by hydrocephalus or raised intracranial pressure, which was the result of her tumor partially obstructing the aqueduct of Sylvius. The

symptoms were directly referable to the raised intracranial pressure, and she suffered because of the tumor partially obstructing the aqueduct of Sylvius.

87.    This continuous production of cerebrospinal fluid coupled with the obstruction that prevented it from escaping into the fourth ventricle caused the cerebrospinal fluid to build up in the lateral and third ventricles in the top part of the brain. This buildup caused a significant increase in intracranial pressure.

88.    The increased intracranial pressure, which was caused by the obstructive hydrocephalus, caused central downward herniation syndrome. This occurs when the pressure in the top part of the brain is so severe that the brain begins to push downward through the tentorium cerebelli, a hole in the fibrous structure separating the top half of the brain from the bottom half of the brain.

89.    This type of severe intracranial pressure interrupts neurological brain function and can cause strokes, hemorrhages, and even death.

90.    Ms. Urizar-Mota developed acute obstructive hydrocephalus within 72 hours of her presentation to RIH Emergency Department on June 19, 2019.

    c.  Eye

91.    Ms. Urizar-Mota's obstructive hydrocephalus and downward herniation on June 19, 2019, caused injury to her brainstem before her June 24, 2019 tumor resection surgery, and her brainstem injury resulted in injuries to her third, fourth, and sixth cranial nerves (cranial nerve palsies), and internuclear ophthalmoplegia ("INO").

92.    Ms. Urizar-Mota's INO and third, fourth, and sixth nerve palsies manifest in eye movement abnormalities.

93.    Ms. Urizar-Mota's eye examination results and ocular deficits were consistent with brainstem injury caused by downward herniation.

94.    Ms. Urizar-Mota's obstructive hydrocephalus caused neurological injury before her tumor resection surgery.

95.    Ms. Urizar-Mota's cranial nerve injuries result from brainstem injuries, which are distinct from her cerebellar injuries that occurred during the surgical resection of her tumor.

96.    The sixth nerve, which is in the brainstem, controls the abducens muscle, which is one of the muscles responsible for eye movement. If a patient's sixth nerve is injured, the patient cannot move their eyes outwards and/or laterally.

97.    Ms. Urizar-Mota sustained injury to her sixth nerve before her tumor resection surgery because of obstructive hydrocephalus.

98.    Ms. Urizar-Mota's sixth nerve palsy caused by obstructive hydrocephalus is a result of brainstem injury. This was caused by the direct compression of the sixth nerve against the tentorium, the part of the brain that separates the top part of the brain from the bottom part of the brain, which occurred because of the downward herniation caused by Ms. Urizar-Mota's severe increased intracranial pressure and hydrocephalus. No evidence suggests the brainstem injuries occurred during the surgery.

99.    Ms. Urizar-Mota's injuries to her sixth nerve and her sixth nerve palsy are permanent.

### d. Cerebellum Injuries–Surgery, Stroke

100.    In addition to Ms. Urizar-Mota's brainstem injuries, she also sustained injuries to her cerebellum.

101.    Pre-operative brain MRI performed at RIH revealed a stroke in the splenium corpus callosum (the thickest part of the nerve fibers that connect the left and right side of the brain).

102.    Ms. Urizar-Mota's splenium corpus infarct (tissue death) to the top of the brain occurred before her tumor resection surgery and was the result of the acute obstructive hydrocephalus that caused her ventricular system to expand.

103.    The stroke in the splenium of the corpus callosum is evidence of brain injury and severe pressure in her brain before her tumor surgery.

104.    Blood in Ms. Urizar-Mota's brain, before the surgical resection of her tumor, was integral to the development of her brain lesions/strokes.

105.    If Ms. Urizar-Mota's brain resection surgery had been performed under conditions wherein she did not have blood in the fourth ventricle and was not at risk for vasospasm (sudden collapse of the artery restricting blood flow) due to the fourth ventricle blood, it would be less likely that she would have experienced the lesions/strokes.

### e. MEK Inhibitors

106.    Ms. Urizar-Mota's tumor was Grade 1, slow growing, and non-invasive.

107.   The tumor would have been visible on neuroimaging at least a decade before the diagnosis.  If neuroimaging had been obtained in November 2012 or at any time after that, the tumor would have been discovered.

108.   As of 2017, there were non-surgical treatments for Ms. Urizar-Mota's tumor, including "MEK inhibitors" and "BRAF inhibitors."  These agents successfully shrink tumors in eighty percent of patients and would have allowed her tumor to be treated without surgery.

109.   If Ms. Urizar-Mota's tumor had been diagnosed in 2017 or 2018, it is more likely than not that she would have avoided surgery and doctors could have treated her tumor with medication that became available in 2017, such as MEK inhibitors and BRAF inhibitors.  She would more likely than not have avoided the damage she incurred after 2017.

## F. Damages

110.   As a direct and proximate result of Defendant's negligence, Ms. Urizar-Mota suffered needlessly with debilitating headaches, nausea, vomiting, and dizziness for years before her surgery.

111.   Ms. Urizar-Mota needlessly endured pain and suffering for 2408 days; from when Defendant first should have ordered neurological testing on November 14, 2012 to when RIH finally diagnosed her tumor nearly seven years later on June 19, 2019.

112.   A suitable amount to fully compensate for the pain and suffering she incurred during this period is $100 per day for a total damage of $240,800.00.

113.    As a direct and proximate result of Defendant's negligence, Ms. Urizar-Mota suffered severe, permanent, and life-altering neurological damages.

114.    Ms. Urizar-Mota spent six months in the hospital and rehabilitation center before she could return home.

115.    Ms. Urizar-Mota incurred $662,194.62 in medical expenses that were directly and proximately caused by Defendant's negligence.

116.    Ms. Urizar-Mota had a feeding tube inserted for seven months.

117.    Ms. Urizar-Mota is unable to walk without a walker, without getting dizzy and falling.  She always feels unsteady and falls to one side when standing without help.  She suffers from weakness in both arms.  She is unable to drive, cook, clean, work, or take care of her family.  She cannot be left home alone.  She has tremors in her hand and continually drops objects.  She has frequent twitching of her hand and leg.  Dressing herself is difficult.

118.    Ms. Urizar-Mota has been experiencing left-hand tremors since her surgery in June 2019.  She described difficulty using her left upper extremity due to tremors when she uses her left hand.  The tremor is present when she tries to reach for objects.  She described difficulty using utensils and holding objects with her left hand.  The severity of her left-hand tremor is stable.  She also described difficulty ambulating and imbalance.  She currently uses a walker for stability.

119.    Ms. Urizar-Mota is often depressed and cries when she is alone because she feels like she is a burden to her family.

120.  Ms. Urizar-Mota's eyesight is blurry with double vision, mostly horizontal. She also described sensation of "dust in her eyes" with occasional blurring of vision.

121.  According to the life table in evidence, Ms. Urizar-Mota's life expectancy from the date she was finally diagnosed (June 19, 2019) is about 50 years (18,250 days).

122.  A suitable amount to fully compensate Ms. Urizar-Mota for her pain and suffering and loss of enjoyment of life due to her permanent injuries and disability is $350 per day for a total damage for pain and suffering during this period of $6,387,500.00.

123.  Ms. Urizar-Mota was the family's homemaker, which encompassed duties such as manager of household tasks such as cleaning, cooking, organizing, and caring for her family members. She ensured the smooth running of their home including such responsibilities like grocery shopping, childcare, and managing schedules.

124.  As a direct and proximate result of Defendant's negligence, Ms. Urizar-Mota can no longer perform those duties. Those duties have economic value and represent economic loss to her. For eight hours per day, at a minimum of $20/hour, for her life expectancy of 18,250 days, the total economic loss is $2,920,000.00.

125.  Each of Ms. Urizar-Mota's children—Delmy Reyes, Sergio Reyes, Wilmer Reyes, and Gerson Reyes—suffered for years and will continue to suffer a loss

of the care and companionship of their mother due to her disability and inability to care for them as she once did.

126.    Ms. Urizar-Mota's oldest child Delmy Reyes suffered further because she had to perform household and parental duties for which her mother was otherwise responsible.  Delmy lost large parts of her teenage years due to the burden she assumed upon her mother's disability.

127.    A suitable amount to fully compensate Delmy Reyes for her extraordinary efforts caring for her month, taking care of family responsibilities, and for the loss of the care and companionship of her mother is $1,250,000.

128.    A suitable amount to fully compensate Sergio Reyes, Wilmer Reyes, and Gerson Reyes for the loss of the care and companionship of their mother is $750,000 each.

## III.    CONCLUSION OF LAW

129.    A plaintiff pursing a medical malpractice claim must prove by a preponderance of the evidence that: (1) the defendant had a duty to the plaintiff to act or refrain from acting, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff's injuries.  *Schenck v. Roger Williams Gen. Hosp.*, 382 A.2d 514, 516-517 (R.I. 1977).

130.    NP Brosofsky, Dr. Harris, and Dr. Thomas had a duty to exercise ordinary care in Ms. Urizar-Mota's diagnosis, treatment, and care, including the duty to promptly and accurately evaluate and diagnose the cause of her headaches.

131.    Each of the PCHC healthcare providers, beginning with NP Brosofsky, breached the standard of care by not ordering neuroimaging of Ms. Urizar-Mota's brain and/or referring her for a complete neurological consultation.

132.    As a direct and proximate result of each of the breaches of the standard of care, Ms. Urizar-Mota suffered severe and permanent injuries.  The damages she suffered were reasonably foreseeable to Defendant.

133.    As a direct and proximate result of each of the breaches of standards of care, Ms. Urizar-Mota's children suffered damages.  The damages they suffered were reasonably foreseeable to Defendant.

134.    Damages are awarded in tort cases to fully and adequately compensate an individual for injuries sustained.  *Reilly v. United States*, 863 F.2d 149, 164 (1st Cir. 1988).  "Compensatory damages are awarded to a person in satisfaction of or in response to a loss or injury sustained." *Murphy v. United Steelworkers of Am. Loc. No. 5705, AFL–CIO*, 507 A.2d 1342, 1346 (R.I. 1986).

135.    "[V]ictims of a negligent tortfeasor are ordinarily permitted to recover for all the injuries and damages that can be proven to have been reasonably foreseeable and proximately caused by the tortfeasor's negligence." *Flanagan v. Wesselhoeft*, 712 A.2d 365, 371–72 (R.I. 1998) (citing *Atl. Tubing & Rubber Co. v. Int'l Engraving Co.*, 528 F.2d 1272 (1st Cir.)), *cert. denied*, 429 U.S. 817, (1976); *Hueston v. Narragansett Tennis Club, Inc.*, 502 A.2d 827 (R.I. 1986); *Prue v. Goodrich Oil Co.*, 140 A. 665 (R.I. 1928).

136.    "As a general principle, 'the law is always concerned that an injured party shall be fully compensated for whatever injury he [or she] may have sustained.'" *Hernandez v. JS Pallet Co.*, 41 A.3d 978, 984 (R.I. 2012) (quoting *DeSpirito v. Bristol Cty. Water Co.*, 227 A.2d 782, 784 (R.I. 1967)).

137.    There is no formula for computation of damages for pain and suffering; a factfinder should "exercise [] [their] judgment and [] appl[y] [] [their] experience in the affairs of life and [their] own knowledge of social and economic matters." *Bruno v. Caianiello*, 404 A.2d 62, 65 (R.I. 1979) (quoting *Wood v. Paolino*, 315 A.2d 744, 746 (R.I. 1974)).

138.    Fact finders are allowed to consider a per diem method that is based on the evidence at trial in consideration of a value for pain and suffering.  *Worsley v. Corcelli*, 377 A.2d 215, 219 (R.I. 1977).

139.    "[U]nemancipated minors [may] recover damages for loss of consortium and for loss of parental society and companionship, respectively, caused by tortious injury to an impaired spouse or parent." *Desjarlais v. USAA Ins.*, 824 A.2d 1272, 1276–77 (R.I. 2003) (citing R.I. Gen. Laws § 9-1-41).[3]

## IV.    AWARD[4]

140.    Considering all the facts the Court has found based on the evidence, in particular the length of the injuries, the permanency of the damage, and the effect on

---

[3] Defendant did not press at trial or in its post-trial briefing, any of its affirmative defenses, and therefore the Court considers them waived.

[4] The Court reduced all award amounts where appropriate to present value.

the family life, the Court finds the following damages are fair and reasonable and so awards judgment to Plaintiff Lucia Urizar-Mota:

      a. Medical Expenses                   $662,194.62

      b. Pain & Suffering–pre-diagnosis    $240,800.00

      c. Pain & Suffering–post-diagnosis   $6,387,500.00

      d. Economic Loss                    $2,920,000.00

141. Considering all the facts in evidence, the Court finds that Sergio Reyes, (Sr.) is not entitled to any damages for loss of consortium.

142. Considering all the facts the Court has found based on the evidence, the following damages are fair and reasonable and so the Court awards judgment to Plaintiff Delmy Reyes, who assumed so many of the household duties and had the greatest damage from the loss of her mother's companionship and society, of $1,250,000.

143. Considering all the facts the Court has found based on the evidence, the Court finds the following damages are fair and reasonable and so the Court awards judgment to Plaintiffs Sergio Reyes, (Jr.), Wilmer Reyes, and Gerson Reyes, (Minors) in Trust with Lucia Urizar-Mota as Trustee as follows:

      a. Sergio Reyes, Jr.: $750,000.00

      b. Wilmer Reyes: $750,000.00

      c. Gerson Reyes: $750,000.00

144. Therefore, judgment shall enter against Defendant United States of America as follows:

    a.   Lucia Urizar-Mota for $8,385,494.62

    b.   Delmy Reyes for $1,250,000.00

    c.   Sergio Reyes (Jr.) for $750,000.00, by and through Lucia Urizar-Mota

    d.   Wilmer Reyes for $750,000.00, by and through Lucia Urizar-Mota

    e.   Gerson Reyes for $750,000.00, by and through Lucia Urizar-Mota

Plaintiffs shall prepare a form of final judgment in consultation with Defendant.

IT IS SO ORDERED!

John J. McConnell, Jr.
Chief Judge
United States District Court

December 9, 2024